1  Ben F. Pierce Gore (SBN 128515)
2  1901 S. Bascom Avenue, Suite 350
   Campbell, CA  95008
3  Telephone:  (408) 429-6506
   Fax:  (408) 369-0752
4  pgore@prattattorneys.com

5  (Co-counsel listed on signature page)

6  *Attorneys for Plaintiff*

7

8

9              IN THE UNITED STATES DISTRICT COURT

10             FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                     SAN JOSE DIVISION

12

13  AMY MAXWELL, individually and on        Case No.
    behalf of all others similarly situated,
14                                           **CLASS ACTION AND REPRESENTATIVE**
              Plaintiff,                      **ACTION**
15
    v.                                       **COMPLAINT FOR DAMAGES,**
16                                           **EQUITABLE AND INJUNCTIVE RELIEF**
    UNILEVER UNITED STATES, INC.,
17  UNILEVER SUPPLY CHAIN, INC.,             **JURY TRIAL DEMANDED**
    and PEPSICO, INC.,
18
              Defendants.
19

20

21         Plaintiff, through her undersigned attorneys, brings this lawsuit against Defendants as to

22  her own acts upon personal knowledge, and as to all other matters upon information and belief.

23  In order to remedy the harm arising from Defendants' illegal conduct, which has resulted in

24  unjust profits, Plaintiff brings this action on behalf of a class of California consumers who

25  purchased Lipton Tea products within the last four years.

26                              **INTRODUCTION**

27         1.      Every day, millions of Americans purchase and consume packaged foods.

28  Identical federal and California laws require truthful, accurate information on the labels of

                              *Class Action Complaint*

packaged foods. This case is about a company that flouts those laws, before and after receiving a warning letter from the FDA. The law, however, is clear: misbranded food cannot legally be manufactured, held, advertised, distributed or sold. Misbranded food is worthless as a matter of law, and purchasers of misbranded food are entitled to a refund of their purchase price.

2.      Unilever is a multinational corporation with 400 brands, including Lipton Tea. Unilever's website claims that "[o]n any given day, two billion people use our products." Lipton employs "more than 80,000 people." According to Unilever, "tea is the second most widely-consumed beverage on earth, behind water." In the U.S., Unilever markets Lipton Tea under more than twelve labels, including Lipton Regular Tea, Lipton Cold Brew Iced Tea Bags, Lipton Green Tea Purple Acai and Blueberry, Lipton Regular Family Size Iced Tea Bags, Lipton Lemon Iced Tea Mix, Lipton Diet Lemon Ice Tea Mix, Lipton Green Tea, Lipton Mandarin Mango Green Tea To Go, Lipton Herbal Chamomile Tea, Lipton Harvest Strawberry & Passion Fruit, Lipton Orange Spice Tea and Lipton Ready to Drink PureLeaf Tea.

http://www.unileverusa.com/brands/foodbrands/lipton/index.aspx

3.      Unilever recognizes that health claims drive sales, and actively promotes the health benefits of Lipton Tea, including flavonoids:

> Made from real tea leaves, many Lipton teas contain tea flavonoids. The flavonoid content per serving can be found on all Lipton tea packages with the Tea Goodness seal which signals that the tea contains a specific level of tea flavonoids. Flavonoids are dietary compounds found in tea, wine, cocoa, fruit and vegetables. They contribute significantly to taste and color, and possibly help maintain certain normal, healthy body functions. A diet rich in flavonoids is generally associated with helping maintain normal healthy heart function.

http://www.unileverusa.com/brands/foodbrands/lipton/index.aspx

4.      On the Lipton Tea website, Unilever goes even further in promoting the health benefits of Lipton Tea, specifically focusing on tea flavonoids:

> Studies suggest that drinking black or green tea may help maintain normal, healthy heart function as part of a diet that is consistent with dietary guidelines. Research suggests that drinking 2 to 3 cups per day of black or green tea may help support normal, healthy vascular function. The mechanism behind this effect has yet to be fully demonstrated, but research suggests that tea flavonoids may be responsible.

http://www.liptont.com/tea_health/healthy_diet/index.aspx

5. Unilever makes health nutrient claims directly on packages of Lipton Tea. For example, the package front panel of certain Lipton Tea products bears the "AOX Naturally Protective Antioxidants" label. The back panel further touts the "protective flavonoid antioxidants" and "flavonoid content" of Lipton Tea, by comparing Lipton Tea to "selected beverages and fruits," including orange juice, broccoli, cranberry juice and coffee. Lipton Decaffeinated Tea Bags, 72 count.

6. In promoting the health benefits of its products, including Lipton Tea, Unilever adopted "Global Principles for Responsible Food and Beverage Marketing." These Global Principles apply to "all of Unilever's food and beverage marketing activities and communications," and include the following provisions:

> These marketing activities and communications include but are not limited to packaging and labeling . . .
> Marketing communications must comply with all relevant laws/regulations in the local country . . .
> All food and beverage marketing communications must be truthful and not misleading.

www.unileverusa.com/Images/30370 Global Principles A5 PDF-2 tcm23-48998.pdf

7. If a manufacturer is going to make a claim on a food label, the label must meet certain legal requirements that help consumers make informed choices and ensure that they are not misled. As described more fully below, Defendants have made, and continue to make, false and deceptive claims in violation of federal and California laws that govern the types of representations that can be made on food labels. These laws recognize that reasonable consumers are likely to choose products claiming to have a health or nutritional benefit over otherwise similar food products that do not claim such benefits.

8. Identical federal and California laws regulate the content of labels on packaged food. The requirements of the federal Food Drug & Cosmetic Act ("FDCA") were adopted by the California legislature in the Sherman Food Drug & Cosmetic Law (the "Sherman Law"). California Health & Safety Code § 109875, et seq. Under FDCA section 403(a), food is "misbranded" if "its labeling is false or misleading in any particular," or if it does not contain certain information on its label or in its labeling. 21 U.S.C. § 343(a).

9.     Under the FDCA, the term "false" has its usual meaning of "untruthful," while the term "misleading" is a term of art.  Misbranding reaches not only false claims, but also those claims that might be technically true, but still misleading.  If any one representation in the labeling is misleading, then the entire food is misbranded, nor can any other statement in the labeling cure a misleading statement.  "Misleading" is judged in reference to "the ignorant, the unthinking and the credulous who, when making a purchase, do not stop to analyze." *United States v. El-O-Pathic Pharmacy*, 192 F.2d 62, 75 (9th Cir. 1951).  Under the FDCA, it is not necessary to prove that anyone was actually misled.

10.    On August 23, 2010, the FDA sent a warning letter to Unilever, informing Unilever of its failure to comply with the requirements of the FDCA and its regulations (the "FDA Warning Letter," attached hereto as Exhibit 1).  The FDA Warning Letter stated, in pertinent part:

### Unauthorized Nutrient Content Claims

Under section 403(r)(1)(A) of the Act [21 U.S.C. 343(r)(1)(A)], a claim that characterizes the level of a nutrient which is of the type required to be in the labeling of the food must be made in accordance with a regulation promulgated by the Secretary (and, by delegation, FDA) authorizing the use of such a claim. The use of a term, not defined by regulation, in food labeling to characterize the level of a nutrient misbrands a product under section 403(r)(1)(A) of the Act.

Nutrient content claims using the term "antioxidant" must also comply with the requirements listed in 21 CFR 101.54(g). These requirements state, in part, that for a product to bear such a claim, an RDI must have been established for each of the nutrients that are the subject of the claim (21 CFR 101.54(g)(1)), and these nutrients must have recognized antioxidant activity (21 CFR 101.54(g)(2). The level of each nutrient that is the subject of the claim must also be sufficient to qualify for the claim under 21 CFR 101.54(b), (c), or (e) (21 CFR 101.54(g)(3)). For example, to bear the claim "high in antioxidant vitamin C," the product must contain 20 percent or more of the RDI for vitamin C under 21 CFR 101.54(b). Such a claim must also include the names of the nutrients that are the subject of the claim as part of the claim or, alternatively, the term "antioxidant" or "antioxidants" may be linked by a symbol (e.g., an asterisk) that refers to the same symbol that appears elsewhere on the same panel of the product label, followed by the name or names of the nutrients with recognized antioxidant activity (21 CFR 101.54(g)(4)). The use of a nutrient content claim that uses the term "antioxidant" but does not comply with the requirements of 21 CFR 101.54(g) misbrands a product under section 403(r)(2)(A)(i) of the Act.

Your webpage entitled "Tea and Health" and subtitled "Tea Antioxidants" includes the statement, "LIPTON Tea is made from tea leaves rich in naturally protective

antioxidants." The term "rich in" is defined in 21 CFR 101.54(b) and may be used to characterize the level of antioxidant nutrients (21 CFR 101.54(g)(3)). However, this claim does not comply with 21 CFR 101.54(g)(4) because it does not include the nutrients that are the subject of the claim or use a symbol to link the term "antioxidant" to those nutrients. Thus, this claim misbrands your product under section 403(r)(2)(A)(i) of the Act.

This webpage also states that "tea is a naturally rich source of antioxidants." The term "rich source" characterizes the level of antioxidant nutrients in the product and, therefore, this claim is a nutrient content claim (see section 403(r)(1) of the Act and 21 CFR 101.13(b)). Even if we determined that the term "rich source" could be considered a synonym for a term defined by regulation (e.g., "high" or "good source"), nutrient content claims that use the term "antioxidant" must meet the requirements of 21 CFR 101.54(g). The claim "tea is a naturally rich source of antioxidants" does not include the nutrients that are the subject of the claim or use a symbol to link the term "antioxidant" to those nutrients, as required by 21 CFR 101.54(g)(4). Thus, this claim misbrands your product under section 403(r)(2)(A)(i) of the Act.

The product label back panel includes the statement "packed with protective FLAVONOID ANTIOXIDANTS." The term "packed with" characterizes the level of flavonoid antioxidants in the product; therefore, this claim is a nutrient content claim (see section 403(r)(1) of the Act and 21 CFR 101.13(b)). Even if we determined that the term "packed with" could be considered a synonym for a term defined by regulation, nutrient content claims that use the term "antioxidant" must meet the requirements of 21 CFR 101.54(g). The claim "packed with FLAVONOID ANTIOXIDANTS" does not comply with 21 CFR 101.54(g)1 because no RDI has been established for flavonoids. Thus, this unauthorized nutrient content claim causes your product to be misbranded under section 403(r)(2)(A)(i) of the Act.

The above violations are not meant to be an all-inclusive list of deficiencies in your products or their labeling. It is your responsibility to ensure that all of your products are in compliance with the laws and regulations enforced by FDA. You should take prompt action to correct the violations. Failure to promptly correct these violations may result in regulatory actions without further notice, such as seizure and/or injunction.

We note that your label contains a chart entitled "Flavonoid Content of selected beverages and foods." The chart appears to compare the amounts of antioxidants in your product with the amount of antioxidants in orange juice, broccoli, cranberry juice and coffee. However, the information provided may be misinterpreted by the consumer because although the chart is labeled, in part, "Flavonoid Content," the y-axis is labeled "AOX"; therefore, the consumer might believe that the chart is stating the total amount of antioxidants rather than specifically measuring the amount of flavonoids in the product.

http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/ucm224509.htm

11.     In response to the FDA Warning letter, Unilever modified its Lipton web site and its packaging by removing some of the most outlandish claims of health and therapeutic benefits that FDA had found in violation of law. However, there are several unlawful statements on Lipton's web site that remain, including but not limited to: "Flavonoids are dietary compounds found in tea, wine, cocoa, fruit and vegetables. They contribute significantly to taste and color, and possibly help maintain certain normal, healthy body functions. A diet rich in flavonoids is generally associated with helping maintain normal, healthy heart function."  "Flavonoids" are a substance or nutrient without an established referenced daily intake value ("RDI").

12.     In addition, the package front panel of many Lipton Tea products contains the following statement: "Regular tea drinking, as part of a healthy diet, may help maintain healthy vascular function."  Such health claims are in violation of 21 U.S.C. § 352(f)(1), and therefore the products are misbranded.

13.     Defendants have made, and continue to make, food label claims that are prohibited by federal and California law.  Under federal and California law, Defendants' misbranded food products, including Lipton Tea, cannot legally be manufactured, advertised, distributed, held or sold.  Defendants' false and misleading labeling practices stem from their global marketing strategy.  Thus, the violations and misrepresentations are similar across product labels and product lines.

## PARTIES

14.     Plaintiff Amy Maxwell is a resident of San Jose, California who purchased Lipton Tea products in California during the four (4) years prior to the filing of this Complaint (the "Class Period").

15.     Defendant Unilever United States, Inc. is a Delaware corporation with its principle place of business at 700 Sylvan Avenue, Englewood Cliffs, New Jersey.

16.     Defendant Unilever Supply Chain, Inc. is a Delaware corporation with its principle place of business at 800 Sylvan Avenue, Englewood Cliffs, New Jersey.

17.     Defendant PepsiCo, Inc. ("PepsiCo") is a North Carolina corporation with its principle place of business at 700 Anderson Hill Road, Purchase, New York.

18.     In 1991, Unilever created a joint venture with PepsiCo, the Pepsi Lipton Partnership (the "Partnership"), for the marketing of ready to drink teas in North America. The Partnership operates as a subsidiary of PepsiCo, with its principle place of business at 700 Anderson Hill Road, Purchase, New York. PepsiCo and Lipton each control 50% of the shares in the Partnership. The Partnership manufactures, distributes and sells certain Lipton Tea products.

19.     Collectively, Defendants are leading producers of retail food products, including Lipton Tea products. They sell their misbranded food products to consumers through grocery and other retail stores throughout California.

**JURISDICTION AND VENUE**

20.     This Court has original jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action in which: (1) there are over 100 members in the proposed class; (2) members of the proposed class have a different citizenship from Defendants; and (3) the claims of the proposed class members exceed $5,000,000 in the aggregate.

21.     The Court has jurisdiction over the federal claim alleged herein pursuant to 28 U.S.C. § 1331, because it arises under the laws of the United States.

22.     The Court has jurisdiction over the California claims alleged herein pursuant to 28 U.S.C. § 1367, because they form part of the same case or controversy under Article III of the United States Constitution.

23.     Alternatively, the Court has jurisdiction over all claims alleged herein pursuant to 28 U.S.C. § 1332, because the matter in controversy exceeds the sum or value of $75,000, and is between citizens of different states.

24.     The Court has personal jurisdiction over Defendants because a substantial portion of the wrongdoing alleged in this Complaint occurred in California, Defendants are authorized to do business in California, have sufficient minimum contacts with California, and otherwise intentionally avail themselves of the markets in California through the promotion, marketing and sale of merchandise, sufficient to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

25.     Because a substantial part of the events or omissions giving rise to these claims occurred in this District and because the Court has personal jurisdiction over Defendants, venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) and (b).

## FACTUAL ALLEGATIONS

### A.     Identical California And Federal Laws Regulate Food Labeling

26.     Food manufacturers are required to comply with federal and state laws and regulations that govern the labeling of food products.  First and foremost among these is the FDCA and its labeling regulations, including those set forth in 21 C.F.R. § 101.

27.     Pursuant to the Sherman Law, California has expressly adopted the federal labeling requirements as its own and indicated that "[a]ll food labeling regulations and any amendments to those regulations adopted pursuant to the federal act, in effect on January 1, 1993, or adopted on or after that date shall be the food regulations of this state."  California Health & Safety Code § 110100.

28.     In addition to its blanket adoption of federal labeling requirements, California has also enacted a number of laws and regulations that adopt and incorporate specific enumerated federal food laws and regulations.  For example, food products are misbranded under California Health & Safety Code § 110660 if their labeling is false and misleading in one or more particulars; are misbranded under California Health & Safety Code § 110665 if their labeling fails to conform to the requirements for nutrient labeling set forth in 21 U.S.C. § 343(q) and regulations adopted thereto; are misbranded under California Health & Safety Code § 110670 if their labeling fails to conform with the requirements for nutrient content and health claims set forth in 21 U.S.C. § 343(r) and regulations adopted thereto; are misbranded under California Health & Safety Code § 110705 if words, statements and other information required by the Sherman Law to appear on their labeling are either missing or not sufficiently conspicuous; are misbranded under California Health & Safety Code § 110735 if they are represented as having special dietary uses but fail to bear labeling that adequately informs consumers of their value for that use; and are misbranded under California Health & Safety Code § 110740 if they contain

artificial flavoring, artificial coloring and chemical preservatives but fail to adequately disclose that fact on their labeling.

**B.  Defendants' Food Products Are Misbranded**

29.     Pursuant to Section 403 of the FDCA, a claim that characterizes the level of a nutrient in a food is a "nutrient content claim" that must be made in accordance with the regulations that authorize the use of such claims. 21 U.S.C. § 343(r)(1)(A).  California expressly adopted the requirements of 21 U.S.C. § 343(r) in § 110670 of the Sherman Law.

30.     Nutrient content claims are claims about specific nutrients contained in a product. They are typically made on the front of packaging in a font large enough to be read by the average consumer.  Because these claims are relied upon by consumers when making purchasing decisions, the regulations govern what claims can be made in order to prevent misleading claims.

31.     Section 403(r)(1)(A) of the FDCA governs the use of expressed and implied nutrient content claims on labels of food products that are intended for sale for human consumption.  *See* 21 C.F.R. § 101.13.

32.     21 C.F.R. § 101.13 provides the general requirements for nutrient content claims, which California has expressly adopted.  *See* California Health & Safety Code § 110100.  21 C.F.R. § 101.13 requires that manufacturers include certain disclosures when a nutrient claim is made and, at the same time, the product contains certain levels of unhealthy ingredients, such as fat and sodium.  It also sets forth the manner in which that disclosure must be made, as follows:

 (4)(i) The disclosure statement "See nutrition information for ___ content" shall be in easily legible boldface print or type, in distinct contrast to other printed or graphic matter, and in a size no less than that required by §101.105(i) for the net quantity of contents statement, except where the size of the claim is less than two times the required size of the net quantity of contents statement, in which case the disclosure statement shall be no less than one-half the size of the claim but no smaller than one-sixteenth of an inch, unless the package complies with §101.2(c)(2), in which case the disclosure statement may be in type of not less than one thirty-second of an inch.

(ii) The disclosure statement shall be immediately adjacent to the nutrient content claim and may have no intervening material other than, if applicable, other information in the statement of identity or any other information that is required to be presented with the claim under this section (e.g., see paragraph (j)(2) of this section) or under a regulation in subpart D of this part (e.g., see §§101.54 and 101.62). If the nutrient content claim appears on more than one panel of the label, the disclosure statement shall be adjacent to the claim on each panel except for the

panel that bears the nutrition information where it may be omitted.

33.    An "expressed nutrient content claim" is defined as any direct statement about the level (or range) of a nutrient in the food (*e.g.*, "low sodium" or "contains 100 calories").  *See* 21 C.F.R. § 101.13(b)(1).

34.    An "implied nutrient content claim" is defined as any claim that: (i) describes the food or an ingredient therein in a manner that suggests that a nutrient is absent or present in a certain amount (*e.g.*, "high in oat bran"); or (ii) suggests that the food, because of its nutrient content, may be useful in maintaining healthy dietary practices and is made in association with an explicit claim or statement about a nutrient (*e.g.*, "healthy, contains 3 grams (g) of fat").  21 C.F.R. § 101.13(b)(2)(i-ii).

### 1.    Defendants Make Unlawful Antioxidant Claims

35.    Federal and California regulations regulate antioxidant claims as a particular type of nutrient content claim.  Specifically, 21 C.F.R. § 101.54(g) contains special requirements for nutrient claims that use the term "antioxidant":

(1)  the name of the antioxidant must be disclosed;

(2)  there must be an established RDI for that antioxidant, and if not, no "antioxidant" claim can be made about it;

(3)   the label claim must include the specific name of the nutrient that is an antioxidant and cannot simply say "antioxidants" (*e.g.*, "high in antioxidant vitamins C and E"),[1] *see* 21 C.F.R. § 101.54(g)(4);

(4)   the nutrient that is the subject of the antioxidant claim must also have recognized antioxidant activity, *i.e.*, there must be scientific evidence that after it is eaten and absorbed from the gastrointestinal tract, the substance participates in physiological, biochemical

---

[1]  Alternatively, when used as part of a nutrient content claim, the term "antioxidant" or "antioxidants" (such as "high in antioxidants") may be linked by a symbol (such as an asterisk) that refers to the same symbol that appears elsewhere on the same panel of a product label followed by the name or names of the nutrients with the recognized antioxidant activity.  If this is done, the list of nutrients must appear in letters of a type size height no smaller than the larger of one half of the type size of the largest nutrient content claim or 1/16 inch.

*Class Action Complaint*

or cellular processes that inactivate free radicals or prevent free radical-initiated chemical reactions, *see* 21 C.F.R. § 101.54(g)(2);

(5)  the antioxidant nutrient must meet the requirements for nutrient content claims in 21 C.F.R. § 101.54(b), (c), or (e) for "High" claims, "Good Source" claims, and "More" claims, respectively.  For example, to use a "High" claim, the food would have to contain 20% or more of the Daily Reference Value ("DRV") or RDI per serving.  For a "Good Source" claim, the food would have to contain between 10-19% of the DRV or RDI per serving, *see* 21 C.F.R. § 101.54(g)(3); and

(6)  the antioxidant nutrient claim must also comply with general nutrient content claim requirements such as those contained in 21 C.F.R. § 101.13(h) that  prescribe the circumstances in which a nutrient content claim can be made on the label of products high in fat, saturated fat, cholesterol or sodium.

36.    The antioxidant labeling for Lipton Tea products violates California law.  The antioxidant claims on the packages of these products violate California law:  (1) because the names of the antioxidants are not disclosed on the product labels; (2) because there are no RDIs for the antioxidants being touted, including flavonoids; (3) because the claimed antioxidant nutrients fail to meet the requirements for nutrient content claims in 21 C.F.R. § 101.54(b), (c), or (e) for "High" claims, "Good Source" claims, and "More" claims, respectively; and (4) because Defendants lack adequate scientific evidence that the claimed antioxidant nutrients participate in physiological, biochemical, or cellular processes that inactivate free radicals or prevent free radical-initiated chemical reactions after they are eaten and absorbed from the gastrointestinal tract.

37.    For example, the package label of Lipton Decaffeinated Tea Bags bears the "Naturally Protective Antioxidants AOX" seal, and the package back panel compares the "Flavonoid Content" of "Lipton Decaf Tea" to orange juice, broccoli, cranberry juice and coffee. Additional specific violations are detailed in the FDA Warning Letter, attached hereto as Exhibit 1.

38.     For these reasons, Defendants' antioxidant claims at issue in this Complaint are misleading and in violation of 21 C.F.R. § 101.54 and California law, and the products at issue are misbranded as a matter of law.   Misbranded products cannot be legally manufactured, advertised, distributed, held or sold and are legally worthless.

39.     In addition to the FDA Warning Letter to Unilever discussed above (Exhibit 1), the FDA has issued warning letters addressing similar unlawful antioxidant nutrient content claims.  *See, e.g.*, Exhibit 2 (FDA warning letter dated August 30, 2010 to Dr. Pepper Snapple Group regarding its misbranded Canada Dry Sparkling Green Tea Ginger Ale product because green tea and green tea flavonoids "are not nutrients with recognized antioxidant activity"); Exhibit 3 (FDA warning letter dated February 22, 2010 to Redco Foods, Inc. regarding its misbranded Salada Naturally Decaffeinated Green Tea product because "there are no RDIs for (the antioxidants) grapeskins, rooibos (red tea) and anthocyanins"); Exhibit 4 (FDA warning letter dated February 22, 2010 to Fleminger Inc. regarding its misbranded TeaForHealth products because the admonition "[d]rink high antioxidant green tea" . . . "does not include the nutrients that are the subject of the claim or use a symbol to link the term antioxidant to those nutrients"). Defendants are aware of these FDA warning letters.

### 2.     Defendants Make Unlawful Nutritional Value Claims

40.     Defendants have also violated 21 C.F.R. § 101.54(g)(1), which prohibits food manufacturers from making claims regarding the nutritional value of their products when the products fail to disclose that no RDI has been established for the touted nutrients.

41.     For example, certain Lipton Tea products claim to be "packed with flavonoids" but they fail to disclose that no RDI has been established for flavonoids.  Thus, these products violate 21 C.F.R. § 101.54(g)(1).

42.     The types of misrepresentations made above would be considered by a reasonable consumer when deciding to purchase Defendants' misbranded food products.  The failure to comply with the labeling requirements of 21 C.F.R. § 101.54 renders Defendants' products misbranded as a matter of federal and California law.

43.     In addition, 21 C.F.R. § 101.65, which has been adopted by California, sets certain minimum nutritional requirements for making an implied nutrient content claim that a product is healthy.  For example, for unspecified foods the food must supply at least 10 percent of the RDI of one or more specified nutrients.  Defendants have misrepresented the healthiness of their products while failing to meet the regulatory requirements for making such claims.

### 3.     Defendants Make Unlawful "Natural" Claims

44.     In its rule-making and warning letters to manufacturers, the FDA has repeatedly stated its policy to restrict the use of the term "natural" in connection with added color, synthetic substances and flavors as provided in 21 C.F.R. § 101.22.

45.     The FDA has also repeatedly affirmed its policy regarding the use of the term "natural" as meaning that nothing artificial or synthetic (including all color additives regardless of source) has been included in, or has been added to, a food that would not normally be expected to be in the food.

46.     For example, 21 C.F.R. § 70.3(f) makes clear that "where a food substance such as beet juice is deliberately used as a color, as in pink lemonade, it is a color additive." Similarly, any coloring or preservative can preclude the use of the term "natural" even if the coloring or preservative is derived from natural sources.  Further, the FDA distinguishes between natural and artificial flavors in 21 C.F.R. § 101.22.

47.     Defendants' "all natural" labeling practices violate FDA Compliance Guide CPG Sec. 587.100, which states:  [t]he use of the words "food color added," "natural color," or similar words containing the term "food" or "natural" may be erroneously interpreted to mean the color is a naturally occurring constituent in the food.  Since all added colors result in an artificially colored food, we would object to the declaration of any added color as "food" or "natural."

48.     Likewise, California Health & Safety Code § 110740 prohibits the use of artificial flavoring, artificial coloring and chemical preservatives unless those ingredients are adequately disclosed on the labeling.

49.     The FDA has sent out numerous warning letters concerning this issue.  *See, e.g.*, Exhibit 5 (August 16, 2001 FDA warning letter to Oak Tree Farm Dairy because there was citric

1   acid in its all natural iced tea); Exhibit 6 (August 29, 2001 FDA warning letter to Hirzel Canning

2   Company because there was citric acid or calcium chloride in its all natural tomato products);

3   Exhibit 7 (August 2, 2001 FDA warning letter to GMP Manufacturing, Inc. stating: "[t]he

4   products, Cytomax Exercise and Recovery Drink (Peachy Keen flavor) and Cytomax Lite

5   (Lemon Iced Tea Flavor) are misbranded because they contain colors but are labeled using the

6   term "no artificial colors.").  Defendants are aware of these FDA warning letters.

7        50.    Defendants have unlawfully labeled a number of their food products as being "all

8   natural" or "made with natural ingredients" when they actually contain artificial ingredients and

9   flavorings, artificial coloring and chemical preservatives.  These products include Lipton Pure

10  Leaf Tea products and Lipton Iced Tea products.

11       51.    For example, the label of Lipton 100% Iced Green Tea with Citrus states that it is

12  "100% natural" despite the fact that it contains a number of chemicals, preservatives and artificial

13  flavorings including sugar, citric acid, acerola, fruit extract, REB A (purified stevia extract).

14       52.    Consumers are thus misled into purchasing Defendants' products with synthetic

15  unnatural ingredients that are not "all natural" as falsely represented on their labeling.

16  Defendants' products in this respect are misbranded under federal and California law.

17          **4.**     **Defendants Make Unlawful Health Claims**

18       53.    A health claim is a statement expressly or implicitly linking the consumption of a

19  food substance (*e.g.*, ingredient, nutrient, or complete food) to risk of a disease (*e.g.*,

20  cardiovascular disease) or a health-related condition (*e.g.*, hypertension). *See* 21 C.F.R.

21  §101.14(a)(1), (a)(2), and (a)(5). Only health claims made in accordance with FDCA

22  requirements, or authorized by FDA as qualified health claims, may be included in food labeling.

23  Other express or implied statements that constitute health claims, but that do not meet statutory

24  requirements, are prohibited in labeling foods.

25       54.    21 C.F.R. § 101.14, which has been expressly adopted by California, provides

26  when and how a manufacturer may make a health claim about its product.  A "Health Claim"

27  means any claim made on the label or in labeling of a food, including a dietary supplement, that

28  expressly or by implication, including "third party" references, written statements (e.g., a brand

name including a term such as "heart"), symbols (e.g., a heart symbol), or vignettes, characterizes the relationship of any substance to a disease or health-related condition. Implied health claims include those statements, symbols, vignettes, or other forms of communication that suggest, within the context in which they are presented, that a relationship exists between the presence or level of a substance in the food and a disease or health-related condition (see 21 CFR 101.14(a)(1)).

55.     Further, health claims are limited to claims about disease risk reduction, and cannot be claims about the diagnosis, cure, mitigation, or treatment of disease. An example of an authorized health claim is: "Three grams of soluble fiber from oatmeal daily in a diet low in saturated fat and cholesterol may reduce the risk of heart disease. This cereal has 2 grams per serving."

56.     A claim that a substance may be used in the diagnosis, cure, mitigation, treatment, or prevention of a disease is a drug claim and may not be made for a food. 21 U.S.C. § 321(g)(1)(D).

57.     The use of the term "healthy" is not a health claim but rather an implied nutrient content claim about general nutrition that is defined by FDA regulation. In general, the term may be used in labeling an individual food product that:

Qualifies as both low fat and low saturated fat;

Contains 480 mg or less of sodium per reference amount and per labeled serving, and per 50 g (as prepared for typically rehydrated foods) if the food has a reference amount of 30 g or 2 tbsps or less;

Does not exceed the disclosure level for cholesterol (*e.g.*, for most individual food products, 60 mg or less per reference amount and per labeled serving size); *and*

Except for raw fruits and vegetables, certain frozen or canned fruits and vegetables, and enriched cereal-grain products that conform to a standard of identity, provides at least 10% of the daily value (DV) of vitamin A, vitamin C, calcium, iron, protein, *or* fiber per reference amount. Where eligibility is based on a nutrient that has been added to the food, such fortification must comply with FDA's fortification policy.

21 C.F.R. § 101.65(d)(2). The FDA's definition applies separate criteria to use of healthy on raw, single ingredient seafood or game meat products. 21 C.F.R. § 101.65(d)(2)(ii). FDA's regulation on healthy also encompasses other, derivative uses of health (*e.g.*, healthful, healthier) in food labeling. 21 C.F.R. § 101.65(d).

58. Unilever has violated the provisions of § 21 C.F.R. §101.14, 21 C.F.R. §101.65, 21 U.S.C. § 321(g)(1)(D) and 21 U.S.C. § 352(f)(1) on a number of its products and on its website. For example, until recently on the link to its webpage entitled "Tea and Health," subtitled "Heart Health Research" and further subtitled "Cholesterol Research" the following claim is made: "[F]our recent studies in people at risk for coronary disease have shown a significant cholesterol lowering effect from tea or tea flavonoids ... One of these studies, on post-menopausal women, found that total cholesterol was lowered by 8% after drinking 8 cups of green tea daily for 12 weeks ...." The therapeutic claims on its website establish that the product is a drug because it is intended for use in the cure, mitigation, treatment, or prevention of disease. Lipton's products are not generally recognized as safe and effective for the above referenced uses and, therefore, the product is a "new drug" under section 201(p) of the Act [21 U.S.C. § 321(p)]. New drugs may not be legally marketed in the U.S. without prior approval from FDA as described in section 505(a) of the Act [21 U.S.C. § 355(a)]. FDA approves a new drug on the basis of scientific data submitted by a drug sponsor to demonstrate that the drug is safe and effective.

59. As discussed in paragraph 8 and as shown in Exhibit 1, the FDA conducted a review of one of Defendant's products (Lipton Green Tea 100% Natural Naturally Decaffeinated Tea) and concluded that Lipton was "in violation of the Federal Food, Drug, and Cosmetic Act … and the applicable regulations in Title 21, Code of Federal Regulations, Part 101 (21 CFR 101)." FDA found the product to be misbranded stating, "Your Lipton Green Tea 100% Natural Naturally Decaffeinated product is offered for conditions that are not amenable to self-diagnosis and treatment by individuals who are not medical practitioners; therefore, adequate directions for use cannot be written so that a layperson can use this drug safely for its intended purposes. Thus, your Lipton Green Tea 100% Natural Naturally Decaffeinated product is misbranded under

section 502(f)(1) of the Act in that the labeling for this drug fails to bear adequate directions for use [21 U.S.C. § 352(f)(1)]." See Exhibit 1.

60.     In response to the FDA Warning Letter, Lipton modified its web site and its packaging by removing some of the most outlandish claims of health and therapeutic benefits that FDA had found in violation of law. However, there are several objectionable statements on Lipton's web site that remain.  On the present day web site the following statement appears: "Flavonoids are dietary compounds found in tea, wine, cocoa, fruit and vegetables. They contribute significantly to taste and color, and possibly help maintain certain normal, healthy body functions. A diet rich in flavonoids is generally associated with helping maintain normal, healthy heart function." And the package front panel of many Lipton Tea products claims a level of "flavonoids," a substance or nutrient without an established referenced daily intake value (RDI), and contains the following statement, "Regular tea drinking, as part of a healthy diet, may help maintain healthy vascular function." Such health claims are in violation of 21 U.S.C. § 352(f)(1) and therefore the products are misbranded.

61.     Not only do Unilever's health claims regarding the benefits of "tea flavonoids" violate FDA rules and regulations, they directly contradict Unilever's own scientific research, which has concluded: "[T]he evidence today does not support a direct relationship between tea consumption and a physiological AOX [antioxidant] benefit."  This conclusion was reported by Dr. Jane Rycroft, Director of Lipton Tea Institute of Tea, in an article published in January, 2011, in which Dr. Rycroft states:

> Only a few scientific publications report an effect of tea on free radical damage in humans using validated biomarkers in well designed human studies. Unfortunately, the results of these studies are at variance and the majority of the studies do not report significant effects . . .

> Therefore, despite more than 50 studies convincingly showing that flavonoids possess potent antioxidant activity *in vitro,* the ability of flavonoids to act as an antioxidant *in vivo* [in humans], has not been demonstrated.

> Based on the current scientific consensus that the evidence today does not support a direct relationship between tea consumption and a  physiological AOX benefit . . .

> No evidence has been provided to establish that having antioxidant activity/ content and/or antioxidant properties is a beneficial physiological effect.

Rycroft, Jane, "The Antioxidant Hypothesis Needs to be Updated", Vol. 1, *Tea Quarterly Tea Science Overview,* Lipton Tea Institute of Tea Research (Jan. 2011), pp. 2-3.    Nonetheless, Unilever continues to tout the benefits of "tea flavonoids" on its product labels and on its website.

**C.** **Defendants Have Violated California Law**

62.    Defendants have manufactured, advertised, distributed and sold products that are misbranded under California law.    Misbranded products cannot be legally manufactured, advertised, distributed or sold and are legally worthless as a matter of law.

63.    Defendants have violated California Health & Safety Code §§ 109885 and 110390 which make it unlawful to disseminate false or misleading food advertisements that include statements on products and product packaging or labeling or any other medium used to directly or indirectly induce the purchase of a food product.

64.    Defendants have violated California Health & Safety Code § 110395 which makes it unlawful to manufacture, sell, deliver, hold or offer to sell any misbranded food.

65.    Defendants have violated California Health & Safety Code § 110398 which makes it unlawful to deliver or proffer for delivery any food that has been falsely advertised.

66.    Defendants have violated California Health & Safety Code § 110660 because their labeling is false and misleading in one or more ways, as follows:

a.    They are misbranded under California Health & Safety Code § 110665 because their labeling fails to conform to the requirements for nutrient labeling set forth in 21 U.S.C. § 343(q) and the regulations adopted thereto;

b.    They are misbranded under California Health & Safety Code § 110670 because their labeling fails to conform with the requirements for nutrient content and health claims set forth in 21 U.S.C. § 343(r) and the regulations adopted thereto; and

c.    They are misbranded under California Health & Safety Code § 110705 because words, statements and other information required by the Sherman Law to appear on their labeling either are missing or not sufficiently conspicuous.

67.    Defendants have violated California Health & Safety Code § 110760 which makes it unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food that is misbranded.

68.    Defendants have violated California Health & Safety Code § 110765 which makes it unlawful for any person to misbrand any food.

69.    Defendants have violated California Health & Safety Code § 110770 which makes it unlawful for any person to receive in commerce any food that is misbranded or to deliver or proffer for deliver any such food.

70.    Defendants have violated the standard set by 21 C.F.R. § 101.2, which has been incorporated by reference in the Sherman Law, by failing to include on their product labels the nutritional information required by law.

71.    Defendants have violated the standards set by 21 CFR §§ 101.13, and 101.54, which have been adopted by reference in the Sherman Law, by including unauthorized antioxidant claims on their products.

**D.    <u>Plaintiff Purchased Defendants' Misbranded Food Products</u>**

72.    Plaintiff cares about the nutritional content of food and seeks to maintain a healthy diet.

73.    Plaintiff purchased Defendants' misbranded food products at issue in this Complaint, including certain Lipton Tea products, on occasions during the Class Period.

74.    Plaintiff purchased the following Lipton Tea products:

Lipton Pureleaf Sweetened bottled iced tea, 16 oz. glass bottle



1
2
3
4
5
6
7
8
9
10
11
12
13
14



15
16
17
18
19
20
21
22
23
24
25
26
27
28



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



1

Lipton Iced Green Tea To Go w/Mandarin & Mango, 14 sticks



**Nutrition Facts**

Serving Size 1/2 packet (0.7g)
(makes 8 fl oz prepared)
Servings Per Container 28

Amount Per Serving

**Calories** 0

% Daily Value*

| | | |
|---|---|---|
| **Total Fat** 0g | | **0%** |
| **Sodium** 0g | | **0%** |
| **Total Carb.** 0g | | **0%** |
| **Protein** 0g | | |

Not a significant source of calories from fat, saturated fat, trans fat, cholesterol, dietary fiber, sugars, vitamin A, vitamin C, calcium and iron.

*Percent Daily Values are based on a 2,000 calorie diet.

INGREDIENTS: GREEN TEA POWDER, CITRIC ACID (PROVIDES TARTNESS), ASPARTAME** (SWEETENER), CORN SYRUP SOLIDS, MODIFIED CORN STARCH, NATURAL FLAVOR, MALTODEXTRIN, SUGAR), ACESULFAME POTASSIUM (SWEETENER), SILICON DIOXIDE (PREVENTS CAKING), YELLOW 5 SOY LECITHIN.

**PHENYLKETONURICS:
CONTAINS PHENYLALANINE
HAS A DIETARILY INSIGNIFICANT AMOUNT OF SUGAR

DISTRIBUTED BY
© UNILEVER,
ENGLEWOOD CLIFFS,
NJ 07632

Unilever

Caffeine Level - 12mg per 8 fl oz serving.

One packet of *Iced Green Tea To Go Mandarin & Mango* is 0 calories – makes 16-20 fl oz.

To learn more about tea's role in a healthy lifestyle call 1-888-LiptonT (1-888-547-8668) or visit www.lipton.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Lipton Vanilla Caramel Truffle Black Tea, 20 bags



*Class Action Complaint*



*Class Action Complaint*

*Class Action Complaint*

Lipton Green Tea Decaffeinated, 20 bags





*Class Action Complaint*



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



Lipton White Tea w/Raspberry, 16.9 oz. plastic bottle



Lipton Cold Brew Iced Tea, 22 bags





At Lipton®, our tea experts carefully select the best leaves grown from around the world, pick them at the peak of freshness, and blend them to create the finest quality, great tasting teas. We then use a proprietary process based on the ingredients naturally found in tea to eliminate the need to boil water. Just add cold water and enjoy!

GROW   PICK   BLEND   JUST ADD COLD WATER

With Lipton® Cold Brew we bring you quality and convenience so you can easily make that perfect, refreshing pitcher of iced tea. Feel good about choosing Lipton® for you and your family.

Lipton®. From our expert hands to yours.

## Nutrition Facts

Serving Size 1/4 Tea Bag (1.6g)
(makes 8 fl oz prepared)
Servings Per Container 88

**Amount Per Serving**

**Calories** 0

| | % Daily Value* |
|---|---|
| **Total Fat** 0g | **0%** |
| **Sodium** 0mg | **0%** |
| **Total Carbohydrate** 0g | **0%** |
| **Protein** 0g | |

Not a significant source of calories from fat, saturated fat, trans fat, cholesterol, dietary fiber, sugars, vitamin A, vitamin C, calcium and iron.

*Percent Daily Values are based on a 2,000 calorie diet.

**INGREDIENTS:** ORANGE PEKOE AND PEKOE CUT BLACK TEA.

### Recommended Brewing Instructions for Refreshing Iced Tea:

pour 2 quarts cold water over 2 tea bags

brew 3 minutes, remove tea bags

sweeten to taste then add ice

To learn more about tea's role in a healthy lifestyle call 1-888-LIPTONT (1-888-547-8668) or visit www.lipton.com

*Unilever*

© Unilever Englewood Cliffs, NJ 07632
**This product contains 10mg of caffeine per 8 fl oz serving.**
U.S. pat. nos. 6,491,961; 6,780,454

1

Lipton Decaffeinated Tea, 72 bags





*Class Action Complaint*

75.     Plaintiff read the labels on Defendants' products, including the antioxidant and nutrient content claims, where applicable, before purchasing them.

76.     Plaintiff relied on Defendants' package labeling, and based and justified the decision to purchase Defendants' products in substantial part on Defendants' package labeling.

77.     At point of sale, Plaintiff did not know, and had no reason to know, that Defendants' products were misbranded as set forth herein, and would not have bought the products had she known the truth about them.

78.     As a result of Defendants' misrepresentations, Plaintiff and thousands of others in California purchased the products at issue.

79.     Defendants' labeling, advertising and marketing as alleged herein is false and misleading and designed to increase sales of the products at issue.    Defendants' misrepresentations are part of an extensive labeling, advertising and marketing campaign, and a reasonable person would attach importance to Defendants' representations in determining whether to purchase the products at issue.

## CLASS ACTION ALLEGATIONS

80.     Plaintiff brings this action as a class action pursuant to Federal Rule of Procedure 23(b)(2) and 23(b)(3) on behalf of the following class:

> All persons in California who purchased Lipton Tea products within the last four years (the "Class").

81.     The following persons are expressly excluded from the Class:  (1) Defendants and their subsidiaries and affiliates; (2) all persons who make a timely election to be excluded from the proposed Class; (3) governmental entities; and (4) the Court to which this case is assigned and its staff.

82.     This action can be maintained as a class action because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable.

83.     <u>Numerosity</u>:  Based upon Defendants' publicly available sales data with respect to the misbranded products at issue, it is estimated that the Class numbers in the thousands, and that joinder of all Class members is impracticable.

84. <u>Common Questions Predominate</u>:  This action involves common questions of law and fact applicable to each Class member that predominate over questions that affect only individual Class members.  Thus, proof of a common set of facts will establish the right of each Class member to recover.  Questions of law and fact common to each Class member include, for example:

a.   Whether Defendants engaged in unlawful and misleading business practices by failing to properly package and label their misbranded food products sold to consumers;

b.   Whether the food products at issue were misbranded or unlawfully packaged and labeled as a matter of law;

c.   Whether Defendants made unlawful and misleading antioxidant claims with respect to their food products sold to consumers;

d.   Whether Defendants made unlawful and misleading nutrient content claims with respect to their food products sold to consumers;

h.   Whether Defendants violated California Bus. & Prof. Code § 17200, California Bus. & Prof. Code § 17500, and the Sherman Law;

i.   Whether Plaintiff and the Class are entitled to equitable and/or injunctive relief;

j.   Whether Defendants' unlawful, unfair and/or deceptive practices harmed Plaintiff and the Class; and

k.   Whether Defendants were unjustly enriched by their deceptive practices.

85. <u>Typicality</u>:  Plaintiff's claims are typical of the claims of the Class because Plaintiff bought Defendants' misbranded food products during the Class Period.  Defendants' unlawful, unfair and/or fraudulent actions concern the same business practices described herein irrespective of where they occurred or were received.  Plaintiff and the Class sustained similar injuries arising out of Defendants' conduct in violation of California law.  The injuries of each member of the Class were caused directly by Defendants' wrongful conduct.  In addition, the factual underpinning of Defendants' misconduct is common to all Class members and represents a common thread of misconduct resulting in injury to all members of the Class.  Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the Class members and are based on the same legal theories.

86.     <u>Adequacy</u>:  Plaintiff will fairly and adequately protect the interests of the Class. Neither Plaintiff nor Plaintiff's counsel have any interests that conflict with or are antagonistic to the interests of the Class members.  Plaintiff has retained highly competent and experienced class action attorneys to represent their interests and those of the members of the Class.  Plaintiff and Plaintiff's counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiff and counsel are aware of their fiduciary responsibilities to the Class members and will diligently discharge those duties by vigorously seeking the maximum possible recovery for the Class.

87.     <u>Superiority</u>:     There is no plain, speedy or adequate remedy other than by maintenance of this class action.  The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendants and result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties.  Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of effort and expense that numerous individual actions would engender.  Further, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation would make it difficult or impossible for individual members of the Class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.   Class treatment of common questions of law and fact would also be superior to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the Court and the litigants, and will promote consistency and efficiency of adjudication.

88.     The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) are met as Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole.

89.     The prerequisites to maintaining a class action pursuant to Fed. R. Civ. P. 23(b)(3) are met as questions of law or fact common to class members predominate over any questions

affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

90.     Plaintiff and Plaintiff's counsel are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Business and Professions Code § 17200, *et seq.***
**Unlawful Business Acts and Practices**

91.     Plaintiff incorporates by reference each allegation set forth above.

92.     Defendants' conduct constitutes unlawful business acts and practices.

93.     Defendants sold misbranded food products in California during the Class Period.

94.     Defendants are corporations and, therefore, each is a "person" within the meaning of the Sherman Law.

95.     Defendants' business practices are unlawful under § 17200, *et seq*. by virtue of Defendants' violations of Article 6 (misbranded food) of the Sherman Law.

96.     Defendants' business practices are unlawful under § 17200, *et seq*. by virtue of Defendants' violations of § 17500, *et seq.*, which forbids untrue and misleading advertising.

97.     Defendants sold Plaintiff and the Class misbranded food products that were not capable of being sold legally and which were legally worthless.

98.     As a result of Defendants' illegal business practices, Plaintiff and the Class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future conduct and such other orders and judgments which may be necessary to disgorge Defendants' ill-gotten gains and to restore to any Class Member any money paid for the misbranded food products.

99.     Defendants' unlawful business acts present a threat and reasonable continued likelihood of deception to Plaintiff and the Class.