1  Ben F. Pierce Gore (SBN 128515)
2  1901 S. Bascom Avenue, Suite 350
   Campbell, CA  95008
3  Telephone:  (408) 429-6506
   Fax:  (408) 369-0752
4  pgore@prattattorneys.com

5  (Co-counsel listed on signature page)

6  *Attorneys for Plaintiff*

7

8

9             IN THE UNITED STATES DISTRICT COURT

10          FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                    SAN JOSE DIVISION

12

13  AMY MAXWELL, individually and on          Case No.  C 12-01736 EJD
    behalf of all others similarly situated,
14                                            **AMENDED CLASS ACTION AND
                  Plaintiff,                  REPRESENTATIVE ACTION**
15
    v.                                        **COMPLAINT FOR DAMAGES,
16                                            EQUITABLE AND INJUNCTIVE RELIEF**

17  UNILEVER UNITED STATES, INC.,             **JURY TRIAL DEMANDED**
    PEPSICO, INC., and PEPSI LIPTON TEA
18  PARTNERSHIP,

19                Defendants.

20

21        Plaintiff, Amy Maxwell, through her undersigned attorneys, brings this lawsuit against

22  Defendants Unilever United States, Inc. ("Unilever"), PepsiCo Inc, and Pepsi Lipton Tea

23  Partnership (collectively "Defendants") as to her own acts upon personal knowledge, and as to all

24  other matters upon information and belief.  In order to remedy the harm arising from Defendants'

25  illegal conduct, which has resulted in unjust profits, Plaintiff brings this action on behalf of a

26  class of California consumers who, within the last four years, purchased 1) any carbonated

27  beverage manufactured, distributed or bottled under the authority of the Defendants that

28  contained an artificial flavoring, artificial coloring, or chemical preservative but failed to bear a

1  statement on its label disclosing that fact, or 2) any Lipton or Brisk tea products ("Misbranded

2  Food Products").

3  **INTRODUCTION**

4  1.      Every day millions of Americans purchase and consume packaged foods. To

5  protect these consumers, identical California and federal laws require truthful, accurate

6  information on the labels of packaged foods. This case is about companies that flout those laws

7  and sell misbranded food to unsuspecting consumers. The law, however, is clear: misbranded

8  food cannot legally be manufactured, held, advertised, distributed or sold. Misbranded food is

9  worthless as a matter of law, and purchasers of misbranded food are entitled to a refund of their

10  purchase price.

11  2.      Unilever is a multinational corporation with 400 brands, including Lipton Tea.

12  Unilever's website claims that "[o]n any given day, two billion people use our products."  Lipton

13  employs "more than 80,000 people."  According to Unilever, "tea is the second most widely-

14  consumed beverage on earth, behind water."  In the U.S., Unilever markets Lipton Tea under

15  more than twelve labels, including Lipton Regular Tea, Lipton Cold Brew Iced Tea Bags, Lipton

16  Green Tea Purple Acai and Blueberry, Lipton Regular Family Size Iced Tea Bags, Lipton Lemon

17  Iced Tea Mix, Lipton Diet Lemon Ice Tea Mix, Lipton Green Tea, Lipton Mandarin Mango

18  Green Tea To Go, Lipton Herbal Chamomile Tea, Lipton Harvest Strawberry & Passion Fruit,

19  Lipton Orange Spice Tea, Lipton Ready to Drink Pure Leaf Tea.

20  http://www.unileverusa.com/brands/foodbrands/lipton/index.aspx.  Additionally Unilever markets

21  ready to drink teas under the Lipton and Brisk Tea brands through Defendant Pepsi Lipton Tea

22  Partnership, a joint venture with Defendant PepsiCo, Inc.

23  3.      Unilever recognizes that health claims drive sales, and actively promotes the

24  purpoted health benefits of Lipton Tea.  Unilever's website claims:

25  Made from real tea leaves, many Lipton teas contain tea flavonoids. The flavonoid
26  content per serving can be found on all Lipton tea packages with the Tea Goodness
     seal which signals that the tea contains a specific level of tea flavonoids.
27  Flavonoids are dietary compounds found in tea, wine, cocoa, fruit and vegetables.
     They contribute significantly to taste and color, and possibly help maintain certain
28

normal, healthy body functions.  A diet rich in flavonoids is generally associated with helping maintain normal healthy heart function.

http://www.unileverusa.com/brands/foodbrands/lipton/index.aspx

4.    On its Lipton Tea website, Unilever goes even further in promoting the health benefits of Lipton Tea:

Studies suggest that drinking black or green tea may help maintain normal, healthy heart function as part of a diet that is consistent with dietary guidelines.  Research suggests that drinking 2 to 3 cups per day of black or green tea may help support normal, healthy vascular function.  The mechanism behind this effect has yet to be fully demonstrated, but research suggests that tea flavonoids may be responsible.

http://www.liptont.com/tea_health/healthy_diet/index.aspx

5.    Unilever also makes health nutrient claims directly on packages of Lipton Tea. For example, the package front panel of certain Lipton Tea products bears the "AOX Naturally Protective Antioxidants" label.  The back panel further touts the "protective flavonoid antioxidants" and "flavonoid content" of Lipton Tea, by comparing Lipton Tea to "selected beverages and fruits," including orange juice, broccoli, cranberry juice and coffee.

6.    In promoting the alleged health benefits of its products, including Lipton Tea, Unilever purportedly adopted "Global Principles for Responsible Food and Beverage Marketing." These Global Principles apply to "all of Unilever's food and beverage marketing activities and communications," and include the following provisions:

These marketing activities and communications include but are not limited to packaging and labeling . . .
Marketing communications must comply with all relevant laws/regulations in the local country . . .
All food and beverage marketing communications must be truthful and not misleading.

www.unileverusa.com/Images/30370 Global Principles A5 PDF-2 tcm23-48998.pdf

7.    Unfortunately, as discussed below, Unilever has violated these principles and engaged in misleading and deceptive labeling and marketing practices.

8.    PepsiCo, Inc., the manufacture of carbonated beverages such as Pepsi, also recognizes that health and wellness issues are important to its sales and success. PepsiCo states in

its most recent annual report that "[o]ur success depends on our ability to respond to consumer trends, including concerns of consumers regarding health and wellness, obesity, product attributes and ingredients, and to expand into adjacent categories."

9.   If a manufacturer is going to make a claim on a food label, the label must meet certain legal requirements that help consumers make informed choices and ensure that they are not misled.  As described more fully below, Defendants have made, and continue to make, false and deceptive claims in violation of California and federal laws that govern the types of representations that can be made on food labels.  These laws recognize that reasonable consumers are likely to choose products claiming to have a health or nutritional benefit over otherwise similar food products that do not claim such benefits.

10.   Under California law, which is identical to federal law, a number of the Defendants' food labeling practices are unlawful because they are deceptive and misleading to consumers: These include:

A.   Representing food products to be "all natural" or "natural" when they contain significant quantities of chemical preservatives, synthetic chemicals, added artificial color and other artificial ingredients;

B.   Failing to disclose the presence of chemical preservatives, artificial flavorings or artificial added colors as required by law;

C.   Making unlawful nutrient content claims on the labels of  food products that fail to meet the minimum nutritional requirements legally required for the nutrient content claims being made;

D.   Making unlawful antioxidant claims on the labels of food products that fail to meet the minimum nutritional requirements legally required for the antioxidant claims being made;

E.   Making unlawful and unapproved health claims about their products that are prohibited by law; and

F.   Making unlawful claims that suggest to consumers that their products can prevent the risk or treat the effects of certain diseases like cancer or heart disease.

11.   These practices are not only illegal but they mislead consumers and deprive them of the information they require to make informed purchasing decisions. Thus, for example, a mother who reads labels because she wants to purchase natural or healthy foods for her children

- 4 -
*Amended Class Action Complaint*

1    would be mislead by Defendants' practices and labeling.

2         12.    California and federal laws have placed numerous requirements on food

3    companies that are designed to ensure that the claims that companies make about their products to

4    consumers are truthful, accurate and backed by acceptable forms of scientific proof. When

5    companies such as Defendants make unlawful nutrient content, antioxidant, or health claims that

6    are prohibited by regulation, consumers such as Plaintiff are misled.

7         13.    Identical California and federal laws regulate the content of labels on packaged

8    food.  The requirements of the federal Food Drug & Cosmetic Act ("FDCA") were adopted by

9    the California legislature in the Sherman Food Drug & Cosmetic Law (the "Sherman Law").

10   California Health & Safety Code § 109875, *et seq*.  Under both the Sherman Law and FDCA

11   section 403(a), food is "misbranded" if "its labeling is false or misleading in any particular," or if

12   it does not contain certain information on its label or its labeling.  21 U.S.C. § 343(a).

13        14.    Under the FDCA, the term "false" has its usual meaning of "untruthful," while the

14   term "misleading" is a term of art.  Misbranding reaches not only false claims, but also those

15   claims that might be technically true, but still misleading.  If any one representation in the

16   labeling is misleading, the entire food is misbranded, nor can any other statement in the labeling

17   cure a misleading statement.  "Misleading" is judged in reference to "the ignorant, the unthinking

18   and the credulous who, when making a purchase, do not stop to analyze." *United States v. El-O-*

19   *Pathic Pharmacy*, 192 F.2d 62, 75 (9th Cir. 1951). Under the FDCA, it is not necessary to prove

20   that anyone was actually misled.

21        15.    On August 23, 2010, the FDA sent a warning letter to Unilever, informing

22   Unilever of its failure to comply with the requirements of the FDCA and its regulations (the

23   "FDA Warning Letter," attached hereto as Exhibit 1).  The FDA Warning Letter stated, in

24   pertinent part:

25                        **Unauthorized Nutrient Content Claims**

26        Under section 403(r)(1)(A) of the Act [21 U.S.C. 343(r)(1)(A)], a claim that
          characterizes the level of a nutrient which is of the type required to be in the
27        labeling of the food must be made in accordance with a regulation promulgated by
          the Secretary (and, by delegation, FDA) authorizing the use of such a claim. The

28

use of a term, not defined by regulation, in food labeling to characterize the level of a nutrient misbrands a product under section 403(r)(1)(A) of the Act.

Nutrient content claims using the term "antioxidant" must also comply with the requirements listed in 21 CFR 101.54(g). These requirements state, in part, that for a product to bear such a claim, an RDI must have been established for each of the nutrients that are the subject of the claim (21 CFR 101.54(g)(1)), and these nutrients must have recognized antioxidant activity (21 CFR 101.54(g)(2). The level of each nutrient that is the subject of the claim must also be sufficient to qualify for the claim under 21 CFR 101.54(b), (c), or (e) (21 CFR 101.54(g)(3)). For example, to bear the claim "high in antioxidant vitamin C," the product must contain 20 percent or more of the RDI for vitamin C under 21 CFR 101.54(b). Such a claim must also include the names of the nutrients that are the subject of the claim as part of the claim or, alternatively, the term "antioxidant" or "antioxidants" may be linked by a symbol (e.g., an asterisk) that refers to the same symbol that appears elsewhere on the same panel of the product label, followed by the name or names of the nutrients with recognized antioxidant activity (21 CFR 101.54(g)(4)). The use of a nutrient content claim that uses the term "antioxidant" but does not comply with the requirements of 21 CFR 101.54(g) misbrands a product under section 403(r)(2)(A)(i) of the Act.

Your webpage entitled "Tea and Health" and subtitled "Tea Antioxidants" includes the statement, "LIPTON Tea is made from tea leaves rich in naturally protective antioxidants." The term "rich in" is defined in 21 CFR 101.54(b) and may be used to characterize the level of antioxidant nutrients (21 CFR 101.54(g)(3)). However, this claim does not comply with 21 CFR 101.54(g)(4) because it does not include the nutrients that are the subject of the claim or use a symbol to link the term "antioxidant" to those nutrients. Thus, this claim misbrands your product under section 403(r)(2)(A)(i) of the Act.

This webpage also states that "tea is a naturally rich source of antioxidants." The term "rich source" characterizes the level of antioxidant nutrients in the product and, therefore, this claim is a nutrient content claim (see section 403(r)(1) of the Act and 21 CFR 101.13(b)). Even if we determined that the term "rich source" could be considered a synonym for a term defined by regulation (e.g., "high" or "good source"), nutrient content claims that use the term "antioxidant" must meet the requirements of 21 CFR 101.54(g). The claim "tea is a naturally rich source of antioxidants" does not include the nutrients that are the subject of the claim or use a symbol to link the term "antioxidant" to those nutrients, as required by 21 CFR 101.54(g)(4). Thus, this claim misbrands your product under section 403(r)(2)(A)(i) of the Act. The product label back panel includes the statement "packed with protective FLAVONOID ANTIOXIDANTS." The term "packed with" characterizes the level of flavonoid antioxidants in the product; therefore, this claim is a nutrient content claim (see section 403(r)(1) of the Act and 21 CFR 101.13(b)). Even if we determined that the term "packed with" could be considered a synonym for a term defined by regulation, nutrient content claims that use the term "antioxidant" must meet the requirements of 21 CFR 101.54(g). The claim "packed with FLAVONOID ANTIOXIDANTS" does not comply with

21 CFR 101.54(g)1) because no RDI has been established for flavonoids. Thus, this unauthorized nutrient content claim causes your product to be misbranded under section 403(r)(2)(A)(i) of the Act.

The above violations are not meant to be an all-inclusive list of deficiencies in your products or their labeling. It is your responsibility to ensure that all of your products are in compliance with the laws and regulations enforced by FDA. You should take prompt action to correct the violations. Failure to promptly correct these violations may result in regulatory actions without further notice, such as seizure and/or injunction.

We note that your label contains a chart entitled "Flavonoid Content of selected beverages and foods." The chart appears to compare the amounts of antioxidants in your product with the amount of antioxidants in orange juice, broccoli, cranberry juice and coffee. However, the information provided may be misinterpreted by the consumer because although the chart is labeled, in part, "Flavonoid Content," the y-axis is labeled "AOX"; therefore, the consumer might believe that the chart is stating the total amount of antioxidants rather than specifically measuring the amount of flavonoids in the product.

http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/ucm224509.htm

In response to the FDA Warning letter, Unilever modified its Lipton web site and its packaging by removing some of the most outlandish claims of health and therapeutic benefits that FDA had found in violation of law. However, there are several unlawful statements on Lipton's web site that remain, including but not limited to: "Flavonoids are dietary compounds found in tea, wine, cocoa, fruit and vegetables. They contribute significantly to taste and color, and possibly help maintain certain normal, healthy body functions. A diet rich in flavonoids is generally associated with helping maintain normal, healthy heart function."  "Flavonoids" are a substance or nutrient without an established referenced daily intake value ("RDI").  In addition, the package front panel of many Lipton Tea products contains the following statement: "Regular tea drinking, as part of a healthy diet, may help maintain healthy vascular function."  Such health claims are in violation of 21 U.S.C. § 352(f)(1), and therefore the products are misbranded.

16.     Defendants have made, and continue to make, unlawful nutrient content and antioxidant claims on food labels of their Misbranded Food Products that are prohibited by California and federal law and which render these products misbranded.  Under federal and California law, Defendants' Misbranded Food Products cannot legally be manufactured, advertised, distributed, held or sold.  Defendants' false and misleading labeling practices stem

1   from their global marketing strategy.  Thus, the violations and misrepresentations are similar

2   across product labels and product lines.  Defendants' violations of law include the illegal

3   advertising, marketing, distribution, delivery and sale of Defendants' Misbranded Food Products

4   to consumers in California and throughout the United States.

5                                   **PARTIES**

6          17.     Plaintiff Amy Maxwell is a resident of San Jose, California who purchased

7   Defendants' Misbranded Food Products in California during the four (4) years prior to the filing

8   of this Civil Action (the "Class Period").  Plaintiff purchased in excess of $25 worth of

9   Defendants' Misbranded Food Products.

10         18.     Defendant Unilever United States, Inc. ("Unilever") is a Delaware corporation

11  with its principle place of business at 700 Sylvan Avenue, Englewood Cliffs, New Jersey.

12  Unilever manufactures, markets, distributes and sells Lipton Tea Products and Brisk Tea

13  Products.

14         19.     Defendant PepsiCo, Inc. ("PepsiCo") is a North Carolina corporation with its

15  principle place of business at 700 Anderson Hill Road, Purchase, New York. On the label of

16  certain ready to drink Lipton Tea products bought by the Plaintiff it is represented that the

17  products are bottled under the authority of PepsiCo. PepsiCo also manufactures, markets,

18  distributes and sells other beverages that contain an artificial flavoring, artificial coloring, or

19  chemical preservative but fail to bear a statement on their label to that effect.

20         20.     Defendant Pepsi Lipton Tea Partnership (the "Partnership") is a joint venture

21  between Unilever and PepsiCo.  Unilever  and PepsiCo created the "Partnership" in 1991,

22  Unilever created a joint venture with PepsiCo, the Pepsi Lipton Tea Partnership (the

23  "Partnership"), for the marketing of ready to drink teas in North America.  The Partnership

24  operates as a subsidiary of PepsiCo, with its principle place of business at 700 Anderson Hill

25  Road, Purchase, New York.  PepsiCo and Lipton each control 50% of the shares in the

26  Partnership.  The Partnership manufactures, distributes and sells certain ready to drink Lipton Tea

27  products and Brisk Tea Products.

28

21.     Collectively, Defendants are leading producers of retail food products, including Lipton Tea, Brisk Tea, and carbonated beverages. They sell their misbranded food products to consumers through grocery and other retail stores throughout California.

## JURISDICTION AND VENUE

22.     This Court has original jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action in which:  (1) there are over 100 members in the proposed class; (2) members of the proposed class have a different citizenship from Defendants; and (3) the claims of the proposed class members exceed $5,000,000 in the aggregate.

23.     The Court has jurisdiction over the federal claim alleged herein pursuant to 28 U.S.C. § 1331, because it arises under the laws of the United States.

24.     The Court has jurisdiction over the California claims alleged herein pursuant to 28 U.S.C. § 1367, because they form part of the same case or controversy under Article III of the United States Constitution.

25.     Alternatively, the Court has jurisdiction over all claims alleged herein pursuant to 28 U.S.C. § 1332, because the matter in controversy exceeds the sum or value of $75,000, and is between citizens of different states.

26.     The Court has personal jurisdiction over Defendants because a substantial portion of the wrongdoing alleged in this Amended Complaint occurred in California, Defendants are authorized to do business in California, have sufficient minimum contacts with California, and otherwise intentionally avail themselves of the markets in California through the promotion, marketing and sale of merchandise, sufficient to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

27.     Because a substantial part of the events or omissions giving rise to these claims occurred in this District and because the Court has personal jurisdiction over Defendants, venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) and (b).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **FACTUAL ALLEGATIONS**

## A. **Identical California And Federal Laws Regulate Food Labeling**

28.     Food manufacturers are required to comply with identical state and federal laws and regulations that govern the labeling of food products.  First and foremost among these is the FDCA and its labeling regulations, including those set forth in 21 C.F.R. § 101.

29.     Pursuant to the Sherman Law, California has expressly adopted the federal labeling requirements as its own and indicated that "[a]ll food labeling regulations and any amendments to those regulations adopted pursuant to the federal act, in effect on January 1, 1993, or adopted on or after that date shall be the food regulations of this state."  California Health & Safety Code § 110100.

30.     In addition to its blanket adoption of federal labeling requirements, California has also enacted a number of laws and regulations that adopt and incorporate specific enumerated federal food laws and regulations.  For example, food products are misbranded under California Health & Safety Code § 110660 if their labeling is false and misleading in one or more particulars; are misbranded under California Health & Safety Code § 110665 if their labeling fails to conform to the requirements for nutrient labeling set forth in 21 U.S.C. § 343(q) and regulations adopted thereto; are misbranded under California Health & Safety Code § 110670 if their labeling fails to conform with the requirements for nutrient content and health claims set forth in 21 U.S.C. § 343(r) and regulations adopted thereto; are misbranded under California Health & Safety Code § 110705 if words, statements and other information required by the Sherman Law to appear on their labeling are either missing or not sufficiently conspicuous; are misbranded under California Health & Safety Code § 110735 if they are represented as having special dietary uses but fail to bear labeling that adequately informs consumers of their value for that use; and are misbranded under California Health & Safety Code § 110740 if they contain artificial flavoring, artificial coloring and chemical preservatives but fail to adequately disclose that fact on their labeling.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## B.   **FDA Enforcement History**

31.     In recent years the FDA has become increasingly concerned that food manufacturers have been disregarding food labeling regulations. To address this concern, the FDA elected to take steps to inform the food industry of its concerns and to place the industry on notice that food labeling compliance was an area of enforcement priority.

32.     In October 2009, the FDA issued a *Guidance For Industry: Letter regarding Point Of Purchase Food Labeling* ("2009 FOP Guidance") to address its concerns about front of package labels.  The 2009 FOP Guidance advised the food industry:

> FDA's research has found that with FOP labeling, people are less likely to check the Nutrition Facts label on the information panel of foods (usually, the back or side of the package). It is thus essential that both the criteria and symbols used in front-of-package and shelf-labeling systems be nutritionally sound, well-designed to help consumers make informed and healthy food choices, and not be false or misleading. The agency is currently analyzing FOP labels that appear to be misleading. The agency is also looking for symbols that either expressly or by implication are nutrient content claims. We are assessing the criteria established by food manufacturers for such symbols and comparing them to our regulatory criteria.

> It is important to note that nutrition-related FOP and shelf labeling, while currently voluntary, is subject to the provisions of the Federal Food, Drug, and Cosmetic Act that prohibit false or misleading claims and restrict nutrient content claims to those defined in FDA regulations. Therefore, FOP and shelf labeling that is used in a manner that is false or misleading misbrands the products it accompanies. Similarly, a food that bears FOP or shelf labeling with a nutrient content claim that does not comply with the regulatory criteria for the claim as defined in Title 21 Code of Federal Regulations (CFR) 101.13 and Subpart D of Part 101 is misbranded. We will consider enforcement actions against clear violations of these established labeling requirements. . .

> … Accurate food labeling information can assist consumers in making healthy nutritional choices. FDA intends to monitor and evaluate the various FOP labeling systems and their effect on consumers' food choices and perceptions. FDA recommends that manufacturers and distributors of food products that include FOP labeling ensure that the label statements are consistent with FDA laws and regulations. FDA will proceed with enforcement action against products that bear FOP labeling that are explicit or implied nutrient content claims and that are not consistent with current nutrient content claim requirements. FDA will also proceed with enforcement action where such FOP labeling or labeling systems are used in a manner that is false or misleading.

33.     The 2009 FOP Guidance recommended that "manufacturers and distributors of food products that include FOP labeling ensure that the label statements are consistent with FDA law and regulations" and specifically advised the food industry that it would "proceed with enforcement action where such FOP labeling or labeling systems are used in a manner that is false or misleading."

34.     Despite the issuance of the 2009 FOP Guidance, Defendants did not remove the unlawful and misleading food labeling claims from their Misbranded Food Products.

35.     On March 3, 2010, the FDA issued an "Open Letter to Industry from [FDA Commissioner] Dr. Hamburg" (hereinafter, "Open Letter"). The Open Letter reiterated the FDA's concern regarding false and misleading labeling by food manufacturers. In pertinent part the letter stated:

> In the early 1990s, the Food and Drug Administration (FDA) and the food industry worked together to create a uniform national system of nutrition labeling, which includes the now-iconic Nutrition Facts panel on most food packages.  Our citizens appreciate that effort, and many use this nutrition information to make food choices.  Today, ready access to reliable information about the calorie and nutrient content of food is even more important, given the prevalence of obesity and diet-related diseases in the United States.  This need is highlighted by the announcement recently by the First Lady of a coordinated national campaign to reduce the incidence of obesity among our citizens, particularly our children.

> With that in mind, I have made improving the scientific accuracy and usefulness of food labeling one of my priorities as Commissioner of Food and Drugs.  The latest focus in this area, of course, is on information provided on the principal display panel of food packages and commonly referred to as "front-of-pack" labeling. The use of front-of-pack nutrition symbols and other claims has grown tremendously in recent years, and it is clear to me as a working mother that such information can be helpful to busy shoppers who are often pressed for time in making their food selections. ….

> As we move forward in those areas, I must note, however, that there is one area in which more progress is needed.  As you will recall, we recently expressed concern, in a "Dear Industry" letter, about the number and variety of label claims that may not help consumers distinguish healthy food choices from less healthy ones and, indeed, may be false or misleading.

> At that time, we urged food manufacturers to examine their product labels in the context of the provisions of the Federal Food, Drug, and Cosmetic Act that prohibit false or misleading claims and restrict nutrient content claims to those defined in FDA regulations.  As a result, some manufacturers have revised their

labels to bring them into line with the goals of the Nutrition Labeling and Education Act of 1990. Unfortunately, however, we continue to see products marketed with labeling that violates established labeling standards.

To address these concerns, FDA is notifying a number of manufacturers that their labels are in violation of the law and subject to legal proceedings to remove misbranded products from the marketplace. While the warning letters that convey our regulatory intentions do not attempt to cover all products with violative labels, they do cover a range of concerns about how false or misleading labels can undermine the intention of Congress to provide consumers with labeling information that enables consumers to make informed and healthy food choices. For example: …

- Products that claim to treat or mitigate disease are considered to be drugs and must meet the regulatory requirements for drugs, including the requirement to prove that the product is safe and effective for its intended use.
- Misleading "healthy" claims continue to appear on foods that do not meet the long- and well-established definition for use of that term.

. . . .

These examples and others that are cited in our warning letters are not indicative of the labeling practices of the food industry as a whole. In my conversations with industry leaders, I sense a strong desire within the industry for a level playing field and a commitment to producing safe, healthy products. That reinforces my belief that FDA should provide as clear and consistent guidance as possible about food labeling claims and nutrition information in general, and specifically about how the growing use of front-of-pack calorie and nutrient information can best help consumers construct healthy diets.

I will close with the hope that these warning letters will give food manufacturers further clarification about what is expected of them as they review their current labeling. I am confident that our past cooperative efforts on nutrition information and claims in food labeling will continue as we jointly develop a practical, science-based front-of-pack regime that we can all use to help consumers choose healthier foods and healthier diets.

36.     Notwithstanding the Open Letter, Defendants have continued to utilize unlawful food labeling claims despite the express guidance of the FDA in the Open Letter.

37.     In addition to its guidance to industry, the FDA has sent warning letters to the industry, including many of Defendants' peer food manufacturers, for the same types of unlawful nutrient content claims described above.

38.    In these letters dealing with unlawful nutrient content claims, the FDA indicated that, as a result of the same type of claims utilized by Defendants, products were in "violation of the Federal Food, Drug, and Cosmetic Act … and the applicable regulations in Title 21, Code of Federal Regulations, Part 101 (21 CFR § 101)" and "misbranded within the meaning of section 403(r)(1)(A) because the product label bears a nutrient content claim but does not meet the requirements to make the claim."  Similarly, letters for unlawful "all natural" claims similar to those at issue here, indicated that the products at issue were "misbranded under section 403(a)(1) of the Act" because their labels were "false and misleading."

39.    These warning letters were not isolated as the FDA has issued other warning letters to other companies for the same type of food labeling claims at issue in this case.

40.    The FDA stated that the agency not only expected companies that received warning letters to correct their labeling practices but also anticipated that other firms would examine their food labels to ensure that they are in full compliance with food labeling requirements and make changes where necessary. Defendants did not change the labels on their Misbranded Food Products in response to the warning letters sent to other companies.

41.    Defendants also continued to ignore the FDA's Guidance for Industry, A Food Labeling Guide which details the FDA's guidance on how to make food labeling claims. Defendants continued to utilize unlawful claims on the labels of their Misbranded Food Products. As such, the Defendants' Misbranded Food Products continue to run afoul of FDA guidance as well as identical federal and California law.

42.    Despite the FDA's numerous warnings to industry, Defendants have continued to sell products bearing unlawful food labeling claims without meeting the requirements to make them.

1      43.     Plaintiff did not know, and had no reason to know, that the Defendants'

2   Misbranded Food Products were misbranded and bore food labeling claims despite failing to meet

3   the requirements to make those food labeling claims. Similarly, Plaintiff did not know, and had

4   no reason to know, that the Defendants' Misbranded Food Products were misbranded because

5   their labeling was false and misleading.

6                  **C.      Defendants' Products Are Misbranded**

7      44.     Pursuant to Section 403 of the FDCA, a claim that characterizes the level of a

8   nutrient in a food is a "nutrient content claim" that must be made in accordance with the

9   regulations that authorize the use of such claims.  21 U.S.C. § 343(r)(1)(A).  California expressly

10  adopted the requirements of 21 U.S.C. § 343(r) in Section 110670 of the Sherman Law.

11     45.     Nutrient content claims are claims about specific nutrients contained in a product.

12  They are typically made on food packaging in a font large enough to be read by the average

13  consumer.   Because consumers, including Plaintiff, rely upon these claims when making

14  purchasing decisions, the regulations govern what claims can be made in order to prevent

15  misleading claims.

16     46.     Section 403(r)(1)(A) of the FDCA governs the use of expressed and implied

17  nutrient content claims on labels of food products that are intended for sale for human

18  consumption. 21 C.F.R. § 101.13.

19     47.     21 C.F.R. § 101.13 provides the general requirements for nutrient content claims,

20  which California has expressly adopted.  California Health & Safety Code § 110100.

21     48.     An "expressed nutrient content claim" is defined as any direct statement about the

22  level (or range) of a nutrient in the food (*e.g.*, "low sodium" or "contains 100 calories").   21

23  C.F.R. § 101.13(b)(1).

24     49.     An "implied nutrient content claim" is defined as any claim that: (i) describes the

25  food or an ingredient therein in a manner that suggests that a nutrient is absent or present in a

26  certain amount (*e.g.*, "high in oat bran"); or (ii) suggests that the food, because of its nutrient

27  content, may be useful in maintaining healthy dietary practices and is made in association with an

28

explicit claim or statement about a nutrient (*e.g.*, "healthy, contains 3 grams (g) of fat").   21 C.F.R. § 101.13(b)(2)(i-ii).

50.   These regulations authorize use of a limited number of defined nutrient content claims. In addition to authorizing the use of only a limited set of defined nutrient content terms on food labels, these regulations authorize the use of only certain synonyms for these defined terms. If a nutrient content claim or its synonym is not included in the food labeling regulations it cannot be used on a label. Only those claims, or their synonyms, that are specifically defined in the regulations may be used. All other claims are prohibited. 21 CFR 101.13(b).

51.   Only approved nutrient content claims will be permitted on the food label, and all other nutrient content claims will misbrand a food. It is thus clear which types of claims are prohibited and which types are permitted. Manufacturers are on notice that the use of an unapproved nutrient content claim is prohibited conduct. 58 FR 2302. In addition, 21 USC 343(r)(2), whose requirements have been adopted by California, prohibits using unauthorized undefined terms and declares foods that do so to be misbranded.

52.   Similarly, the regulations specify absolute and comparative levels at which foods qualify to make these claims for particular nutrients (*e.g.*, .low fat, . . . more vitamin C) and list synonyms that may be used in lieu of the defined terms. Certain implied nutrient content claims (*e.g.*, "healthy") also are defined. The daily values (DVs) for nutrients that the FDA has established for nutrition labeling purposes have application for nutrient content claims, as well. Claims are defined under current regulations for use with nutrients having established DVs; moreover, relative claims are defined in terms of a difference in the percent DV of a nutrient provided by one food as compared to another. *See. e.g.* 21 C.F.R. §§ 101.13 and 101.54.

a.   **Defendants Make Unlawful Nutrient Content Claims**

53.   In order to appeal to consumer preferences, Defendants have repeatedly made false and unlawful nutrient content claims about antioxidants and other nutrients that either fail to utilize one of the limited defined terms or use one the defined terms improperly. These nutrient content claims are unlawful because they fail to comply with the nutrient content claim provisions in violation of 21 C.F.R. §§ 101.13 and 101.54, which are incorporated in California's Sherman

Law. To the extent that the terms used by Defendants to describe nutrients and antioxidants are deemed to be a synonym for a defined term like "contain" the claim would still be unlawful because either the terms are being used improperly or the nutrients and antioxidants at issue do not have established daily values and thus cannot serve as the basis for a term that has a minimum daily value threshold as the defined terms at issue here do.

54.     Defendants' claims concerning unnamed antioxidants, other antioxidants and nutrients are false because Defendants' use of a defined term is in effect a claim that the products have met the minimum nutritional requirements for the use of the defined term when they have not.

55.     For example, nutrient content claims that Defendants make on the labels of their tea and website are false and unlawful because they use defined terms such as "rich," "contains," and "provides" improperly. Defendants use these terms to describe antioxidants and flavonoids that fail to satisfy the minimum nutritional thresholds for these defined terms. Rich requires a nutrient to be present at a level at least 20% of the Daily Value for that nutrient while "contains" and "provides" require a nutrient to be present at a level at least 10% of the Daily Value for that nutrient.

56.     Defendants' misuse of defined terms is not limited the nutrient content claims on one or two products. Defendants' tea related claims are part of a widespread practice of misusing defined nutrient content claims to overstate the nutrient content of  their tea products. For example, Defendants' claims that tea "contain" or "provides" antioxidants or flavonoids are unlawful because neither of these nutrients have a DV and thus they cannot satisfy the 10% DV required for a "contains" nutrient content claim. Defendants make numerous other false and unlawful nutrient content claims such as Defendants' claims that tea  is "rich in"  nutrients when it is not.

57.     Defendants also falsely and unlawfully use undefined terms such as "packed with," "found in" and "source of."  By using undefined terms such as "packed with, "found in" and "source of," Defendants are, in effect, falsely asserting that their products meet at least the lowest minimum threshold for any nutrient content claim which would be 10% of the daily value of the

nutrient at issue.  Such a threshold represents the lowest level that a nutrient can be present in a food before it becomes deceptive and misleading to highlight its presence in a nutrient content claim. Thus, for example, it is deceptive and misleading for Defendants to claim that their teas are "packed with antioxidants." It is similarly deceptive and misleading for Defendants to claim that teas are a "source" of antioxidants or that such nutrients are "found" in tea.  None of these nutrients has a DV and thus it is unlawful to make nutrient content claims about them.

58.    FDA enforcement actions targeting identical or similar claims to those made by Defendants have made clear the unlawfulness of such claims.  For example, on March 24, 2011, the FDA sent Jonathan Sprouts, Inc. a warning letter where it specifically targeted a "source" type claim like the one used by Defendants. In that letter the FDA stated:

> Your Organic Clover Sprouts product label bears the claim "Phytoestrogen Source[.]" Your webpage entitled "Sprouts, The Miracle Food! - Rich in Vitamins, Minerals and Phytochemicals" bears the claim "Alfalfa sprouts are one of our finest food sources of . . . saponin." These claims are nutrient content claims subject to section 403(r)(1)(A) of the Act because they characterize the level of nutrients of a type required to be in nutrition labeling (phytoestrogen and saponin) in your products by use of the term "source." Under section 403(r)(2)(A) of the Act, nutrient content claims may be made only if the characterization of the level made in the claim uses terms which are defined by regulation. However, FDA has not defined the characterization "source" by regulation. Therefore, this characterization may not be used in nutrient content claims.

59.    It is thus clear that a "source" claim like the one utilized by Defendants is unlawful because the "FDA has not defined the characterization 'source' by regulation" and thus such a "characterization may not be used in nutrient content claims." Similarly, a claim that a nutrient is "found" in tea is improper because it is either an undefined characterization that a nutrient is found in a food at some undefined level or because it is a synonym for a defined term like "contains" as there is no difference in meaning between the statement "tea contains antioxidants" and the statement "antioxidants are found in tea." Both characterize the fact the tea contains antioxidants at some undefined level. The types of misrepresentations made above would be considered by a reasonable consumer like the Plaintiff when deciding to purchase the products.

60.    These very same types of violations at issue here over nutrient content claims for food products were condemned in an FDA warning letter to Unilever in which, the FDA stated:

The product label back panel includes the statement "packed with protective FLAVONOID ANTIOXIDANTS." The term "packed with" characterizes the level of flavonoid antioxidants in the product; therefore, this claim is a nutrient content claim (see section 403(r)(1) of the Act and 21 CFR 101.13(b)). Even if we determined that the term "packed with" could be considered a synonym for a term defined by regulation, nutrient content claims that use the term "antioxidant" must meet the requirements of 21 CFR 101.54(g). The claim "packed with FLAVONOID ANTIOXIDANTS" does not comply with 21 CFR 101.54(g)1) because no RDI has been established for flavonoids.

61.     Just as the FDA found Unilever's use of the phrase "packed with flavonoid antioxidants" to be in violation of law for the particular tea products focused on by the FDA, Unilever's use on its website and package labels of terms such as "packed with antioxidants" is in violation of law as are Defendants' other nutrient content claims.   Therefore, such violations cause Defendants' products "to be misbranded under section 403(r)(2)(A)(i) of the Act".

62.     The nutrient content claims regulations discussed above are intended to ensure that consumers are not misled as to the actual or relative levels of nutrients in food products.

63.     Plaintiff relied on Defendants' nutrient content claims when making her purchase decisions over the last four years and was misled because she erroneously believed the implicit misrepresentation that the Defendants' products she was purchasing met the minimum nutritional threshold to make such claims. Antioxidant and flavonoid content was important to Plaintiff in trying to buy "healthy" food products. Plaintiff would not have purchased these products had she known that the Defendants' products did not in fact satisfy such minimum nutritional requirements with regard to antioxidants, flavonoids and other nutrients.

64.     For these reasons, Defendants' nutrient content claims at issue in this Amended Complaint are false and misleading and in violation of 21 C.F.R. §§ 101.13 and 101.54 and identical California law, and the products at issue are misbranded as a matter of law. Defendants have violated these referenced regulations. Therefore, Defendants' Misbranded Food Products are misbranded as a matter of California and federal law and cannot be sold or held and thus are legally worthless.

65.     Defendants' claims in this respect are false and misleading and the products are in this respect misbranded under identical California and federal laws.  Misbranded products cannot

1   be legally sold and are legally worthless. Plaintiff and members of the Class who purchased these

2   products paid an unwarranted premium for these products.

3          **b.      Special Requirements Must Be Met For Antioxidant Nutrient Content Claims**

4          66.     Defendants violate identical California and federal antioxidant labeling

5   regulations.

6          67.      Both California and federal regulations regulate antioxidant claims as a particular

7   type of nutrient content claim.  Specifically, 21 C.F.R. § 101.54(g), which has been adopted by

8   California, contains special requirements for nutrient claims that use the term "antioxidant":

9          (1)  the name of the antioxidant must be disclosed;

10         (2) there must be an established RDI for that antioxidant, and if not, no "antioxidant"

11   claim can be made about it;

12         (3)  the label claim must include the specific name of the nutrient that is an antioxidant

13   and cannot simply say "antioxidants" (*e.g.*, "high in antioxidant vitamins C and E"), *see* 21

14   C.F.R. § 101.54(g)(4);

15         (4)  the nutrient that is the subject of the antioxidant claim must also have recognized

16   antioxidant activity, *i.e.*, there must be scientific evidence that after it is eaten and absorbed from

17   the gastrointestinal tract, the substance participates in physiological, biochemical or cellular

18   processes that inactivate free radicals or prevent free radical-initiated chemical reactions, *see* 21

19   C.F.R.  § 101.54(g)(2);

20         (5)  the antioxidant nutrient must meet the requirements for nutrient content claims in 21

21   C.F.R. § 101.54(b), (c), or (e) for "High" claims, "Good Source" claims, and "More" claims,

22   respectively.  For example, to use a "High" claim, the food would have to contain 20% or more of

23   the Daily Reference Value ("DRV") or RDI per serving.  For a "Good Source" claim, the food

24   would have to contain between 10-19% of the DRV or RDI per serving, *see* 21 C.F.R. §

25   101.54(g)(3); and

26         (6)  the antioxidant nutrient claim must also comply with general nutrient content claim

27   requirements such as those contained in 21 C.F.R. § 101.13(h) that prescribe the circumstances in

28

1   which a nutrient content claim can be made on the label of products high in fat, saturated fat,
2   cholesterol or sodium.

3       68.    The antioxidant labeling for Lipton Tea products violates federal and California
4   law.

5       69.    The antioxidant claims on the packages of these products violate federal and
6   California law:  (1) because the antioxidants are not named, (2) because there are no RDIs for the
7   unnamed antioxidants being touted (3) because no antioxidants are capable of qualifying for a
8   "good source" claim  and (4) because Defendants lack adequate scientific evidence that the
9   claimed antioxidant nutrients participate in physiological, biochemical, or cellular processes that
10  inactivate free radicals or prevent free radical-initiated chemical reactions after they are eaten and
11  absorbed from the gastrointestinal tract.

12      70.    The FDA has issued at least 7 warning letters addressing similar unlawful
13  antioxidant nutrient content claims. Defendants knew or should have known of these FDA
14  warning letters.

15      71.    Ignoring the legal requirements regarding antioxidant claims, Defendants have
16  made multiple unlawful antioxidant claims about their tea and other beverage products.

17      72.    Not only do Defendants' antioxidant nutrient content claims regarding the benefits
18  of unnamed antioxidants, flavonoids and other nutrients violate FDA rules and regulations as
19  previously interpreted by FDA in the above mentioned warning letters and in its publications,
20  they directly contradict Unilever's own current scientific research, which has concluded after
21  researching antioxidant properties that:

22          despite more than 50 studies convincingly showing that flavonoids possess potent
23          antioxidant activity *in vitro,* the ability of flavonoids to act as an antioxidant *in vivo* [in
            humans], has not been demonstrated….
24
            No  evidence  has  been  provided  to  establish  that  having  antioxidant
25          activity/content and/or antioxidant properties is a beneficial physiological effect.
26
            Rycroft, Jane, "The Antioxidant Hypothesis Needs to be Updated," Vol. 1, *Tea Quarterly*
27
        *Tea Science Overview,* Lipton Tea Institute of Tea Research (Jan. 2011), pp. 2-3.
28

73.     In fact, the USDA recently removed the USDA ORAC Database for Selected Foods from its website "due to mounting evidence that the values indicating antioxidant capacity have no relevance to the effects of specific bioactive compounds, including polyphenols on human health."   It was this database that the Defendants premised a number of their labeling claims including the graphs of antioxidant and/or flavonoid content they placed on their labels. According to the USDA:

> ORAC values are routinely misused by food and dietary supplement manufacturing companies to promote their products and by consumers to guide their food and dietary supplement choices….

> There is no evidence that the beneficial effects of polyphenol-rich foods can be attributed to the antioxidant properties of these foods. The data for antioxidant capacity of foods generated by in vitro (test-tube) methods cannot be extrapolated to in vivo (human) effects and the clinical trials to test benefits of dietary antioxidants have produced mixed results. We know now that antioxidant molecules in food have a wide range of functions, many of which are unrelated to the ability to absorb free radicals.

For these reasons the ORAC table, previously available on this web site has been withdrawn.

74.     Scientific evidence and consensus establishes the improper nature of the Defendants' antioxidant claims as they cannot satisfy the legal and regulatory requirement that the nutrient that is the subject of the antioxidant claim must have recognized antioxidant activity, *i.e.,* there must be scientific evidence that after it is eaten and absorbed from the gastrointestinal tract, the substance participates in physiological, biochemical or cellular processes that inactivate free radicals or prevent free radical-initiated chemical reactions, *see* 21 C.F.R.  § 101.54(g)(2).

75.     Plaintiff relied on Defendants' unlawful antioxidant nutrient content claims when making her purchase decisions. Antioxidant content and healthy food products were important to her. She was misled because she erroneously believed the implicit misrepresentation that the Defendants' products she was purchasing met the minimum nutritional threshold to satisfy the requirements for the antioxidant claims being made about the products. This threshold represents the lowest level that a nutrient can be present in a food before it becomes deceptive and misleading to highlight its presence in a nutrient content claim. Plaintiff would not have

purchased these products had she known that the Defendants' products did not in fact satisfy such minimum nutritional requirements with regard to antioxidants. Plaintiff and members of the Class who purchased these products paid an unwarranted premium for these products. For these reasons, Defendants' antioxidant claims at issue in this Complaint are false and misleading and in violation of 21 C.F.R. § 101.54 and California law, and the products at issue are misbranded as a matter of law.  Misbranded products cannot be legally manufactured, advertised, distributed, held or sold, and are thus legally worthless.

76.    In addition to the FDA Warning Letter to Unilever discussed above (Exhibit 1), the FDA has issued warning letters addressing similar unlawful antioxidant nutrient content claims. *See, e.g.*, Exhibit 2 (FDA warning letter dated August 30, 2010 to Dr. Pepper Snapple Group regarding its misbranded Canada Dry Sparkling Green Tea Ginger Ale product because green tea and green tea flavonoids "are not nutrients with recognized antioxidant activity"); Exhibit 3 (FDA warning letter dated February 22, 2010 to Redco Foods, Inc. regarding its misbranded Salada Naturally Decaffeinated Green Tea product because "there are no RDIs for (the antioxidants) grapeskins, rooibos (red tea) and anthocyanins"); Exhibit 4 (FDA warning letter dated February 22, 2010 to Fleminger Inc. regarding its misbranded TeaForHealth products because the admonition "[d]rink high antioxidant green tea" . . . "does not include the nutrients that are the subject of the claim or use a symbol to link the term antioxidant to those nutrients").

77.    Defendants are aware of these FDA warning letters.

78.    The antioxidant regulations discussed above are intended to ensure that consumers are not misled as to the actual or relative levels of antioxidants in food products.

79.    Plaintiff relied on Defendants' antioxidant claims when making her purchase decisions over the last four years and was misled because she erroneously believed the implicit misrepresentation that the Defendants' products she was purchasing met the minimum nutritional threshold to make such claims. Antioxidant and flavonoid content was important to Plaintiff in trying to but "healthy" food products. Plaintiff would not have purchased these products had she known that the Defendants' products did not in fact satisfy such minimum nutritional requirements with regard to antioxidants, flavonoids and other nutrients.

80.     For these reasons, Defendants' antioxidant claims at issue in this Amended Complaint are false and misleading and in violation of 21 C.F.R. §§ 101.13 and 101.54 and identical California law, and the products at issue are misbranded as a matter of law. Defendants have violated these referenced regulations. Therefore, Defendants' Misbranded Food Products are misbranded as a matter of California and federal law and cannot be sold or held and thus are legally worthless.

81.     Defendants' claims in this respect are false and misleading and the products are in this respect misbranded under identical California and federal laws, Misbranded products cannot be legally sold and are legally worthless. Plaintiff and members of the Class who purchased these products paid an unwarranted premium for these products.

      c.     **Defendants Make Unlawful Nutritional Value Claims**

82.     Defendants have also violated 21 C.F.R. § 101.54(g)(1), which prohibits food manufacturers from making claims regarding the nutritional value of their products when the products fail to disclose that no RDI has been established for the touted nutrients.

83.     For example, certain Lipton Tea products claim to be "rich in" antioxidants, "packed with flavonoid antioxidants" (old labels) or "packed with flavonoids" (new labels)  or to "contain" or "provide" antioxidants or flavonoids but they fail to disclose that no RDI has been established for flavonoids or the antioxidants in tea.  Thus, these products violate 21 C.F.R. § 101.54(g)(1).

84.     The types of misrepresentations made above would be considered by a reasonable consumer interested in purchasing healthy products and products containing beneficial antioxidants when deciding to purchase Defendants' misbranded food products.  The failure to comply with the labeling requirements of 21 C.F.R. § 101.54 renders Defendants' products misbranded as a matter of federal and California law.

85.     The nutrient content claims regulations discussed above are intended to ensure that consumers are not misled as to the actual or relative levels of nutrients in food products.

86.     Plaintiff relied on Defendants' nutrient content claims when making her purchase decisions over the last four years and was misled because she erroneously believed the implicit

misrepresentation that the Defendants' products she was purchasing met the minimum nutritional threshold to make such claims. Antioxidant and flavonoid content was important to Plaintiff in trying to buy "healthy" food products. Plaintiff would not have purchased these products had she known that the Defendants' products did not in fact satisfy such minimum nutritional requirements with regard to antioxidants, flavonoids and other nutrients.

87.     For these reasons, Defendants' nutrient content claims at issue in this Amended Complaint are false and misleading and in violation of 21 C.F.R. §§ 101.13 and 101.54 and identical California law, and the products at issue are misbranded as a matter of law. Defendants have violated these referenced regulations. Therefore, Defendants' Misbranded Food Products are misbranded as a matter of California and federal law and cannot be sold or held and thus are legally worthless.

88.     Defendants' claims in this respect are false and misleading and the products are in this respect misbranded under identical California and federal laws. Misbranded products cannot be legally sold and are legally worthless. Plaintiff and members of the Class who purchased these products paid an unwarranted premium for these products.

        **d.**    **Defendants Make Unlawful "Natural" Claims**

89.     In its rule-making and warning letters to manufacturers, the FDA has repeatedly stated its policy to restrict the use of the term "natural" in connection with added color, synthetic substances and flavors as provided in 21 C.F.R. § 101.22.

90.     The FDA has also repeatedly affirmed its policy regarding the use of the term "natural" as meaning that nothing artificial or synthetic (including all color additives regardless of source) has been included in, or has been added to, a food that would not normally be expected to be in the food.

91.     For example, 21 C.F.R. § 70.3(f) makes clear that "where a food substance such as beet juice is deliberately used as a color, as in pink lemonade, it is a color additive." Similarly, any coloring or preservative can preclude the use of the term "natural" even if the coloring or preservative is derived from natural sources.  Further, the FDA distinguishes between natural and artificial flavors in 21 C.F.R. § 101.22.

92.   Defendants' "all natural" labeling practices violate FDA Compliance Guide CPG Sec. 587.100, which states:  [t]he use of the words "food color added," "natural color," or similar words containing the term "food" or "natural" may be erroneously interpreted to mean the color is a naturally occurring constituent in the food.  Since all added colors result in an artificially colored food, we would object to the declaration of any added color as "food" or "natural."

93.   Likewise, California Health & Safety Code § 110740 prohibits the use of artificial flavoring, artificial coloring and chemical preservatives unless those ingredients are adequately disclosed on the labeling.

94.   The FDA has sent out numerous warning letters concerning this issue.  *See, e.g.*, Exhibit 5 (August 16, 2001 FDA warning letter to Oak Tree Farm Dairy because there was citric acid in its all natural iced tea); Exhibit 6 (August 29, 2001 FDA warning letter to Hirzel Canning Company because there was citric acid or calcium chloride in its all natural tomato products); Exhibit 7 (August 2, 2001 FDA warning letter to GMP Manufacturing, Inc. stating: "[t]he products, Cytomax Exercise and Recovery Drink (Peachy Keen flavor) and Cytomax Lite (Lemon Iced Tea Flavor) are misbranded because they contain colors but are labeled using the term "no artificial colors.").  Defendants are aware of these FDA warning letters.

95.   Defendants have unlawfully labeled a number of their food products as being "all natural" or "made with natural ingredients" when they actually contain artificial ingredients and flavorings, artificial coloring and chemical preservatives.  These products include Lipton Pure Leaf Tea products and Lipton Iced Tea products.

96.   For example, the label of Lipton Pure Leaf Sweetened Tea states that it is "All Natural" but it contains added color and citric acid.  In another example, the label of Lipton Sweet Tea states "natural flavor" despite the fact that it contains the artificial flavor phosphoric acid and high fructose corn syrup. In yet another example, the label of Lipton Brisk Lemon Iced Tea states that it is "iced tea with other natural flavors" despite the fact that it contains artificial flavors like phosphoric acid and high fructose corn syrup and citric acid. Similarly, the label of Lipton 100% Iced Green Tea with Citrus states that it is "100% natural" despite the fact that it contains citric acid and REB A (purified stevia extract).

97.     Consumers are thus misled into purchasing Defendants' products with synthetic unnatural ingredients that are not "all natural" as falsely represented on their labeling. Defendants' products in this respect are misbranded under federal and California law.

98.     Plaintiff relied on Defendants' "all natural" and natural claims when making her purchase decisions over the last four years and was misled because she erroneously believed the implicit misrepresentation that the Defendants' products she was purchasing were natural as represented. Purchasing natural products was important to Plaintiff in trying to but "healthy" food products. Plaintiff would not have purchased these products had she known that the Defendants' products were not natural.

99.     For these reasons, Defendants' "all natural" and natural claims at issue in this Amended Complaint are false and misleading and in violation of identical California and federal law, and the products at issue are misbranded as a matter of law. Therefore, Defendants' Misbranded Food Products are misbranded as a matter of California and federal law and cannot be sold or held and thus are legally worthless.

100.    Defendants' claims in this respect are false and misleading and the products are in this respect misbranded under identical California and federal laws, Misbranded products cannot be legally sold and are legally worthless. Plaintiff and members of the Class who purchased these products paid an unwarranted premium for these products.

**e.      Defendants Violate California And Federal Law By Failing To Disclose The Presence Of Chemical Preservatives, Artificial Colors And Artificial Flavors**

101.    The Defendants violated California and federal law by failing to disclose the presence of such chemical preservatives, artificial colors and artificial flavors as mandated by identical California and federal law.

102.    "Under California law "food is misbranded if it bears or contains any artificial flavoring, artificial coloring, or chemical preservative, unless its labeling states that fact (California Health & Safety Code § 110740). California's law is identical to federal law on this point.

103.   Pursuant to 21 C.F.R. § 101.22 which has been adopted by California, "[a] statement of artificial flavoring, artificial coloring, or chemical preservative shall be placed on the food or on its container or wrapper, or on any two or all three of these, as may be necessary to render such statement likely to be read by the ordinary person under customary conditions of purchase and use of such food." 21 C.F.R. § 101.22 defines a chemical preservative as "any chemical that, when added to food, tends to prevent or retard deterioration thereof, but does not include common salt, sugars, vinegars, spices, or oils extracted from spices, substances added to food by direct exposure thereof to wood smoke, or chemicals applied for their insecticidal or herbicidal properties."

104.   Defendants' Misbranded Food Products are misbranded because they contain artificial flavors, chemical preservatives and added colors but fail to disclose that fact.

105.   For example, while various Lipton and Brisk teas contain phosphoric acid which is used in those products as an artificial flavor and/or as an acidulant which is a type of chemical preservative designed to retard spoilage, their labels fail to disclose the fact that the phosphoric acid is being used as a preservative in those products by including a parenthetical such as (preservative) or (to retard spoilage) or (artificial flavor) after the term phosphoric acid in the ingredient statement. Similarly, many of Defendant PepsiCo's beverages, including the Pepsi bought by the Plaintiff, also contain phosphoric acid being used as an artificial flavor and/or acidulant but fail to disclose that fact. Defendants do the same thing with the citric acid and other chemical preservatives and artificial flavors in their products. Because Defendants unlawfully fail to indicate these ingredients are being used as chemical preservatives or artificial flavoring agents, a reasonable consumer would be unaware of such usage.

106.   A reasonable consumer would also expect that when Defendants lists their products' ingredients that it would make all disclosures required by law such as the disclosure of chemical preservatives and coloring mandated by identical California and federal law.

107.   Plaintiff saw the Defendants' label representations and relied on them in the reasonable expectation that such representations were true. Plaintiff based her purchasing

decisions in part on the belief that these products did not contain chemical preservatives or artificial ingredients.

108.   Plaintiff did not know, and had no reason to know, that Defendants' Misbranded Food Products contained undisclosed chemical preservatives and other artificial ingredients because 1) the Defendants falsely represented on its label that the products were free of artificial ingredients & preservatives and 2) failed to disclose those chemical preservatives and artificial ingredients as required by California and federal law.

109.   Consumers including the Plaintiff, were thus misled into purchasing Defendants' products with false and misleading labeling statements and ingredient descriptions, which did not describe the basic nature of the ingredients, as required by California Health & Safety Code § 110740 and 21 C.F.R. §§ 101.22 which has been adopted as law by California.

110.   Had Plaintiff been aware that the Misbranded Food Products she purchased contained undisclosed chemical preservatives and artificial ingredients she would not have purchased the products.

111.   Because of their false label representations and omissions about chemical preservatives and artificial ingredients Defendants' Misbranded Food Products are in this respect misbranded under identical federal and California law, including California Health & Safety Code § 110740.  Misbranded products cannot be legally sold and are legally worthless. Plaintiff and members of the Class who purchased these products paid an unwarranted premium for these products.

   **f.**     **Defendants Make Unlawful Health Claims**

112.   A health claim is a statement expressly or implicitly linking the consumption of a food substance (*e.g.*, ingredient, nutrient, or complete food) to risk of a disease (*e.g.*, cardiovascular disease) or a health-related condition (*e.g.*, hypertension). *See* 21 C.F.R. §101.14(a)(1), (a)(2), and (a)(5). Only health claims made in accordance with FDCA requirements, or authorized by FDA as qualified health claims, may be included in food labeling. Other express or implied statements that constitute health claims, but that do not meet statutory requirements, are prohibited in labeling foods.

113.    21 C.F.R. § 101.14, which has been expressly adopted by California, provides when and how a manufacturer may make a health claim about its product.  A "Health Claim" means any claim made on the label or in labeling of a food, including a dietary supplement, that expressly or by implication, including "third party" references, written statements (e.g., a brand name including a term such as "heart"), symbols (e.g., a heart symbol), or vignettes, characterizes the relationship of any substance to a disease or health-related condition. Implied health claims include those statements, symbols, vignettes, or other forms of communication that suggest, within the context in which they are presented, that a relationship exists between the presence or level of a substance in the food and a disease or health-related condition (see 21 CFR 101.14(a)(1)).

114.    Further, health claims are limited to claims about disease risk reduction, and cannot be claims about the diagnosis, cure, mitigation, or treatment of disease. An example of an authorized health claim is: "Three grams of soluble fiber from oatmeal daily in a diet low in saturated fat and cholesterol may reduce the risk of heart disease. This cereal has 2 grams per serving."

115.    A claim that a substance may be used in the diagnosis, cure, mitigation, treatment, or prevention of a disease is a drug claim and may not be made for a food. 21 U.S.C. § 321(g)(1)(D).

116.    The use of the term "healthy" is not a health claim but rather an implied nutrient content claim about general nutrition that is defined by FDA regulation. 21 C.F.R. § 101.65, which has been adopted by California, sets certain minimum nutritional requirements for making an implied nutrient content claim that a product is healthy.  For example, for unspecified foods the food must supply at least 10 percent of the RDI of one or more specified nutrients. Defendants have misrepresented the healthiness of their products while failing to meet the regulatory requirements for making such claims. In general, the term may be used in labeling an individual food product that:

Qualifies as both low fat and low saturated fat;

Contains 480 mg or less of sodium per reference amount

and per labeled serving, and per 50 g (as prepared for typically rehydrated foods) if the food has a reference amount of 30 g or 2 tbsps or less;

Does not exceed the disclosure level for cholesterol (*e.g.*, for most individual food products, 60 mg or less per reference amount and per labeled serving size); *and*

Except for raw fruits and vegetables, certain frozen or canned fruits and vegetables, and enriched cereal-grain products that conform to a standard of identity, provides at least 10% of the daily value (DV) of vitamin A, vitamin C, calcium, iron, protein, *or* fiber per reference amount. Where eligibility is based on a nutrient that has been added to the food, such fortification must comply with FDA's fortification policy.

21 C.F.R. § 101.65(d)(2).  The FDA's regulation on the use of the term healthy also encompasses other, derivative uses of the term health (*e.g.*, healthful, healthier) in food labeling. 21 C.F.R. § 101.65(d).

117.   Unilever has violated the provisions of § 21 C.F.R. §101.14, 21 C.F.R. §101.65, 21 U.S.C. § 321(g)(1)(D) and 21 U.S.C. § 352(f)(1) by including certain claims on its product labeling and website. For example, until recently on the link to its webpage entitled "Tea and Health," subtitled "Heart Health Research" and further subtitled "Cholesterol Research" the following claim is made: "[F]our recent studies in people at risk for coronary disease have shown a significant cholesterol lowering effect from tea or tea flavonoids ... One of these studies, on post-menopausal women, found that total cholesterol was lowered by 8% after drinking 8 cups of green tea daily for 12 weeks ...."

118.   The therapeutic claims on its website establish that the product is a drug because it is intended for use in the cure, mitigation, treatment, or prevention of disease. Lipton's products are not generally recognized as safe and effective for the above referenced uses and, therefore, the products would be "new drug[s]" under section 201(p) of the Act [21 U.S.C. § 321(p)]. New drugs may not be legally marketed in the U.S. without prior approval from the FDA as described in section 505(a) of the Act [21 U.S.C. § 355(a)]. FDA approves a new drug on the basis of scientific data submitted by a drug sponsor to demonstrate that the drug is safe and effective.

119.   As discussed in paragraph 8 and as shown in Exhibit 1, the FDA conducted a

review of one of Defendants' products (Lipton Green Tea 100% Natural Naturally Decaffeinated Tea) and concluded that Lipton was "in violation of the Federal Food, Drug, and Cosmetic Act … and the applicable regulations in Title 21, Code of Federal Regulations, Part 101 (21 CFR 101)." FDA found the product to be misbranded stating:

> Your Lipton Green Tea 100% Natural Naturally Decaffeinated product is offered for conditions that are not amenable to self-diagnosis and treatment by individuals who are not medical practitioners; therefore, adequate directions for use cannot be written so that a layperson can use this drug safely for its intended purposes. Thus, your Lipton Green Tea 100% Natural Naturally Decaffeinated product is misbranded under section 502(f)(1) of the Act in that the labeling for this drug fails to bear adequate directions for use [21 U.S.C. § 352(f)(1)].

See Exhibit 1.

120.    In response to the FDA Warning Letter, Lipton modified its web site and its packaging by removing some of the most outlandish claims of health and therapeutic benefits that FDA had found in violation of law. However, a number of unlawful statements on Lipton's web site remain.  For example, on the present day web site the following statements appear:

> A large number of studies suggest that tea may help address key health issues.

> Tea and Heart Health
> A heart healthy diet typically contains flavonoid rich foods.  Studies have also shown that tea can improve endothelial/ blood vessel function.

> STAY HEALTHY
> The secret is out: tea is good for your body.  Research suggests that tea which contains goodies including flavonoids, may help maintain your health. So tea can truly be part of your healthy lifestyle. Take a closer look at The Power of the Leaf. Just step inside to discover the possibilities.

> Natural components of tea may help maintain good oral health.

> Tea which is rich in flavonoids, can help improve your vascular function …And Lipton Tea is made from tea leaves naturally rich in flavonoids plus other good stuff your body loves.

> Flavonoids are dietary compounds found in tea, wine, cocoa, fruit and vegetables. They contribute significantly to taste and color, and possibly help maintain certain normal, healthy body functions. A diet rich in flavonoids is generally associated with helping maintain normal, healthy heart function." And the package front

panel of many Lipton Tea products claims a level of "flavonoids," a substance or nutrient without an established referenced daily intake value (RDI), and contains the following statement, "Regular tea drinking, as part of a healthy diet, may help maintain healthy vascular function.

121.   In addition, the labels of Lipton tea products tell consumers to call or go to the Lipton website to learn more about "tea's role in a healthy lifestyle" or "tea and health."

122.   Such health claims are in violation of 21 U.S.C. § 352(f)(1) and therefore the products are misbranded.

123.   Not only do Unilever's health claims regarding the benefits of "tea flavonoids" violate FDA rules and regulations, they directly contradict Unilever's own scientific research, which has concluded: "[T]he evidence today does not support a direct relationship between tea consumption and a physiological AOX [antioxidant] benefit."   This conclusion was reported by Dr. Jane Rycroft, Director of Lipton Tea Institute of Tea, in an article published in January, 2011, in which Dr. Rycroft states:

> Only a few scientific publications report an effect of tea on free radical damage in humans using validated biomarkers in well designed human studies. Unfortunately, the results of these studies are at variance and the majority of the studies do not report significant effects . . .
>
> Therefore, despite more than 50 studies convincingly showing that flavonoids possess potent antioxidant activity *in vitro,* the ability of flavonoids to act as an antioxidant *in vivo* [in humans], has not been demonstrated.
>
> Based on the current scientific consensus that the evidence today does not support a direct relationship between tea consumption and a physiological AOX benefit ...
>
> No evidence has been provided to establish that having antioxidant activity/ content and/or antioxidant properties is a beneficial physiological effect.

Rycroft, Jane, "The Antioxidant Hypothesis Needs to be Updated", Vol. 1.

124.   This is further confirmed by the USDA which recently removed the USDA ORAC Database for Selected Foods from its website "due to mounting evidence that the values indicating antioxidant capacity have no relevance to the effects of specific bioactive compounds, including polyphenols on human health."   It was this database that the defendants premised a number of their labeling claims including the graphs of antioxidant and/or flavonoid content they placed on their labels. According to the USDA:

ORAC values are routinely misused by food and dietary supplement manufacturing companies to promote their products and by consumers to guide their food and dietary supplement choices….

There is no evidence that the beneficial effects of polyphenol-rich foods can be attributed to the antioxidant properties of these foods. The data for antioxidant capacity of foods generated by in vitro (test-tube) methods cannot be extrapolated to in vivo (human) effects and the clinical trials to test benefits of dietary antioxidants have produced mixed results. We know now that antioxidant molecules in food have a wide range of functions, many of which are unrelated to the ability to absorb free radicals.

For these reasons the ORAC table, previously available on this web site has been withdrawn.

125.    Nonetheless, Unilever continues to tout the benefits of "tea flavonoids" on its product labels and on its website.

126.    Plaintiff saw such health related claims on Unilever's websites and relied on the Defendants' health claims which influenced her decision to purchase the Defendants' products. Plaintiff would not have bought the products had she known Defendants' claims were not accurate and were unapproved by FDA and thus misbranded.

127.    Plaintiff and members of the Class was misled into the belief that such claims were true, legal, had passed regulatory muster and were supported by science capable of securing regulatory acceptance. Because this was not the case, Plaintiff and members of the Class have been deceived.

128.    Defendants' materials and advertisements not only violate regulations adopted by California such as 21 C.F.R. § 101.14,  they also violate California Health & Safety Code § 110403 which prohibits the advertisement of products that are represented to have any effect  on enumerated conditions, disorders and diseases including cancer and heart diseases unless the materials have federal approval.

129.    Plaintiff and members of the Class have been misled by Defendants' unlawful labeling practices and actions into purchasing products they would not have otherwise purchased had they known the truth about these products. Plaintiff and members of the Class who purchased these products paid an unwarranted premium for these products.

130.    Defendants' health related claims are false and misleading and the products are in this respect misbranded under identical California and federal laws. Misbranded products cannot be legally sold and thus are legally worthless.

**D.    Defendants Have Violated California Law By Manufacturing, Advertising, Distributing and Selling Misbranded Food Products**

131.    Defendants have manufactured, advertised, distributed and sold products that are misbranded under California law.   Misbranded products cannot be legally manufactured, advertised, distributed, sold or held and are legally worthless as a matter of law.

132.    Defendants have violated California Health & Safety Code § 110390 which makes it unlawful to disseminate false or misleading food advertisements that include statements on products and product packaging or labeling or any other medium used to directly or indirectly induce the purchase of a food product.

133.    Defendants have violated California Health & Safety Code § 110395 which makes it unlawful to manufacture, sell, deliver, hold or offer to sell any falsely advertised food.

134.    Defendants have violated California Health & Safety Code §§ 110398 and 110400 which make it unlawful to advertise misbranded food or to deliver or proffer for delivery any food that has been falsely advertised.

135.    Defendants have violated California Health & Safety Code § 110403 which prohibits the advertisement of products that are represented to have any effect  on enumerated conditions, disorders and diseases including cancer and heart diseases unless it has federal approval.

136.    Defendants have violated California Health & Safety Code § 110660 because their labeling is false and misleading in one or more ways.

137.    Defendants' Misbranded Food Products are misbranded under California Health & Safety Code § 110665 because their labeling fails to conform to the requirements for nutrient labeling set forth in 21 U.S.C. § 343(q) and the regulations adopted thereto.

138.    Defendants' Misbranded Food Products are misbranded under California Health & Safety Code § 110670 because their labeling fails to conform with the requirements for nutrient content and health claims set forth in 21 U.S.C. § 343(r) and the regulations adopted thereto.

139.    Defendants' Misbranded Food Products are misbranded under California Health & Safety Code § 110735 because they purport to be or are represented for special dietary uses, and their labels fail to bear such information concerning their vitamin, mineral, and other dietary properties as the Secretary determines to be, and by regulations prescribes as, necessary in order fully to inform purchasers as to its value for such uses.

140.    Defendants' Misbranded Food Products are misbranded under California Health & Safety Code § 110740 because they contain artificial flavoring, artificial coloring and chemical preservatives but fail to adequately disclose that fact on their labeling.

141.    Defendants have violated California Health & Safety Code § 110760 which makes it unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food that is misbranded.

142.    Defendants have violated California Health & Safety Code § 110765 which makes it unlawful for any person to misbrand any food.

143.    Defendants have violated California Health & Safety Code § 110770 which makes it unlawful for any person to receive in commerce any food that is misbranded or to deliver or proffer for delivery any such food.

144.    Defendants have violated the standard set by 21 C.F.R. § 101.22, which has been incorporated by reference in the Sherman Law, by failing to include on their product labels the nutritional information required by law.

145.    Defendants have violated the standards set by 21 CFR §§ 101.13, 101.14, and 101.54 which have been adopted and incorporated by reference in the Sherman Law, by including unauthorized antioxidant and nutrient content claims on their products.

146.    Defendants have violated the standards set by 21 CFR §§ 101.14, and 101.65, which have been adopted by reference in the Sherman Law, by including unauthorized health and healthy claims on their products.

E.      **Plaintiff Purchased Defendants' Misbranded Food Products**

147.    Plaintiff cares about the nutritional content of food products and seeks to maintain a healthy diet.

148.    Plaintiff purchased Defendants' misbranded food products at issue in this Complaint, including certain Misbranded Food Products, since 2008 and throughout the Class Period.  During the Class Period, Plaintiff spent more that twenty-five dollars ($25.00) on Defendants' Misbranded Food Products.

149.    Plaintiff purchased the following Lipton Tea products:

Lipton Pure Leaf Sweetened bottled iced tea, 16 oz. glass bottle

Lipton Iced Green Tea to Go w/Mandarin & Mango, 14 sticks

Lipton Vanilla Caramel Truffle Black Tea, 20 bags

Lipton Green Tea Decaffeinated, 20 bags

Lipton White Tea w/Raspberry, 16.9 oz. plastic bottle

Lipton Cold Brew Iced Tea, 22 bags

Lipton Decaffeinated Tea, 72 bags

Lipton Sweet Tea, 128 oz plastic bottle.

The Plaintiff also bought Lipton Brisk tea products such as Lipton Brisk Lemon Iced Tea and Pepsi carbonated beverages such as Pepsi.

150.    Plaintiff read the labels on Defendants' Misbranded Food Products, including the "All Natural," antioxidant and other nutrient content label claims, before purchasing them.

151.    Plaintiff relied on Defendants' package labeling including the "All Natural," label antioxidant and other nutrient content claims, and based and justified the decision to purchase Defendants' products in substantial part on Defendants' package labeling. Plaintiff read Unilever's website and web claims concerning Defendants' Misbranded Food Products, including the "All Natural," antioxidant and other nutrient content claims as well as the health and disease related claims before purchasing them.

152.    Plaintiff reasonably relied on Defendants' package labeling, packaging, and website and justified the decision to purchase Defendants' Misbranded Food Products in substantial part on Defendants' package labeling and web claims as well as product packaging, including the antioxidant and other nutrient content claims and the representations that the products were natural and healthy.

153.    At point of sale, Plaintiff did not know, and had no reason to know, that Defendants' products did not have the beneficial contents as represented and were misbranded as set forth herein, and would not have bought the products had she known the truth about them.

154.    After Plaintiff learned that Defendants' Misbranded Food Products were falsely labeled, she stopped purchasing them.

155.    At point of sale, Plaintiff did not know, and had no reason to know, that Defendants' "All Natural," antioxidant and other nutrient content label claims were unlawful and unauthorized as set forth herein, and would not have bought the products had she known the truth about them.

156.    As a result of Defendants unlawful misrepresentations, Plaintiff and thousands of others in California and throughout the United States purchased the Misbranded Food Products at issue.

157.    Defendants' labeling, advertising and marketing as alleged herein are false and misleading and are designed to increase sales of the products at issue.    Defendants' misrepresentations are part of an extensive labeling, advertising and marketing campaign, and a reasonable person would attach importance to Defendants' misrepresentations in determining whether to purchase the products at issue.

158.    A reasonable person would also attach importance to whether Defendants' products are legally salable, and capable of legal possession, and to Defendants' representations about these issues in determining whether to purchase the products at issue. Plaintiff would not have purchased Defendants' Misbranded Food Products had she known they were not capable of being legally sold or held.

159.    Defendants' Misbranded Food Products 1) whose essential characteristics had

been misrepresented by the Defendants, 2) which had their nutritional and health benefits misrepresented and overstated by the Defendants, and 3) which were misbranded products which could not be resold and whose very possession was illegal, were worthless to the Plaintiff and as a matter of law.

## CLASS ACTION ALLEGATIONS

160.    Plaintiff brings this action as a class action pursuant to Federal Rule of Procedure 23(b)(2) and 23(b)(3) on behalf of the following class:

> All persons in California who, within the last four years, purchased 1) any carbonated beverage manufactured, distributed or bottled under the authority of the Defendants that contained an artificial flavoring, artificial coloring, or chemical preservative but failed to bear a statement on its label disclosing that fact, or 2) any Lipton or Brisk tea products (the "Class").

161.    The following persons are expressly excluded from the Class:  (1) Defendants and their subsidiaries and affiliates; (2) all persons who make a timely election to be excluded from the proposed Class; (3) governmental entities; and (4) the Court to which this case is assigned and its staff.

162.    This action can be maintained as a class action because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable.

163.    <u>Numerosity</u>:  Based upon Defendants' publicly available sales data with respect to the misbranded products at issue, it is estimated that the Class numbers in the thousands, and that joinder of all Class members is impracticable.

164.    <u>Common Questions Predominate</u>:  This action involves common questions of law and fact applicable to each Class member that predominate over questions that affect only individual Class members.  Thus, proof of a common set of facts will establish the right of each Class member to recover.  Questions of law and fact common to each Class member include, just for example:

> a.    Whether Defendants engaged in unlawful, unfair or deceptive business practices by failing to properly package and label their Misbranded Food Products sold to consumers;
>
> b.    Whether the food products at issue were misbranded or unlawfully packaged and labeled as a matter of law;

c.   Whether Defendants made unlawful and misleading "All Natural" or natural claims with respect to their food products sold to consumers;

d.   Whether Defendants made unlawful and misleading antioxidant, nutrient content or health claims with respect to their food products sold to consumers;

e.   Whether Defendants violated California Bus. & Prof. Code § 17200, *et seq.*, California Bus. & Prof. Code § 17500, *et seq.*, the Consumers Legal Remedies Act, Cal. Civ. Code §1750, *et seq.*, California Civ. Code § 1790, *et seq.*, 15 U.S.C. § 2301, *et seq.*, and the Sherman Law;

f.   Whether Plaintiff and the Class are entitled to equitable and/or injunctive relief;

g.   Whether Defendants' unlawful, unfair and/or deceptive practices harmed Plaintiff and the Class; and

h.   Whether Defendants were unjustly enriched by their deceptive practices.

165.   Typicality:   Plaintiff's claims are typical of the claims of the Class because Plaintiff bought Defendants' Misbranded Food Products during the Class Period.   Defendants' unlawful, unfair and/or fraudulent actions concern the same business practices described herein irrespective of where they occurred or were experienced.   Plaintiff and the Class sustained similar injuries arising out of Defendants' conduct in violation of California law.   The injuries of each member of the Class were caused directly by Defendants' wrongful conduct.   In addition, the factual underpinning of Defendants' misconduct is common to all Class members and represents a common thread of misconduct resulting in injury to all members of the Class.   Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the Class members and are based on the same legal theories.

166.   Adequacy:   Plaintiff will fairly and adequately protect the interests of the Class. Neither Plaintiff nor Plaintiff's counsel have any interests that conflict with or are antagonistic to the interests of the Class members.   Plaintiff has retained highly competent and experienced class action attorneys to represent her interests and those of the members of the Class.   Plaintiff and Plaintiff's counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiff and counsel are aware of their fiduciary responsibilities to the Class

1    members and will diligently discharge those duties by vigorously seeking the maximum possible

2    recovery for the Class.

3         167.   <u>Superiority</u>:   There is no plain, speedy or adequate remedy other than by

4    maintenance of this class action.  The prosecution of individual remedies by members of the

5    Class will tend to establish inconsistent standards of conduct for Defendants and result in the

6    impairment of Class members' rights and the disposition of their interests through actions to

7    which they were not parties.  Class action treatment will permit a large number of similarly

8    situated persons to prosecute their common claims in a single forum simultaneously, efficiently

9    and without the unnecessary duplication of effort and expense that numerous individual actions

10   would engender.  Further, as the damages suffered by individual members of the Class may be

11   relatively small, the expense and burden of individual litigation would make it difficult or

12   impossible for individual members of the Class to redress the wrongs done to them, while an

13   important public interest will be served by addressing the matter as a class action.   Class

14   treatment of common questions of law and fact would also be superior to multiple individual

15   actions or piecemeal litigation in that class treatment will conserve the resources of the Court and

16   the litigants, and will promote consistency and efficiency of adjudication.

17        168.   The prerequisites to maintaining a class action for injunctive or equitable relief

18   pursuant to Fed. R. Civ. P. 23(b)(2) are met as Defendants have acted or refused to act on grounds

19   generally applicable to the Class, thereby making appropriate final injunctive or equitable relief

20   with respect to the Class as a whole.

21        169.   The prerequisites to maintaining a class action pursuant to Fed. R. Civ. P. 23(b)(3)

22   are met as questions of law or fact common to class members predominate over any questions

23   affecting only individual members, and a class action is superior to other available methods for

24   fairly and efficiently adjudicating the controversy.

25        170.   Plaintiff and Plaintiff's counsel are unaware of any difficulties that are likely to be

26   encountered in the management of this action that would preclude its maintenance as a class

27   action.

28

1

## CAUSES OF ACTION

2

### FIRST CAUSE OF ACTION
B**usiness and Professions Code § 17200,** *et seq.*
**Unlawful Business Acts and Practices**

3

4

5       171.    Plaintiff incorporates by reference each allegation set forth above.

6       172.    Defendants' conduct constitutes unlawful business acts and practices.

7       173.    Defendants' conduct resulted in mislabeling and misbranding their food products

8    in California.

9       174.    Defendants sold Misbranded Food Products in California and throughout the

10    United States during the Class Period.

11       175.    Defendants are corporations and, therefore, each is a "person" within the meaning

12    of the Sherman Law.

13       176.    Defendants' business practices are unlawful under § 17200, *et seq.* by virtue of

14    Defendants' violations of the advertising provisions of Article 3 of the Sherman Law and the

15    misbranded food provisions of Article 6 of the Sherman Law.

16       177.    Defendants' business practices are unlawful under § 17200, *et seq.* by virtue of

17    Defendants' violations of § 17500, *et seq.*, which forbids untrue and misleading advertising.

18       178.    Defendants' business practices are unlawful under § 17200, *et seq.* by virtue of

19    Defendants' violations of the Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*

20       179.    Defendants sold Plaintiff and the Class Misbranded Food Products that were not

21    capable of being sold or held legally and which were legally worthless. Plaintiff and the Class

22    paid a premium price for the Misbranded Food Products.

23       180.    As a result of Defendants' illegal business practices, Plaintiff and the Class,

24    pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future

25    conduct and such other orders and judgments which may be necessary to disgorge Defendants'

26    ill-gotten gains and to restore to any Class Member any money paid for the Misbranded Food

27    Products.

28

181.   Defendants' unlawful business acts present a threat and reasonable continued likelihood of injury to Plaintiff and the Class.

182.   As a result of Defendants' conduct, Plaintiff and the Class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future conduct by Defendants, and such other orders and judgments which may be necessary to disgorge Defendants' ill-gotten gains and restore any money paid for Defendants' Misbranded Food Products by Plaintiff and the Class.

**SECOND CAUSE OF ACTION**
**Business and Professions Code § 17200, *et seq.***
**Unfair Business Acts and Practices**

183.   Plaintiff incorporates by reference each allegation set forth above.

184.   Defendants' conduct as set forth herein constitutes unfair business acts and practices.

185.   Defendants' conduct resulted in mislabeling and misbranding their food products in California.

186.   Defendants sold Misbranded Food Products in California and throughout the United States during the Class Period.

187.   Plaintiff and members of the Class suffered a substantial injury by virtue of buying Defendants' Misbranded Food Products that they would not have purchased absent Defendants' illegal conduct.

188.   Defendants' deceptive marketing, advertising, packaging and labeling of their Misbranded Food Products and their sale of unsalable misbranded products that were illegal to possess was of no benefit to consumers, and the harm to consumers and competition is substantial.

189.   Defendants sold Plaintiff and the Class Misbranded Food Products that were not capable of being legally sold or held and that were legally worthless. Plaintiff and the Class paid a premium price for the Misbranded Food Products.

190.    Plaintiff and the Class who purchased Defendants' Misbranded Food Products had no way of reasonably knowing that the products were misbranded and were not properly marketed, advertised, packaged and labeled, and thus could not have reasonably avoided the injury each of them suffered.

191.    The consequences of Defendants' conduct as set forth herein outweigh any justification, motive or reason therefor.  Defendants' conduct is and continues to be immoral, unethical, unscrupulous, contrary to public policy, and is substantially injurious to Plaintiff and the Class.

192.    As a result of Defendants' conduct, Plaintiff and the Class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future conduct by Defendants, and such other orders and judgments which may be necessary to disgorge Defendants' ill-gotten gains and restore any money paid for Defendants' Misbranded Food Products by Plaintiff and the Class.

### THIRD CAUSE OF ACTION
### Business and Professions Code § 17200, *et seq.*
### Fraudulent Business Acts and Practices

193.    Plaintiff incorporates by reference each allegation set forth above.

194.    Defendants' conduct as set forth herein constitutes fraudulent business practices under California Business and Professions Code sections § 17200, *et seq.*

195.    Defendants sold misbranded food products in California during the class period.

196.    Defendants sold Misbranded Food Products throughout the United States during the Class Period.

197.    Defendants' misleading marketing, advertising, packaging and labeling of the Misbranded Food Products and their misrepresentations that the products were salable, capable of legal possession and not misbranded were likely to deceive reasonable consumers, and in fact, Plaintiff and members of the Class were deceived.  Defendants have engaged in fraudulent business acts and practices.

198.    Defendants' fraud and deception caused Plaintiff and the Class to purchase Defendants' Misbranded Food Products that they would otherwise not have purchased had they known the true nature of those products.

199.    Defendants sold Plaintiff and the Class Misbranded Food Products that were not capable of being sold or held legally and that were legally worthless. Plaintiff and the Class paid a premium price for the Misbranded Food Products.

200.    As a result of Defendants' conduct as set forth herein, Plaintiff and the Class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future conduct by Defendants, and such other orders and judgments which may be necessary to disgorge Defendants' ill-gotten gains and restore any money paid for Defendants' Misbranded Food Products by Plaintiff and the Class.

**FOURTH CAUSE OF ACTION**
**Business and Professions Code § 17500, *et seq.***
**<u>Misleading and Deceptive Advertising</u>**

201.    Plaintiff incorporates by reference each allegation set forth above.

202.    Plaintiff asserts this cause of action for violations of California Business and Professions Code § 17500*, et seq*. for misleading and deceptive advertising against Defendants.

203.    Defendants sold misbranded food products in California.

204.    Defendants sold Misbranded Food Products in California and throughout the United States during the Class Period.

205.    Defendants engaged in a scheme of offering Defendants Misbranded Food Products for sale to Plaintiff and members of the Class by way of, *inter alia*, product packaging and labeling, and other promotional materials.  These materials misrepresented and/or omitted the true contents and nature of Defendants Misbranded Food Products.  Defendants' advertisements and inducements were made within California and throughout the United States and come within the definition of advertising as contained in Business and Professions Code §17500, *et seq.* in that such product packaging and labeling, and promotional materials were intended as inducements to

1  purchase Defendants' Misbranded Food Products and are statements disseminated by Defendants

2  to Plaintiff and the Class that were intended to reach members of the Class.  Defendants knew, or

3  in the exercise of reasonable care should have known, that these statements were misleading and

4  deceptive as set forth herein.

5  206.   In furtherance of their plan and scheme, Defendants prepared and distributed

6  within California and nationwide via product packaging and labeling, and other promotional

7  materials, statements that misleadingly and deceptively represented the composition and the

8  nature of Defendants' Misbranded Food Products.  Plaintiff and the Class necessarily and

9  reasonably relied on Defendants' materials, and were the intended targets of such representations.

10  207.   Defendants' conduct in disseminating misleading and deceptive statements in

11  California and nationwide to Plaintiff and the Class was and is likely to deceive reasonable

12  consumers by obfuscating the true composition and nature of Defendants Misbranded Food

13  Products in violation of the "misleading prong" of California Business and Professions Code §

14  17500, *et seq*.

15  208.   As a result of Defendants' violations of the "misleading prong" of California

16  Business and Professions Code § 17500, *et seq.*, Defendants have been unjustly enriched at the

17  expense of Plaintiff and the Class.  Misbranded products cannot be legally sold or held and are

18  legally worthless. Plaintiff and the Class paid a premium price for the Misbranded Food Products.

19  209.   Plaintiff and the Class, pursuant to Business and Professions Code § 17535, are

20  entitled to an order enjoining such future conduct by Defendants, and such other orders and

21  judgments which may be necessary to disgorge Defendants' ill-gotten gains and restore any

22  money paid for Defendants' Misbranded Food Products by Plaintiff and the Class.

23  
24  **FIFTH CAUSE OF ACTION**
**Business and Professions Code § 17500, *et seq*.**
<u>**Untrue Advertising**</u>

25  
26  210.   Plaintiff incorporates by reference each allegation set forth above.

27  211.   Plaintiff asserts this cause of action against Defendants for violations of California

28  Business and Professions Code § 17500, *et seq.*, regarding untrue advertising.

1    212.   Defendants sold misbranded food products in California.

2    213.   Defendants sold Misbranded Food Products in California and throughout the

3    United States during the Class Period.

4    214.   Defendants engaged in a scheme of offering Defendants' Misbranded Food

5    Products for sale to Plaintiff and the Class by way of product packaging and labeling, and other

6    promotional materials.  These materials misrepresented and/or omitted the true contents and

7    nature of Defendants' Misbranded Food Products.  Defendants' advertisements and inducements

8    were made in California and throughout the United States and come within the definition of

9    advertising as contained in Business and Professions Code §17500, *et seq.* in that the product

10   packaging and labeling, and promotional materials were intended as inducements to purchase

11   Defendants' Misbranded Food Products, and are statements disseminated by Defendants to

12   Plaintiff and the Class.  Defendants knew, or in the exercise of reasonable care should have

13   known, that these statements were untrue.

14   215.   In furtherance of their plan and scheme, Defendants prepared and distributed in

15   California and nationwide via product packaging and labeling, and other promotional materials,

16   statements that falsely advertise the composition of Defendants' Misbranded Food Products, and

17   falsely misrepresented the nature of those products.  Plaintiff and the Class were the intended

18   targets of such representations and would reasonably be deceived by Defendants' materials.

19   216.   Defendants' conduct in disseminating untrue advertising throughout California

20   deceived Plaintiff and members of the Class by obfuscating the contents, nature and quality of

21   Defendants' Misbranded Food Products in violation of the "untrue prong" of California Business

22   and Professions Code § 17500.

23   217.   As a result of Defendants' violations of the "untrue prong" of California Business

24   and Professions Code § 17500, *et seq.*, Defendants have been unjustly enriched at the expense of

25   Plaintiff and the Class.  Misbranded products cannot be legally sold or held and are legally

26   worthless. Plaintiff and the Class paid a premium price for the Misbranded Food Products.

27   218.   Plaintiff and the Class, pursuant to Business and Professions Code § 17535, are

28   entitled to an order enjoining such future conduct by Defendants, and such other orders and

judgments which may be necessary to disgorge Defendants' ill-gotten gains and restore any money paid for Defendants' Misbranded Food Products by Plaintiff and the Class.

**SIXTH CAUSE OF ACTION**
**<u>Consumers Legal Remedies Act, Cal. Civ. Code §1750, *et seq.*</u>**

219.     Plaintiff incorporates by reference each allegation set forth above.

220.     This cause of action is brought pursuant to the CLRA.  Defendant's violations of the CLRA were and are willful, oppressive and fraudulent, thus supporting an award of punitive damages.

221.     Plaintiff and the Class are entitled to actual and punitive damages against Defendant for its violations of the CLRA.  In addition, pursuant to Cal. Civ. Code § 1782(a)(2), Plaintiffs and the Class are entitled to an order enjoining the above-described acts and practices, providing restitution to Plaintiff and the Class, ordering payment of costs and attorneys' fees, and any other relief deemed appropriate and proper by the Court pursuant to Cal. Civ. Code § 1780.

222.     Defendant's actions, representations and conduct have violated, and continue to violate the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the sale of goods or services to consumers.

223.     Defendant sold Misbranded Food Products in California during the Class Period.

224.     Plaintiff and members of the Class are "consumers" as that term is defined by the CLRA in Cal. Civ. Code §1761(d).

225.     Defendant's Misbranded Food Products were and are "goods" within the meaning of Cal. Civ. Code §1761(a).

226.     By engaging in the conduct set forth herein, Defendant violated and continues to violate Section 1770(a)(5), of the CLRA, because Defendant's conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices, in that it misrepresents the particular ingredients, characteristics, uses, benefits and quantities of the goods.

227.     By engaging in the conduct set forth herein, Defendant violated and continues to violate Section 1770(a)(7) of the CLRA, because Defendant's conduct constitutes unfair methods

- 48 -
*Amended Class Action Complaint*

of competition and unfair or fraudulent acts or practices, in that it misrepresents the particular standard, quality or grade of the goods.

228.   By engaging in the conduct set forth herein, Defendant violated and continues to violate Section 1770(a)(9) of the CLRA, because Defendant's conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices, in that it advertises goods with the intent not to sell the goods as advertised.

229.   By engaging in the conduct set forth herein, Defendant has violated and continues to violate Section 1770(a)(16) of the CLRA, because Defendant's conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices, in that it represents that a subject of a transaction has been supplied in accordance with a previous representation when they have not.

230.   Plaintiff requests that the Court enjoin Defendant from continuing to employ the unlawful methods, acts and practices alleged herein pursuant to Cal. Civ. Code § 1780(a)(2).  If Defendant is not restrained from engaging in these practices in the future, Plaintiff and the Class will continue to suffer harm.

231.   Pursuant to Section 1782(a) of the CLRA, on April 30, 2012, Plaintiff's counsel served Unilever with notice of Unilever's violations of the CLRA.  As authorized by Unilever's counsel, Plaintiffs' counsel served Unilever by certified mail, return receipt requested.   Unilever, through its counsel, acknowledged receipt of Plaintiffs' CLRA demand notice, by responding with a letter dated June 4, 2012.

232.   Pursuant to Section 1782(a) of the CLRA, on May 18, 2012, Plaintiff's counsel served PepsiCo with notice of PepsiCo's violations of the CLRA.  As authorized by PepsiCo's counsel, Plaintiffs' counsel served PepsiCo by certified mail, return receipt requested.   PepsiCo, through its counsel, acknowledged receipt of Plaintiffs' CLRA demand notice, by responding with a letter dated June 15, 2012.

233.   Defendants have failed to provide appropriate relief for its violations of the CLRA within 30 days of its receipt of the CLRA demand notice.  Accordingly, pursuant to Sections

1 │ 1780 and 1782(b) of the CLRA, Plaintiff is entitled to recover actual damages, punitive damages,

2 │ attorneys' fees and costs, and any other relief the Court deems proper.

3 │      234.    Plaintiffs make certain claims in this Amended Complaint that were not included

4 │ in the original Complaint filed on April 6, 2012, and were not included in Plaintiff's CLRA

5 │ demand notice.

6 │      235.    This cause of action does not currently seek monetary relief and is limited solely to

7 │ injunctive relief, as to Defendant's violations of the CLRA not included in the original

8 │ Complaint.  Plaintiff intends to amend this Complaint to seek monetary relief in accordance with

9 │ the CLRA after providing Defendant with notice of Plaintiff's new claims pursuant to Cal. Civ.

10 │ Code § 1782.

11 │      236.    At the time of any amendment seeking damages under the CLRA, Plaintiff will

12 │ demonstrate that the violations of the CLRA by Defendant were willful, oppressive and

13 │ fraudulent, thus supporting an award of punitive damages.

14 │      237.    Consequently, Plaintiff and the Class will be entitled to actual and punitive

15 │ damages against Defendant for its violations of the CLRA.  In addition, pursuant to Cal. Civ.

16 │ Code § 1782(a)(2), Plaintiff and the Class will be entitled to an order enjoining the above-

17 │ described acts and practices, providing restitution to Plaintiff and the Class, ordering payment of

18 │ costs and attorneys' fees, and any other relief deemed appropriate and proper by the Court

19 │ pursuant to Cal. Civ. Code § 1780.

20 │
   │                 **SEVENTH CAUSE OF ACTION**
21 │       **Restitution Based on Unjust Enrichment/Quasi-Contract**

22 │      238.    Plaintiff incorporates by reference each allegation set forth above.

23 │      239.    As a result of Defendants' fraudulent and misleading labeling, advertising,

24 │ marketing and sales of Defendants' Misbranded Food Products Defendants were enriched at the

25 │ expense of Plaintiff and the Class.

26 │      240.    Defendants sold Misbranded Food Products to Plaintiff and the Class that were not

27 │ capable of being sold or held legally and which were legally worthless.  It would be against

28 │ equity and good conscience to permit Defendants to retain the ill-gotten benefits they received

from Plaintiff and the Class, in light of the fact that the products were not what Defendants purported them to be.  Thus, it would be unjust and inequitable for Defendants to retain the benefit without restitution to Plaintiff and the Class of all monies paid to Defendants for the products at issue.

241.   As a direct and proximate result of Defendants' actions, Plaintiff and the Class have suffered damages in an amount to be proven at trial.

**EIGHTH CAUSE OF ACTION**
**Beverly-Song Act (Cal. Civ. Code § 1790, *et seq.*)**

242.   Plaintiff incorporates by reference each allegation set forth above.

243.   Plaintiff and members of the Class are "buyers" as defined by Cal. Civ. Code § 1791(b).

244.   Defendants are "manufacturers" and "sellers" as defined by Cal. Civ. Code § 1791(j) & (l).

245.   Defendants' food products are "consumables" as defined by Cal. Civ. Code § 1791(d).

246.   Defendants' "All Natural," nutrient and health claims constitute "express warranties" as defined by Cal. Civ. Code § 1791.2.

247.   Defendants, through their package labels, create express warranties by making the affirmation of fact and promising that their Misbranded Food Products comply with food labeling regulations under federal and California law.

248.   Despite Defendants' express warranties regarding their food products, they do not comply with food labeling regulations under federal and California law.

249.   Defendants breached their express warranties regarding their Misbranded Food Products in violation of Cal. Civ. Code § 1790, *et seq.*

250.   Defendants sold Plaintiff and members of the Class Defendants' Misbranded Food Products that were not capable of being sold or held legally and which were legally worthless. Plaintiff and the Class paid a premium price for the Misbranded Food Products.

251.    As a direct and proximate result of Defendants' actions, Plaintiff and the Class have suffered damages in an amount to be proven at trial pursuant to Cal. Civ. Code § 1794.

252.    Defendants' breaches of warranty were willful, warranting the recovery of civil penalties pursuant to Cal. Civ. Code § 1794.

### NINTH CAUSE OF ACTION
### Magnuson-Moss Act (15 U.S.C. § 2301, *et seq.*)

253.    Plaintiff incorporates by reference each allegation set forth above.

254.    Plaintiff and members of the Class are "consumers" as defined by 15 U.S.C. § 2301(3).

255.    Defendants are "suppliers" and "warrantors" as defined by 15 U.S.C. § 2301(4) & (5).

256.    Defendants' food products are "consumer products" as defined by 15  U.S.C. § 2301(1).

257.    Defendants' "All Natural" claims constitute "express warranties."

258.    Defendants, through their package labels, create express warranties by making the affirmation of fact and promising that their Misbranded Food Products comply with food labeling regulations under federal and California law.

259.    Despite Defendants' express warranties regarding their food products, they do not comply with food labeling regulations under federal and California law.

260.    Defendants breached their express warranties regarding their Misbranded Food Products in violation of 15 U.S.C. §§ 2301, *et seq.*

261.    Defendants sold Plaintiff and members of the Class Misbranded Food Products that were not capable of being sold or held legally and which were legally worthless. Plaintiff and the Class paid a premium price for the Misbranded Food Products.

262.    As a direct and proximate result of Defendants' actions, Plaintiff and the Class have suffered damages in an amount to be proven at trial.

### JURY DEMAND

Plaintiff hereby demands a trial by jury of her claims.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, and on behalf of the general public, prays for judgment against Defendants as follows:

A.      For an order certifying this case as a class action and appointing Plaintiff and her counsel to represent the Class;

B.      For an order awarding, as appropriate, damages, restitution or disgorgement to Plaintiff and the Class for all causes of action;

C.      For an order requiring Defendants to immediately cease and desist from selling their Misbranded Food Products listed in violation of law; enjoining Defendants from continuing to market, advertise, distribute, and sell these products in the unlawful manner described herein; and ordering Defendants to engage in corrective action;

D.      For all remedies available pursuant to Cal. Civ. Code § 1780;

E.      For an order awarding attorneys' fees and costs;

F.      For an order awarding punitive damages;

G.      For an order awarding pre-and post-judgment interest; and

H.      For an order providing such further relief as this Court deems proper.

Dated:  July  30, 2012                    Respectfully submitted,


                                           /s/ Ben F. Pierce Gore
                                          Ben F. Pierce Gore (SBN 128515)
                                          1901 S. Bascom Avenue, Suite 350
                                          Campbell, CA  95008
                                          Telephone:  (408) 429-6506
                                          Fax:  (408) 369-0752
                                          pgore@prattattorneys.com

                                          Jay Nelkin
                                          Carol Nelkin
                                          Stuart M. Nelkin
                                          NELKIN & NELKIN, P.C.
                                          5417 Chaucer Drive
                                          Houston, Texas 77005
                                          Telephone:  (713) 526-4500
                                          Facsimile:  (281) 825-4161
                                          jnelkin@nelkinpc.com
                                          cnelkin@nelkinpc.com
                                          snelkin@nelkinpc.com

*Amended Class Action Complaint*

Don Barrett
David McMullan, Jr.
Brian Herrington
Katherine B. Riley
BARRETT LAW GROUP, P.A.
P.O. Box 927
404 Court Square North
Lexington, MS 39095
Telephone: (662) 834-2488
Toll Free: (877) 816-4443
Fax: (662) 834-2628
dbarrett@barrettlawgroup.com
donbarrettpa@yahoo.com
bherrington@barrettlawgroup.com
kbriley@barrettlawgroup.com
kbriphone@yahoo.com
dmcmullan@barrettlawgroup.com

Charles Barrett
CHARLES BARRETT, P.C.
6518 Hwy. 100, Suite 210
Nashville, TN 37205
Telephone: (615) 515-3393
Fax: (615) 515-3395
charles@cfbfirm.com

Richard Barrett
LAW OFFICES OF RICHARD R. BARRETT, PLLC
2086 Old Taylor Road, Suite 1011
Oxford, MS 38655
Telephone: (662) 380-5018
Fax: (866) 430-5459
rrb@rrblawfirm.net

J. Price Coleman
COLEMAN LAW FIRM
1100 Tyler Avenue, Suite 102
Oxford, MS 38655
Telephone: (662) 236-0047
Fax: (662) 513-0072
colemanlawfirmpa@bellsouth.net

Dewitt M. Lovelace
Alex Peet
LOVELACE LAW FIRM, P.A.
12870 U.S. Hwy 98 West, Suite 200
Miramar Beach, FL 32550
Telephone: (850) 837-6020
Fax: (850) 837-4093
dml@lovelacelaw.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

David Shelton
ATTORNEY AT LAW
1223 Jackson Avenue East, Suite 202
Oxford, MS 38655
Telephone: (662) 281-1212
Fax: (662-281-1312
david@davidsheltonpllc.com

Keith M. Fleischman
Frank Karam
Ananda  N. Chaudhuri
FLEISCHMAN LAW FIRM
565 Fifth Avenue, 7th Floor
New York, New York  10017
Telephone:  212-880-9571
keith@fleischmanlawfirm.com
frank@fkaramlaw.com
achaudhuri@fleischmanlawfirm.com

Zona Jones
Darren Brown
PROVOST UMPHREY LAW FIRM LLP
490 Park Street
P.O. Box 4905
Beaumont, TX 77704
Telephone: (409) 299-5178
zjones@provostumphrey.com
dbrown@provostumphrey.com

*Attorneys for Plaintiff*