Ben F. Pierce Gore (SBN 128515)
PRATT & ASSOCIATES
1871 The Alameda, Suite 425
San Jose, CA 95126
Telephone:  (408) 429-6506
Fax:  (408) 369-0752
pgore@prattattorneys.com

*Attorney for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

|  |  |
|---|---|
| AMY MAXWELL, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>UNILEVER UNITED STATES, INC., PEPSICO, INC., and PEPSI LIPTON TEA PARTNERSHIP,<br><br>Defendants. | Case No. CV12-01736 (EJD)<br><br>**SECOND AMENDED CLASS ACTION AND REPRESENTATIVE ACTION COMPLAINT FOR DAMAGES, EQUITABLE AND INJUNCTIVE RELIEF**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff, Amy Maxwell, ("Plaintiff") through her undersigned attorneys, brings this lawsuit against Defendants Unilever United States, Inc. ("Unilever"), Pepsico, Inc. and Pepsico Lipton Tea Partnership (collectively "Pepsi") as to her own acts upon personal knowledge, and as to all other matters upon information and belief.

**DEFINITIONS**

1.      "Class Period" is April 6, 2008 to the present.

2.      "Purchased Products" are the 8 products listed below (2a-2h) that were purchased by Plaintiff during the Class Period.  Pictures of the Purchased Products along with specific descriptions of the relevant label representations are included in ¶¶ 143-189 below.

    a.   Lipton Pure Leaf Iced Tea – Sweetened (6-16 oz bottles);

    b.   Lipton Iced Green Tea to Go w/ Mandarin & Mango (14 sticks);

1        c.  Lipton Vanilla Caramel Truffle Black Tea (20 bags);

2        d.  Lipton Green Tea Decaffeinated (20 bags);

3        e.  Lipton Decaffeinated Tea (72 bags);

4        f.  Lipton Sweet Tea (1 gallon plastic bottle);

5        g.  Lipton Brisk Lemon Iced Tea (8 fl oz plastic bottle);

6        h.  Pepsi.

7        3.     "Substantially Similar Products" are the products listed in paragraph 4 below.

8    Each of these listed products: (i) make the same label representations, as described herein, as the

9    Purchased Products and (ii) violate the same regulations of the Sherman Food Drug & Cosmetic

10   Law, California Health & Safety Code § 109875 *et seq.* (the "Sherman Law") as the Purchased

11   Products, as described herein.

12       4.     Upon information and belief, these Substantially Similar Products are the

13   Defendants' products, sold during the Class Period, listed below.  Plaintiff reserves the right to

14   supplement this list if evidence is adduced during discovery to show that other products had

15   labels which violate the same provisions of the Sherman Law and have the same label

16   representations as the Purchased Products:

| | |
|---|---|
| Pure Leaf Unsweetened Iced Tea | Black Tea - Bavarian Wild Berry |
| Pure Leaf Iced Tea with Lemon | Black Tea - Black Pearl |
| Pure Leaf Green Tea with Honey | Black Tea - Tuscan Lemon |
| Pure Leaf Iced Tea with Peach | 100% Natural Green Tea with Citrus |
| Pure Leaf Iced Tea with Raspberry | 100% Natural Green Tea w/ Passionfruit |
| Pure Leaf Extra Sweet Iced Tea | Mango |
| Pure Leaf Diet Iced Tea with Lemon | 100% Natural Iced Tea with Pomegranate |
| Pure Leaf Diet Iced Tea with Peach | Blueberry |
| Brisk Tea No-Cal Lemon Iced Tea | Iced Tea Lemonade |
| Brisk Tea Strawberry Iced Tea | Diet Green Tea with Citrus |
| Brisk Tea Peach Iced Tea | Diet Green Tea with Watermelon |
| Brisk Tea Sweet Tea | Diet Iced Tea with Lemon |
| Brisk Tea Fruit Punch Iced Tea | Diet Sparkling Green Tea with Strawberry |
| Brisk Tea Lemonade Iced Tea | Kiwi |
| Brisk Tea Sugar Free Lemonade | Diet Sparkling Green Tea with Mixed Berry |
| Brisk Tea Mango Dragon Fruit Iced Tea | Diet White Tea with Raspberry Flavor |
| Brisk Tea Orangeade Iced Tea | Iced Black Tea Pitcher Size |
| Brisk Tea Sugar Free Orangeade Iced Tea | Iced Green Tea Blackberry Pomegranate |
| 100% Natural Green Tea | Picher Size |
| Green Tea with Citrus | Iced Green Tea Peach Passion Pitcher Size |
| Cranberry Pomegranate Green Tea | Decaf Cold Brew Family Size Tea Bags |
| Orange, Passionfruit & Jasmine Green Tea | Green Tea Honey & Lemon Iced Tea Mix |
| Lemon Ginseng Green Tea | Wild Raspberry White Iced Tea Mix |

| | |
|---|---|
| Honey Green Tea | Decaf Lemon Iced Tea Mix |
| Mixed Berry Green Tea | Diet Lemon Iced Tea Mix |
| Pyramid Green Tea with Mandarin Orange | Diet Raspberry Iced Tea Mix |
| Purple Acai and Blueberry Green Tea Superfruit | Diet Peach Iced Tea Mix |
| Red Goji and Raspberry Green Tea Superfruit | Diet Decaf Lemon Iced Tea Mix |
| Passionfruit and Coconut Green Tea Superfruit | Unsweetened Decaf Iced Tea Mix |
| Acai, Dragonfruit and Melon Green Tea Superfruit | Unsweetened Iced Tea Mix |
| Black Currant and Vanilla Superfruit | White Tea with Island Mango & Peach |
| Decaf Honey Lemon Green Tea | White Tea with Blueberry & Pomegranate Flavor |
| Decaf Blackberry and Pomegranate Green Tea Superfruit | Red Tea with Harvest Strawberry and Passionfruit |
| Black Currant Raspberry Iced Tea Black Tea To Go Packets | Caffeine Free Pepsi |
| Lemon Iced Black Tea To Go Packets | Pepsi MAX |
| Mango Pineapple Iced Tea To Go Packets | Pepsi NEXT |
| Blackberry Pomegranate Iced Green Tea To Go Packets | Pepsi One |
| Strawberry Acai Decaf Iced Green Tea To Go Packets | Pepsi Wild Cherry |
| Lemon Iced Black Tea Pitcher Packets | Diet Pepsi |
| Peach Apricot Iced Black Tea Pitcher Packets | Caffeine Free Diet Pepsi |
| Mango Pineapple Iced Green Tea Pitcher Packets | Diet Pepsi Lime |
| Blackberry Pomegranate Iced Green Tea Pitcher Packets | Diet Pepsi Vanilla |
| | Diet Pepsi Wild Cherry |
| | Pepsi Made in Mexico |
| | Pepsi Throwback |

5.     The class definition, listed in paragraph 214, is a combined list of the Purchased Products and Substantially Similar Products.

## SUMMARY OF THE CASE

6.     Plaintiff's case has two distinct facets.  First, the "UCL unlawful" part.  Plaintiff's first cause of action is brought pursuant to the unlawful prong of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 ("UCL").  Plaintiff alleges that Defendants package and label the Purchased Products in violation of California's Sherman Law which adopts, incorporates – and is identical – to the federal Food Drug & Cosmetic Act, 21 U.S.C. § 301 *et seq.* ("FDCA").  These violations (which do not require a finding that the labels are "misleading") render the Purchased Products "misbranded" which is no small thing.  Under California law, a food product that is misbranded cannot legally be manufactured, advertised, distributed, held or sold.  Misbranded products cannot be legally sold, possessed, have no economic value, and are legally worthless.  Indeed, the sale, purchase or possession of misbranded food is a criminal act in California and the FDA even threatens food companies with seizure of misbranded products.  This "misbranding" – standing alone without any allegations of deception by Defendants or

1   review of or reliance on the labels by Plaintiff – give rise to Plaintiff's first cause of action under

2   the UCL. To state a claim under the unlawful prong, Plaintiff need only allege that she would not

3   have purchased the product had she known it was misbranded because she would have a product

4   that is illegal to own or possess.

5          7.      Second, the "fraudulent" part. Plaintiff alleges that the illegal statements contained

6   on the labels of the Purchased Products – aside from being unlawful under the Sherman Law – are

7   also misleading, deceptive, unfair and fraudulent. Plaintiff describes these labels and how they

8   are misleading. Plaintiff alleges that prior to purchase she reviewed the illegal statements on the

9   labels on the Purchased Products, reasonably relied in substantial part on the labels, and was

10  thereby deceived, in deciding to purchase these products. Had Plaintiff known the truth about the

11  products there would have been no purchases.

12         8.      Plaintiff did not know, and had no reason to know, that the Defendants' Purchased

13  Products were misbranded under the Sherman Law and bore food labeling claims that failed to

14  meet the requirements to make those food labeling claims. Similarly, Plaintiff did not know, and

15  had no reason to know, that Defendants' Purchased Products were false and misleading.

16                                          **BACKGROUND**

17         9.      Every day millions of Americans purchase and consume packaged foods. To

18  protect these consumers, identical California and federal laws require truthful, accurate

19  information on the labels of packaged foods. This case is about companies that flout those laws

20  and sell misbranded food to unsuspecting consumers. The law, however, is clear: misbranded

21  food cannot legally be manufactured, held, advertised, distributed or sold. Misbranded food is

22  worthless as a matter of law, and purchasers of misbranded food are entitled to a refund of their

23  purchase price.

24         10.     Unilever is a multinational corporation with 400 brands, including Lipton Tea.

25  Unilever's website claims that "[o]n any given day, two billion people use our products." Lipton

26  employs "more than 80,000 people." According to Unilever, "tea is the second most widely-

27  consumed beverage on earth, behind water." In the U.S., Unilever markets Lipton Tea under

28  more than twelve labels.

11.     Additionally Unilever markets ready to drink teas under the Lipton and Brisk Tea brands through Defendant Pepsi Lipton Tea Partnership, a joint venture with Defendant PepsiCo, Inc.

12.     Unilever recognizes that health claims drive sales, and actively promotes the purported health benefits of Lipton Tea. Unilever's website claims:

> Made from real tea leaves, many Lipton teas contain tea flavonoids. The flavonoid content per serving can be found on all Lipton tea packages with the Tea Goodness seal which signals that the tea contains a specific level of tea flavonoids.  Flavonoids are dietary compounds found in tea, wine, cocoa, fruit and vegetables.  They contribute significantly to taste and color, and possibly help maintain certain normal, healthy body functions.  A diet rich in flavonoids is generally associated with helping maintain normal healthy heart function.

http://www.unileverusa.com/brands/foodbrands/lipton/index.aspx.

13.     On its Lipton Tea website, Unilever goes even further in promoting the health benefits of Lipton Tea:

> Studies suggest that drinking black or green tea may help maintain normal, healthy heart function as part of a diet that is consistent with dietary guidelines.  Research suggests that drinking 2 to 3 cups per day of black or green tea may help support normal, healthy vascular function.  The mechanism behind this effect has yet to be fully demonstrated, but research suggests that tea flavonoids may be responsible.

http://www.liptont.com/tea_health/healthy_diet/index.aspx.

14.     Unilever also makes health nutrient claims directly on packages of its tea.  For example, the package front panel of certain Lipton Tea products bears the "AOX Naturally Protective Antioxidants" label.  The back panel further touts the "protective flavonoid antioxidants" and "flavonoid content" of Lipton Tea, by comparing Lipton Tea to "selected beverages and fruits," including orange juice, broccoli, cranberry juice and coffee.

15.     In promoting the alleged health benefits of its products, Unilever purportedly adopted "Global Principles for Responsible Food and Beverage Marketing."  These Global Principles apply to "all of Unilever's food and beverage marketing activities and communications," and include the following provisions:

> These marketing activities and communications include but are not limited to packaging and labeling . . .
> Marketing communications must comply with all relevant laws/regulations in the local country . . .

All food and beverage marketing communications must be truthful and not misleading.

www.unileverusa.com/Images/30370 Global Principles A5 PDF-2 tcm23-48998.pdf

16.     Unfortunately, as discussed below, Unilever has violated these principles by using food labels that (i) violate the Sherman Law and thereby render the products misbranded and (ii) are misleading and deceptive.

17.     PepsiCo, Inc., the manufacture of the carbonated beverage Pepsi, also recognizes that health and wellness issues are important to its sales and success. PepsiCo states in its most recent annual report that "[o]ur success depends on our ability to respond to consumer trends, including concerns of consumers regarding health and wellness, obesity, product attributes and ingredients, and to expand into adjacent categories."

18.     If a manufacturer is going to make a claim on a food label, the label must meet certain legal requirements that help consumers make informed choices and ensure that they are not misled.  As described more fully below, Defendants have made, and continue to make, false and deceptive claims in violation of California and federal laws that govern the types of representations that can be made on food labels.  These laws recognize that reasonable consumers are likely to choose products claiming to have a health or nutritional benefit over otherwise similar food products that do not claim such benefits.

19.     Under California law, which is identical to federal law, a number of the Defendants' food labeling practices are unlawful because they are deceptive and misleading to consumers. These are:

    A.     Representing food products to be "all natural" or "natural" when they contain chemical preservatives, synthetic chemicals, added artificial color and other artificial ingredients;

    B.     Failing to disclose the presence of chemical preservatives, artificial flavorings or artificial added colors as required by law;

    C.     Making unlawful nutrient content claims on the labels of food products that fail to meet the minimum nutritional requirements legally required for the nutrient content claims being made;

    D.     Making unlawful antioxidant claims on the labels of food products that fail to meet the minimum nutritional requirements legally required for the antioxidant claims being made;

E.     Unilever makes unlawful and unapproved health claims about its products on the Lipton website that are prohibited by law.

20.     These practices are not only illegal but they mislead consumers and deprive them of the information they require to make informed purchasing decisions. Thus, for example, a mother who reads labels because she wants to purchase natural or healthy foods for her children would be mislead by Defendants' practices and labeling.

21.     California and federal laws have placed numerous requirements on food companies that are designed to ensure that the claims that companies make about their products to consumers are truthful, accurate and backed by acceptable forms of scientific proof. When companies such as Defendants make unlawful nutrient content, antioxidant, or health claims that are prohibited by California law, consumers such as Plaintiff are misled.

22.     Identical California and federal laws regulate the content of labels on packaged food.  The requirements of the FDCA were adopted by the California legislature in the Sherman Law.  Under both the Sherman Law and FDCA section 403(a), food is "misbranded" if "its labeling is false or misleading in any particular," or if it does not contain certain information on its label or its labeling.  21 U.S.C. § 343(a).

23.     Under the FDCA, the term "false" has its usual meaning of "untruthful," while the term "misleading" is a term of art.  Misbranding reaches not only false claims, but also those claims that might be technically true, but still misleading.  If any one representation in the labeling is misleading, the entire food is misbranded, nor can any other statement in the labeling cure a misleading statement.  "Misleading" is judged in reference to "the ignorant, the unthinking and the credulous who, when making a purchase, do not stop to analyze." *United States v. El-O-Pathic Pharmacy*, 192 F.2d 62, 75 (9th Cir. 1951). Under the FDCA, it is not necessary to prove that anyone was actually misled.

24.     On August 23, 2010, the FDA sent a warning letter to Unilever, informing Unilever of its failure to comply with the requirements of the FDCA and its regulations (the "FDA Warning Letter," attached hereto as Exhibit 1).  The FDA Warning Letter stated, in pertinent part:

**Unauthorized Nutrient Content Claims**

Under section 403(r)(1)(A) of the Act [21 U.S.C. 343(r)(1)(A)], a claim that characterizes the level of a nutrient which is of the type required to be in the labeling of the food must be made in accordance with a regulation promulgated by the Secretary (and, by delegation, FDA) authorizing the use of such a claim. The use of a term, not defined by regulation, in food labeling to characterize the level of a nutrient misbrands a product under section 403(r)(1)(A) of the Act.

Nutrient content claims using the term "antioxidant" must also comply with the requirements listed in 21 CFR 101.54(g). These requirements state, in part, that for a product to bear such a claim, an RDI must have been established for each of the nutrients that are the subject of the claim (21 CFR 101.54(g)(1)), and these nutrients must have recognized antioxidant activity (21 CFR 101.54(g)(2). The level of each nutrient that is the subject of the claim must also be sufficient to qualify for the claim under 21 CFR 101.54(b), (c), or (e) (21 CFR 101.54(g)(3)). For example, to bear the claim "high in antioxidant vitamin C," the product must contain 20 percent or more of the RDI for vitamin C under 21 CFR 101.54(b). Such a claim must also include the names of the nutrients that are the subject of the claim as part of the claim or, alternatively, the term "antioxidant" or "antioxidants" may be linked by a symbol (e.g., an asterisk) that refers to the same symbol that appears elsewhere on the same panel of the product label, followed by the name or names of the nutrients with recognized antioxidant activity (21 CFR 101.54(g)(4)). The use of a nutrient content claim that uses the term "antioxidant" but does not comply with the requirements of 21 CFR 101.54(g) misbrands a product under section 403(r)(2)(A)(i) of the Act.

Your webpage entitled "Tea and Health" and subtitled "Tea Antioxidants" includes the statement, "LIPTON Tea is made from tea leaves rich in naturally protective antioxidants." The term "rich in" is defined in 21 CFR 101.54(b) and may be used to characterize the level of antioxidant nutrients (21 CFR 101.54(g)(3)). However, this claim does not comply with 21 CFR 101.54(g)(4) because it does not include the nutrients that are the subject of the claim or use a symbol to link the term "antioxidant" to those nutrients. Thus, this claim misbrands your product under section 403(r)(2)(A)(i) of the Act.

This webpage also states that "tea is a naturally rich source of antioxidants." The term "rich source" characterizes the level of antioxidant nutrients in the product and, therefore, this claim is a nutrient content claim (see section 403(r)(1) of the Act and 21 CFR 101.13(b)). Even if we determined that the term "rich source" could be considered a synonym for a term defined by regulation (e.g., "high" or "good source"), nutrient content claims that use the term "antioxidant" must meet the requirements of 21 CFR 101.54(g). The claim "tea is a naturally rich source of antioxidants" does not include the nutrients that are the subject of the claim or use a symbol to link the term "antioxidant" to those nutrients, as required by 21 CFR 101.54(g)(4). Thus, this claim misbrands your product under section 403(r)(2)(A)(i) of the Act. The product label back panel includes the statement "packed with protective FLAVONOID ANTIOXIDANTS." The term "packed with" characterizes the level of flavonoid antioxidants in the product; therefore, this claim is a nutrient content claim (see section 403(r)(1) of the Act and 21 CFR 101.13(b)). Even if we determined that the term "packed with" could be considered a synonym for a term defined by regulation, nutrient content claims that use the term "antioxidant" must meet the requirements of 21 CFR 101.54(g). The claim "packed with FLAVONOID ANTIOXIDANTS" does not comply with 21 CFR 101.54(g)1) because no RDI has been established for flavonoids. Thus,

this unauthorized nutrient content claim causes your product to be misbranded under section 403(r)(2)(A)(i) of the Act.

The above violations are not meant to be an all-inclusive list of deficiencies in your products or their labeling. It is your responsibility to ensure that all of your products are in compliance with the laws and regulations enforced by FDA. You should take prompt action to correct the violations. Failure to promptly correct these violations may result in regulatory actions without further notice, such as seizure and/or injunction.

We note that your label contains a chart entitled "Flavonoid Content of selected beverages and foods." The chart appears to compare the amounts of antioxidants in your product with the amount of antioxidants in orange juice, broccoli, cranberry juice and coffee. However, the information provided may be misinterpreted by the consumer because although the chart is labeled, in part, "Flavonoid Content," the y-axis is labeled "AOX"; therefore, the consumer might believe that the chart is stating the total amount of antioxidants rather than specifically measuring the amount of flavonoids in the product.

http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/ucm224509.htm

25.     In response to the FDA Warning letter, Unilever modified its Lipton web site and its packaging by removing some of the most outlandish claims of health and therapeutic benefits that FDA had found in violation of law. However, there are several unlawful statements on Lipton's web site that remain: "*Flavonoids are dietary compounds found in tea, wine, cocoa, fruit and vegetables. They contribute significantly to taste and color, and possibly help maintain certain normal, healthy body functions. A diet rich in flavonoids is generally associated with helping maintain normal, healthy heart function*."

26.     "Flavonoids" are a substance or nutrient without an established referenced daily intake value ("RDI").

27.     Defendants have made, and continue to make, unlawful and misleading claims on food labels that are prohibited by California and federal law and which render these products misbranded.  Under federal and California law, such products cannot legally be manufactured, advertised, distributed, held or sold.  Defendants' violations of law include the illegal advertising, marketing, distribution, delivery and sale of these products to consumers in California and throughout the United States.

**PARTIES**

28.     Plaintiff Amy Maxwell is a resident of San Jose, California who bought the Purchased Products listed in paragraph 2 during the Class Period.  Plaintiff bought the Purchased Products on numerous occasions both before and after various label changes by Defendants as discussed herein.  Plaintiff purchased in excess of $25 worth of the Purchased Products in the Class Period.

29.     Defendant Unilever United States, Inc. ("Unilever") is a Delaware corporation with its principle place of business at 700 Sylvan Avenue, Englewood Cliffs, New Jersey. Unilever manufactures, markets, distributes and sells Lipton Tea products and Brisk Tea products.

30.     Defendant PepsiCo, Inc. ("PepsiCo") is a North Carolina corporation with its principle place of business at 700 Anderson Hill Road, Purchase, New York. On the label of certain ready to drink Lipton Tea products bought by the Plaintiff it is represented that the products are bottled under the authority of PepsiCo. PepsiCo also manufactures, markets, distributes and sells other beverages that contain an artificial flavoring, artificial coloring, or chemical preservative but fail to bear a statement on their label to that effect.

31.     Defendant Pepsi Lipton Tea Partnership (the "Partnership") is a joint venture between Unilever and PepsiCo. Unilever and PepsiCo created the "Partnership" in 1991. Unilever created a joint venture with PepsiCo, the Pepsi Lipton Tea Partnership for the marketing of ready to drink teas in North America. The Partnership operates as a subsidiary of PepsiCo, with its principle place of business at 700 Anderson Hill Road, Purchase, New York. PepsiCo and Lipton each control 50% of the shares in the Partnership. The Partnership manufactures, distributes and sells certain ready to drink Lipton Tea products and Brisk Tea Products.  Upon information and belief, the joint venture is controlled by a board that is evenly split between Pepsico personnel and Unilever personnel and its operations are conducted by personnel that remain Pepsico and Unilever employees.

32.     On information and belief, Unilever through its subsidiary Lipton, provides the tea ingredient to the Joint Venture and Pepsi through its subsidiaries and affiliates mix, bottle, label

1   and distribute the products using its extensive bottling and distribution network used in the

2   manufacture and sales of its other Pepsi products. Both Unilever and Pepsi market the products of

3   the Joint Venture.  The 1994 10K Annual Report of Pepsico, Inc. describes the Joint Venture as

4   follows:  "The Pepsi/Lipton Tea Partnership, a joint venture of PCNA [PepsiCo or North

5   America] and Thomas J.  Lipton Co., develops and sells tea concentrate to Pepsi-Cola

6   bottlers and develops and markets ready-to-drink tea products under the LIPTON trademark.

7   Such products are distributed by Pepsi-Cola bottlers throughout the United States."

8           33.     Pepsico employees played an active role in the design and approval of the labeling

9   of Purchased Products and the manufacturing, marketing and distribution of Purchased Products.

10  This was not limited to Pepsi products but also to Lipton Brisk tea products and ready to drink

11  Lipton Tea products. The Lipton White Tea Raspberry states on its cap that it was "manufactured

12  by independent bottlers under the authority of Pepsico, Inc.," and lists Pepsico's location in

13  Purchase, New York and its zip code.  Similarly, the Lipton Brisk Lemon Iced Tea, purchased by

14  Plaintiff, states on its cap that it was "manufactured by independent bottlers under the authority of

15  Pepsico, Inc.," and lists Pepsico's location in Purchase, New York and its zip code.

16          34.     The December 16, 2009 proof for the label of the Lipton Sweet Tea purchased by

17  the Plaintiff shows that the "Project Initiator" was an employee of Pepsico, Eric Fuller, who

18  during the Class Period  titles included Lipton Brand Marketing; Marketing Director Lipton

19  Portfolio of Brands, Pepsi Lipton Partnership and Pepsico Marketing Director. The proof for the

20  label of the Lipton Sweet Tea purchased by the Plaintiff also shows that the "DG Art Director"

21  was another employee of Pepsico, Maria Mileo-Rega, whose title during the class period included

22  Pepsico / Pepsi Design Group and whose duties included designing labels for the Pepsi/Lipton

23  Tea Partnership.

24          35.     The November 17, 2009 proof for the label of the Lipton Sweet Tea purchased by

25  the Plaintiff shows that the "Project Initiator" was an employee of Pepsico, Jamal Henderson,

26  who during the class period  titles included Brand Manager – Lipton Brisk and Associate Brand

27  Manager –Pepsi Lipton Tea Partnership. The proof for the label of the Lipton Sweet Tea

28  purchased by the Plaintiff also shows that the "DG Art Director" was another employee of

1    Pepsico, Mike Gottschalk, whose title during the class period Senior Art Director for Pepsico and

2    whose duties included the design of Lipton Brisk labels.

3          36.      Upon information and belief, Pespico's executive vice president and chief

4    marketing officer was responsible during the class period for the worldwide marketing and

5    advertising for all Pepsico brands including Pepsi, Diet Pepsi, Lipton Iced Tea and Lipton Brisk.

6    Pepsico identifies Pepsi, Diet Pepsi, Lipton Brisk and Lipton Iced Tea as Pepsico brands and

7    Pepsico websites contain advertising, marketing and labeling claims for these brands.

8          37.      Collectively, Defendants are leading producers of retail food products, including

9    the Purchased Products. Defendants sell their food products to consumers through grocery and

10    other retail stores throughout California.

11                      **JURISDICTION AND VENUE**

12          38.      This Court has original jurisdiction over this action under 28 U.S.C. § 1332(d)

13    because this is a class action in which: (1) there are over 100 members in the proposed class;

14    (2) members of the proposed class have a different citizenship from Defendants; and (3) the

15    claims of the proposed class members exceed $5,000,000 in the aggregate.

16          39.      Alternatively, the Court has jurisdiction over all claims alleged herein pursuant

17    to 28 U.S.C. § 1332, because the matter in controversy exceeds the sum or value of $75,000, and

18    is between citizens of different states.

19          40.      The Court has personal jurisdiction over Defendants because a substantial

20    portion of the wrongdoing alleged in this Second Amended Complaint occurred in California,

21    Defendants are authorized to do business in California, have sufficient minimum contacts with

22    California, and otherwise intentionally avail themselves of the markets in California through the

23    promotion, marketing and sale of merchandise, sufficient to render the exercise of jurisdiction by

24    this Court permissible under traditional notions of fair play and substantial justice.

25          41.      Because a substantial part of the events or omissions giving rise to these claims

26    occurred in this District and because the Court has personal jurisdiction over Defendants, venue is

27    proper in this Court pursuant to 28 U.S.C. § 1391(a) and (b).

28

**FACTUAL ALLEGATIONS**

A.     <u>Identical California and Federal Laws Regulate Food Labeling</u>

42.     Food manufacturers are required to comply with identical state and federal laws and regulations that govern the labeling of food products.  First and foremost among these is the FDCA and its labeling regulations, including those set forth in 21 C.F.R. § 101.

43.     Pursuant to the Sherman Law, California has expressly adopted the federal labeling requirements as its own and indicated that "[a]ll food labeling regulations and any amendments to those regulations adopted pursuant to the federal act, in effect on January 1, 1993, or adopted on or after that date shall be the food regulations of this state."  California Health & Safety Code § 110100.

44.     In addition to its blanket adoption of federal labeling requirements, California has also enacted a number of laws and regulations that adopt and incorporate specific enumerated federal food laws and regulations.  For example, food products are misbranded under California Health & Safety Code § 110660 if their labeling is false and misleading in one or more particulars; are misbranded under California Health & Safety Code § 110665 if their labeling fails to conform to the requirements for nutrient labeling set forth in 21 U.S.C. § 343(q) and regulations adopted thereto; are misbranded under California Health & Safety Code § 110670 if their labeling fails to conform with the requirements for nutrient content and health claims set forth in 21 U.S.C. § 343(r) and regulations adopted thereto; are misbranded under California Health & Safety Code § 110705 if words, statements and other information required by the Sherman Law to appear on their labeling are either missing or not sufficiently conspicuous; are misbranded under California Health & Safety Code § 110735 if they are represented as having special dietary uses but fail to bear labeling that adequately informs consumers of their value for that use; and are misbranded under California Health & Safety Code § 110740 if they contain artificial flavoring, artificial coloring and chemical preservatives but fail to adequately disclose that fact on their labeling.

## B.       FDA Enforcement History

45.       In recent years the FDA has become increasingly concerned that food manufacturers have been disregarding food labeling regulations. To address this concern, the FDA elected to take steps to inform the food industry of its concerns and to place the industry on notice that food labeling compliance was an area of enforcement priority.

46.       In October 2009, the FDA issued a *Guidance For Industry: Letter regarding Point Of Purchase Food Labeling* ("2009 FOP Guidance") to address its concerns about front of package labels.  The 2009 FOP Guidance advised the food industry:

> FDA's research has found that with FOP labeling, people are less likely to check the Nutrition Facts label on the information panel of foods (usually, the back or side of the package). It is thus essential that both the criteria and symbols used in front-of-package and shelf-labeling systems be nutritionally sound, well-designed to help consumers make informed and healthy food choices, and not be false or misleading. The agency is currently analyzing FOP labels that appear to be misleading. The agency is also looking for symbols that either expressly or by implication are nutrient content claims. We are assessing the criteria established by food manufacturers for such symbols and comparing them to our regulatory criteria.

> It is important to note that nutrition-related FOP and shelf labeling, while currently voluntary, is subject to the provisions of the Federal Food, Drug, and Cosmetic Act that prohibit false or misleading claims and restrict nutrient content claims to those defined in FDA regulations. Therefore, FOP and shelf labeling that is used in a manner that is false or misleading misbrands the products it accompanies. Similarly, a food that bears FOP or shelf labeling with a nutrient content claim that does not comply with the regulatory criteria for the claim as defined in Title 21 Code of Federal Regulations (CFR) 101.13 and Subpart D of Part 101 is misbranded. We will consider enforcement actions against clear violations of these established labeling requirements. . .

> … Accurate food labeling information can assist consumers in making healthy nutritional choices. FDA intends to monitor and evaluate the various FOP labeling systems and their effect on consumers' food choices and perceptions. FDA recommends that manufacturers and distributors of food products that include FOP labeling ensure that the label statements are consistent with FDA laws and regulations. FDA will proceed with enforcement action against products that bear FOP labeling that are explicit or implied nutrient content claims and that are not consistent with current nutrient content claim requirements. FDA will also proceed with enforcement action where such FOP labeling or labeling systems are used in a manner that is false or misleading.

47.       The 2009 FOP Guidance recommended that "manufacturers and distributors of food products that include FOP labeling ensure that the label statements are consistent with FDA law and regulations" and specifically advised the food industry that it would "proceed with

1  enforcement action where such FOP labeling or labeling systems are used in a manner that is

2  false or misleading."

3        48.      Despite the issuance of the 2009 FOP Guidance, Defendants did not remove the

4  unlawful and misleading food labeling claims from their products.

5        49.      On March 3, 2010, the FDA issued an "Open Letter to Industry from [FDA

6  Commissioner] Dr. Hamburg" (hereinafter, "Open Letter"). The Open Letter reiterated the FDA's

7  concern regarding false and misleading labeling by food manufacturers. In pertinent part the letter

8  stated:

9    In the early 1990s, the Food and Drug Administration (FDA) and the food industry
10   worked together to create a uniform national system of nutrition labeling, which
     includes the now-iconic Nutrition Facts panel on most food packages.  Our citizens
11   appreciate that effort, and many use this nutrition information to make food
     choices.  Today, ready access to reliable information about the calorie and nutrient
12   content of food is even more important, given the prevalence of obesity and diet-
     related diseases in the United States.  This need is highlighted by the
13   announcement recently by the First Lady of a coordinated national campaign to
     reduce the incidence of obesity among our citizens, particularly our children.
14   With that in mind, I have made improving the scientific accuracy and usefulness of
     food labeling one of my priorities as Commissioner of Food and Drugs.  The latest
15   focus in this area, of course, is on information provided on the principal display
     panel of food packages and commonly referred to as "front-of-pack" labeling. The
16   use of front-of-pack nutrition symbols and other claims has grown tremendously in
     recent years, and it is clear to me as a working mother that such information can be
17   helpful to busy shoppers who are often pressed for time in making their food
     selections. ….

18   As we move forward in those areas, I must note, however, that there is one area in
     which more progress is needed.  As you will recall, we recently expressed concern,
19   in a "Dear Industry" letter, about the number and variety of label claims that may
     not help consumers distinguish healthy food choices from less healthy ones and,
20   indeed, may be false or misleading.

21   At that time, we urged food manufacturers to examine their product labels in the
     context of the provisions of the Federal Food, Drug, and Cosmetic Act that
22   prohibit false or misleading claims and restrict nutrient content claims to those
     defined in FDA regulations.  As a result, some manufacturers have revised their
23   labels to bring them into line with the goals of the Nutrition Labeling and
     Education Act of 1990.  Unfortunately, however, we continue to see products
24   marketed with labeling that violates established labeling standards.

25   To address these concerns, FDA is notifying a number of manufacturers that their
     labels are in violation of the law and subject to legal proceedings to remove
26   misbranded products from the marketplace.  While the warning letters that convey
     our regulatory intentions do not attempt to cover all products with violative labels,
27   they do cover a range of concerns about how false or misleading labels can
     undermine the intention of Congress to provide consumers with labeling
28   information that enables consumers to make informed and healthy food choices.

For example: …

- Products that claim to treat or mitigate disease are considered to be drugs and must meet the regulatory requirements for drugs, including the requirement to prove that the product is safe and effective for its intended use.
- Misleading "healthy" claims continue to appear on foods that do not meet the long- and well-established definition for use of that term.
  . . . .

These examples and others that are cited in our warning letters are not indicative of the labeling practices of the food industry as a whole. In my conversations with industry leaders, I sense a strong desire within the industry for a level playing field and a commitment to producing safe, healthy products. That reinforces my belief that FDA should provide as clear and consistent guidance as possible about food labeling claims and nutrition information in general, and specifically about how the growing use of front-of-pack calorie and nutrient information can best help consumers construct healthy diets.

I will close with the hope that these warning letters will give food manufacturers further clarification about what is expected of them as they review their current labeling. I am confident that our past cooperative efforts on nutrition information and claims in food labeling will continue as we jointly develop a practical, science-based front-of-pack regime that we can all use to help consumers choose healthier foods and healthier diets.

50.     Notwithstanding the Open Letter, Defendants have continued to utilize unlawful food labeling claims despite the express guidance of the FDA in the Open Letter.

51.     In addition to its guidance to industry, the FDA has sent warning letters to the industry, including many of Defendants' peer food manufacturers, for the same types of unlawful nutrient content claims described above.

52.     In these letters dealing with unlawful nutrient content claims, the FDA indicated that, as a result of the same type of claims utilized by Defendants, products were in "violation of the Federal Food, Drug, and Cosmetic Act … and the applicable regulations in Title 21, Code of Federal Regulations, Part 101 (21 CFR § 101)" and "misbranded within the meaning of section 403(r)(1)(A) because the product label bears a nutrient content claim but does not meet the requirements to make the claim." Similarly, letters for unlawful "all natural" claims similar to those at issue here, indicated that the products at issue were "misbranded under section 403(a)(1) of the Act" because their labels were "false and misleading."

53.     These warning letters were not isolated as the FDA has issued other warning letters to other companies for the same type of food labeling claims at issue in this case.

54. The FDA stated that the agency not only expected companies that received warning letters to correct their labeling practices but also anticipated that other firms would examine their food labels to ensure that they are in full compliance with food labeling requirements and make changes where necessary. Defendants did not change the labels on their products in response to the warning letters sent to other companies.

55. Defendants also continued to ignore the FDA's Guidance for Industry, A Food Labeling Guide which details the FDA's guidance on how to make food labeling claims. Defendants continued to utilize unlawful claims on the labels of their products. As such, the Purchased Products, continue to run afoul of FDA guidance as well as identical federal and California law.

56. Despite the FDA's numerous warnings to industry, Defendants have continued to sell products bearing unlawful food labeling claims without meeting the requirements to make them.

57. Plaintiff did not know, and had no reason to know, that the Defendants' Purchased Products were misbranded and bore food labeling claims despite failing to meet the requirements to make those food labeling claims. Similarly, Plaintiff did not know, and had no reason to know, that the Defendants' Purchased Products were misbranded because their labeling was false and misleading.

**OVERVIEW OF APPLICABLE SHERMAN LAW VIOLATIONS**

**A.** **"Nutrient Content" Claims**

58. The following Purchased Products have an unlawful and misleading "nutrient content" claim:

> Lipton Pure Leaf Iced Tea – Sweetened
> Lipton Iced Green Tea to Go w/ Mandarin & Mango
> Lipton Vanilla Caramel Truffle Black Tea
> Lipton Green Tea Decaffeinated
> Lipton Decaffeinated Tea
> Lipton Sweet Tea

59. Pursuant to Section 403 of the FDCA, a claim that characterizes the level of a nutrient in a food is a "nutrient content claim" that must be made in accordance with the

1   regulations that authorize the use of such claims.  21 U.S.C. § 343(r)(1)(A).  California expressly

2   adopted the requirements of 21 U.S.C. § 343(r) in § 110670 of the Sherman Law.

3          60.     Nutrient content claims are claims about specific nutrients contained in a product.

4   They are typically made on food packaging in a font large enough to be read by the average

5   consumer.  Because consumers, including Plaintiff, rely upon these claims when making

6   purchasing decisions, the regulations govern what claims can be made in order to prevent

7   misleading claims.

8          61.     Section 403(r)(1)(A) of the FDCA governs the use of expressed and implied

9   nutrient content claims on labels of food products that are intended for sale for human

10  consumption.  21 C.F.R. § 101.13.

11         62.     21 C.F.R. § 101.13 provides the general requirements for nutrient content claims,

12  which California has expressly adopted.  California Health & Safety Code § 110100.

13         63.     An "expressed nutrient content claim" is defined as any direct statement about the

14  level (or range) of a nutrient in the food (*e.g.*, "low sodium" or "contains 100 calories").  21

15  C.F.R. § 101.13(b)(1).

16         64.     An "implied nutrient content claim" is defined as any claim that: (i) describes the

17  food or an ingredient therein in a manner that suggests that a nutrient is absent or present in a

18  certain amount (*e.g.*, "high in oat bran"); or (ii) suggests that the food, because of its nutrient

19  content, may be useful in maintaining healthy dietary practices and is made in association with an

20  explicit claim or statement about a nutrient (*e.g.*, "healthy, contains 3 grams (g) of fat").  21

21  C.F.R. § 101.13(b)(2)(i-ii).

22         65.     These regulations authorize use of a limited number of defined nutrient content

23  claims. In addition to authorizing the use of only a limited set of defined nutrient content terms on

24  food labels, these regulations authorize the use of only certain synonyms for these defined terms.

25  If a nutrient content claim or its synonym is not included in the food labeling regulations it cannot

26  be used on a label. Only those claims, or their synonyms, that are specifically defined in the

27  regulations may be used. All other claims are prohibited. 21 C.F.R. § 101.13(b).

28

SECOND AMENDED CLASS ACTION COMPLAINT                                           18
CASE NO. 12-CV-01736 (EJD)

66.     Only approved nutrient content claims will be permitted on the food label, and all other nutrient content claims will misbrand a food. It is thus clear which types of claims are prohibited and which types are permitted. Manufacturers are on notice that the use of an unapproved nutrient content claim is prohibited conduct. 58 F.R. 2302. In addition, 21 USC § 343(r)(2), whose requirements have been adopted by California, prohibits using unauthorized undefined terms and declares foods that do so to be misbranded.

67.     Similarly, the regulations specify absolute and comparative levels at which foods qualify to make these claims for particular nutrients (*e.g.*, low fat . . . more vitamin C) and list synonyms that may be used in lieu of the defined terms. Certain implied nutrient content claims (*e.g.*, "healthy") also are defined. The daily values (DVs) for nutrients that the FDA has established for nutrition labeling purposes have application for nutrient content claims, as well. Claims are defined under current regulations for use with nutrients having established DVs; moreover, relative claims are defined in terms of a difference in the percent DV of a nutrient provided by one food as compared to another. *See e.g.*, 21 C.F.R. §§ 101.13 and 101.54.

68.     In order to appeal to consumer preferences, Defendants have repeatedly made false and unlawful nutrient content claims about antioxidants and other nutrients that either fail to utilize one of the limited defined terms or use one the defined terms improperly. These nutrient content claims are unlawful because they fail to comply with the nutrient content claim provisions in violation of 21 C.F.R. §§ 101.13 and 101.54, which are incorporated in California's Sherman Law. To the extent that the terms used by Defendants to describe nutrients and antioxidants are deemed to be a synonym for a defined term like "contain" the claim would still be unlawful because either the terms are being used improperly or the nutrients and antioxidants at issue do not have established daily values and thus cannot serve as the basis for a term that has a minimum daily value threshold as the defined terms at issue here do.

69.     Defendants' claims concerning unnamed antioxidants, other antioxidants and nutrients are false because Defendants' use of a defined term is in effect a claim that the products have met the minimum nutritional requirements for the use of the defined term when they have not.

70.     For example, nutrient content claims that Defendants make on the labels of the (i) Lipton Pure Leaf Iced Tea – Sweetened, (ii) Lipton Iced Green Tea to Go w/ Mandarin & Mango, (iii) Lipton Green Tea Decaffeinated, (iv) Lipton Decaffeinated Tea, (v) Lipton Vanilla Caramel Truffle Black Tea, and (vi) Lipton Sweet Tea are false and unlawful because they use the defined term "contains" improperly. Defendants use this term to describe antioxidants and flavonoids that fail to satisfy the minimum nutritional thresholds for these defined terms. "Contains" requires a nutrient to be present at a level at least 10% of the Daily Value for that nutrient.

71.     Defendants' misuse of defined terms is not limited the nutrient content claims on one or two products. Defendants' tea related claims are part of a widespread practice of misusing defined nutrient content claims to overstate the nutrient content of their tea products. For example, Defendants' claims that tea "contain" antioxidants or flavonoids are unlawful because neither of these nutrients have a DV and thus they cannot satisfy the 10% DV required for a "contains" nutrient content claim. Defendants make numerous other false and unlawful nutrient content claims such as Defendants' claims that tea is "rich in" nutrients when it is not.

72.     Defendants also falsely and unlawfully use undefined terms such as "packed with," "found in" and "source of."  By using undefined terms such as "packed with, "found in" and "source of," Defendants are, in effect, falsely asserting that their products meet at least the lowest minimum threshold for any nutrient content claim which would be 10% of the daily value of the nutrient at issue.  Such a threshold represents the lowest level that a nutrient can be present in a food before it becomes deceptive and misleading to highlight its presence in a nutrient content claim. Thus, for example, it is deceptive and misleading for Defendants to claim that their teas are "packed with antioxidants." It is similarly deceptive and misleading for Defendants to claim that teas are a "source" of antioxidants or that such nutrients are "found" in tea.  None of these nutrients has a DV and thus it is unlawful to make nutrient content claims about them.

73.     FDA enforcement actions targeting identical or similar claims to those made by Defendants have made clear the unlawfulness of such claims.  For example, on March 24, 2011, the FDA sent Jonathan Sprouts, Inc. a warning letter where it specifically targeted a "source" type claim like the one used  by  Defendants. In that letter the FDA stated:

1

2

3

4

5

6

7

> Your Organic Clover Sprouts product label bears the claim "Phytoestrogen Source[.]" Your webpage entitled "Sprouts, The Miracle Food! - Rich in Vitamins, Minerals and Phytochemicals" bears the claim "Alfalfa sprouts are one of our finest food sources of . . . saponin." These claims are nutrient content claims subject to section 403(r)(1)(A) of the Act because they characterize the level of nutrients of a type required to be in nutrition labeling (phytoestrogen and saponin) in your products by use of the term "source." Under section 403(r)(2)(A) of the Act, nutrient content claims may be made only if the characterization of the level made in the claim uses terms which are defined by regulation. However, FDA has not defined the characterization "source" by regulation. Therefore, this characterization may not be used in nutrient content claims.

74.     It is thus clear that a "source" claim is unlawful because the "FDA has not defined

the characterization 'source' by regulation" and thus such a "characterization may not be used in

nutrient content claims." Similarly, a claim that a nutrient is "found" in tea is improper because it

is either an undefined characterization that a nutrient is found in a food at some undefined level or

because it is a synonym for a defined term like "contains" as there is no difference in meaning

between the statement "tea contains antioxidants" and the statement "antioxidants are found in

tea." Both characterize the fact the tea contains antioxidants at some undefined level. The types of

misrepresentations made above would be considered by a reasonable consumer like the Plaintiff

when deciding to purchase the products.

75.     These very same types of violations at issue here over nutrient content claims for

food products were condemned in an FDA warning letter to Unilever in which, the FDA stated:

> The product label back panel includes the statement "packed with protective FLAVONOID ANTIOXIDANTS." The term "packed with" characterizes the level of flavonoid antioxidants in the product; therefore, this claim is a nutrient content claim (see section 403(r)(1) of the Act and 21 CFR 101.13(b)). Even if we determined that the term "packed with" could be considered a synonym for a term defined by regulation, nutrient content claims that use the term "antioxidant" must meet the requirements of 21 CFR 101.54(g). The claim "packed with FLAVONOID ANTIOXIDANTS" does not comply with 21 CFR 101.54(g)1 because no RDI has been established for flavonoids.

76.     Just as the FDA found Unilever's use of the phrase "packed with flavonoid

antioxidants" to be in violation of law for the particular tea products focused on by the FDA,

Unilever's use on its website and package labels of terms such as "packed with antioxidants" is in

violation of law as are Defendants' other nutrient content claims.  Therefore, such violations

cause products "to be misbranded under section 403(r)(2)(A)(i) of the Act."

77.     The nutrient content claims regulations discussed above are intended to ensure that consumers are not misled as to the actual or relative levels of nutrients in food products.

78.     For these reasons, Defendants' "contains" nutrient content claims are false and misleading and in violation of 21 C.F.R. §§ 101.13 and 101.54 and identical California law, and the products at issue are misbranded as a matter of law. Defendants have violated these referenced regulations. Therefore, Defendants' (i) Lipton Pure Leaf Iced Tea – Sweetened, (ii) Lipton Iced Green Tea to Go w/ Mandarin & Mango, (iii) Lipton Vanilla Caramel Truffle Black Tea, (iv) Lipton Green Tea Decaffeinated, (v) Lipton Decaffeinated Tea, and (vi) Lipton Sweet Tea.  These products are misbranded as a matter of California and federal law and cannot be sold or held and thus are legally worthless.

79.     Defendants' claims in this respect are false and misleading and are in this respect misbranded under identical California and federal laws.  Misbranded products cannot be legally sold and are legally worthless. Plaintiff and members of the Class who purchased such products paid an unwarranted premium for these products.

**B.     "Antioxidant Nutrient Content" Claims**

80.     The following Purchased Products have an unlawful and misleading "antioxidant nutrient content" claim:

> Lipton Pure Leaf Iced Tea – Sweetened
> Lipton Iced Green Tea to Go w/ Mandarin & Mango
> Lipton Vanilla Caramel Truffle Black Tea
> Lipton Green Tea Decaffeinated
> Lipton Decaffeinated Tea
> Lipton Sweet Tea

81.     Defendants violate identical California and federal antioxidant labeling regulations.

82.     Both California and federal regulations regulate antioxidant claims as a particular type of nutrient content claim.  Specifically, 21 C.F.R. § 101.54(g), which has been adopted by California, contains special requirements for nutrient claims that use the term "antioxidant:"

> (1)     the name of the antioxidant must be disclosed;
>
> (2)     there must be an established RDI for that antioxidant, and if not, no "antioxidant" claim can be made about it;

(3)    the label claim must include the specific name of the nutrient that is an antioxidant and cannot simply say "antioxidants" (*e.g.*, "high in antioxidant vitamins C and E"), *see* 21 C.F.R. § 101.54(g)(4);

(4)    the nutrient that is the subject of the antioxidant claim must also have recognized antioxidant activity, *i.e.*, there must be scientific evidence that after it is eaten and absorbed from the gastrointestinal tract, the substance participates in physiological, biochemical or cellular processes that inactivate free radicals or prevent free radical-initiated chemical reactions, *see* 21 C.F.R. § 101.54(g)(2);

(5)    the antioxidant nutrient must meet the requirements for nutrient content claims in 21 C.F.R. § 101.54(b), (c), or (e) for "High" claims, "Good Source" claims, and "More" claims, respectively. For example, to use a "High" claim, the food would have to contain 20% or more of the Daily Reference Value ("DRV") or RDI per serving. For a "Good Source" claim, the food would have to contain between 10-19% of the DRV or RDI per serving, *see* 21 C.F.R. § 101.54(g)(3); and

(6)    the antioxidant nutrient claim must also comply with general nutrient content claim requirements such as those contained in 21 C.F.R. § 101.13(h) that prescribe the circumstances in which a nutrient content claim can be made on the label of products high in fat, saturated fat, cholesterol or sodium.

83.    Defendant has labels that violate federal and California law: (1) because the antioxidants are not named, (2) because there are no RDIs for the unnamed antioxidants being touted (3) because no antioxidants are capable of qualifying for a "good source" claim and (4) because Defendants lack adequate scientific evidence that the claimed antioxidant nutrients participate in physiological, biochemical, or cellular processes that inactivate free radicals or prevent free radical-initiated chemical reactions after they are eaten and absorbed from the gastrointestinal tract.

84.    The FDA has issued at least 7 warning letters addressing similar unlawful antioxidant nutrient content claims. Defendants knew or should have known of these FDA warning letters.

85.    Ignoring the legal requirements regarding antioxidant claims, Defendants have made multiple unlawful antioxidant claims about their products.

86.    Not only do Defendants' antioxidant nutrient content claims regarding the benefits of unnamed antioxidants, flavonoids and other nutrients violate FDA rules and regulations as previously interpreted by FDA in the above mentioned warning letters and in its publications,

they directly contradict Unilever's own current scientific research, which has concluded after

researching antioxidant properties that:

> despite more than 50 studies convincingly showing that flavonoids possess potent antioxidant activity *in vitro,* the ability of flavonoids to act as an antioxidant *in vivo* [in humans], has not been demonstrated….

> No evidence has been provided to establish that having antioxidant activity/content and/or antioxidant properties is a beneficial physiological effect.

Rycroft, Jane, "The Antioxidant Hypothesis Needs to be Updated," Vol. 1, *Tea Quarterly Tea*

*Science Overview,* Lipton Tea Institute of Tea Research (Jan. 2011), pp. 2-3.

87.     In fact, the USDA recently removed the USDA ORAC Database for Selected

Foods from its website "due to mounting evidence that the values indicating antioxidant capacity

have no relevance to the effects of specific bioactive compounds, including polyphenols on

human health."  It was this database that the Defendants premised a number of their labeling

claims including the graphs of antioxidant and/or flavonoid content they placed on their labels.

According to the USDA:

> ORAC values are routinely misused by food and dietary supplement manufacturing companies to promote their products and by consumers to guide their food and dietary supplement choices….

> There is no evidence that the beneficial effects of polyphenol-rich foods can be attributed to the antioxidant properties of these foods. The data for antioxidant capacity of foods generated by in vitro (test-tube) methods cannot be extrapolated to in vivo (human) effects and the clinical trials to test benefits of dietary antioxidants have produced mixed results. We know now that antioxidant molecules in food have a wide range of functions, many of which are unrelated to the ability to absorb free radicals.

For these reasons the ORAC table, previously available on this web site has been withdrawn.

88.     Scientific evidence and consensus establishes the improper nature of the

Defendants' antioxidant claims as they cannot satisfy the legal and regulatory requirement that

the nutrient that is the subject of the antioxidant claim must have recognized antioxidant activity,

*i.e.,* there must be scientific evidence that after it is eaten and absorbed from the gastrointestinal

tract, the substance participates in physiological, biochemical or cellular processes that inactivate

free radicals or prevent free radical-initiated chemical reactions, *see* 21 C.F.R.  § 101.54(g)(2).

89.     In addition to the FDA Warning Letter to Unilever discussed above (Exhibit 1),

1    the FDA has issued warning letters addressing similar unlawful antioxidant nutrient content

2    claims. *See e.g.*, Exhibit 2 (FDA warning letter dated August 30, 2010 to Dr. Pepper Snapple

3    Group regarding its misbranded Canada Dry Sparkling Green Tea Ginger Ale product because

4    green tea and green tea flavonoids "are not nutrients with recognized antioxidant activity");

5    Exhibit 3 (FDA warning letter dated February 22, 2010 to Redco Foods, Inc. regarding its

6    misbranded Salada Naturally Decaffeinated Green Tea product because "there are no RDIs for

7    (the antioxidants) grapeskins, rooibos (red tea) and anthocyanins"); Exhibit 4 (FDA warning letter

8    dated February 22, 2010 to Fleminger Inc. regarding its misbranded TeaForHealth products

9    because the admonition "[d]rink high antioxidant green tea" . . . "does not include the nutrients

10    that are the subject of the claim or use a symbol to link the term antioxidant to those nutrients").

11          90.    Defendants are aware of these FDA warning letters.

12          91.    The antioxidant regulations discussed above are intended to ensure that consumers

13    are not misled as to the actual or relative levels of antioxidants in food products.

14          92.    For these reasons, Defendants' antioxidant claims at issue in this Second Amended

15    Complaint are false and misleading and in violation of 21 C.F.R. §§ 101.13 and 101.54 and

16    identical California law, and Defendant's (i) Lipton Pure Leaf Iced Tea – Sweetened, (ii) Lipton

17    Iced Green Tea to Go w/ Mandarin & Mango, (iii) Lipton Vanilla Caramel Truffle Black Tea, (iv)

18    Lipton Green Tea Decaffeinated, (v) Lipton Decaffeinated Tea, and (vi) Lipton Sweet Tea are

19    misbranded as a matter of law. Defendants have violated these referenced regulations. Therefore,

20    these products are misbranded as a matter of California and federal law and cannot be sold or held

21    and thus are legally worthless.

22          93.    Defendants' claims in this respect are false and misleading and the products are in

23    this respect misbranded under identical California and federal laws, Misbranded products cannot

24    be legally sold and are legally worthless. Plaintiff and members of the Class who purchased these

25    products paid an unwarranted premium for these products.

26        **D.**    **Nutritional Value Claims**

27          94.    The following Purchased Products have an unlawful and misleading "nutritional

28    value" claim:

Lipton Pure Leaf Iced Tea – Sweetened
Lipton Iced Green Tea to Go w/ Mandarin & Mango
Lipton Green Tea Decaffeinated
Lipton Sweet Tea

95.    Defendants have also violated 21 C.F.R. § 101.54(g)(1), which prohibits food manufacturers from making claims regarding the nutritional value of their products when the products fail to disclose that no RDI has been established for the touted nutrients.

96.    Certain Lipton products claim to be "rich in" antioxidants, "packed with flavonoid antioxidants" (old labels) or "packed with flavonoids" (new labels) or to "contain" or "provide" antioxidants or flavonoids but they fail to disclose that no RDI has been established for flavonoids or the antioxidants in tea.  Thus, these products violate 21 C.F.R. § 101.54(g)(1).

97.    The types of misrepresentations made above would be considered by a reasonable consumer interested in purchasing healthy products and products containing beneficial antioxidants when deciding to purchase such products.  The failure to comply with the labeling requirements of 21 C.F.R. § 101.54 renders such products misbranded as a matter of federal and California law.

98.    The nutrient content claims regulations discussed above are intended to ensure that consumers are not misled as to the actual or relative levels of nutrients in food products.

99.    For these reasons, Defendants' nutritional value claims at issue in this Second Amended Complaint are false and misleading and in violation of 21 C.F.R. §§ 101.13 and 101.54 and identical California law, such products are misbranded as a matter of law. Defendants have violated these referenced regulation, therefore, (i) Lipton Pure Leaf Iced Tea – Sweetened, (ii) Lipton Iced Green Tea to Go w/ Mandarin & Mango, (iii) Lipton Green Tea Decaffeinated, (iv) and Lipton Sweet Tea are misbranded as a matter of California and federal law and cannot be sold or held and thus are legally worthless.

100.    Defendants' claims in this respect are false and misleading and the products are in this respect misbranded under identical California and federal laws. Misbranded products cannot be legally sold and are legally worthless. Plaintiff and members of the Class who purchased these products paid an unwarranted premium for these products.

E.     **"Natural" Claims**

101.    The following Purchased Products have an unlawful and misleading "natural"

claim:

> Lipton Pure Leaf Iced Tea – Sweetened
> Lipton Brisk Lemon Iced Tea

102.    In its rule-making and warning letters to manufacturers, the FDA has repeatedly stated its policy to restrict the use of the term "natural" in connection with added color, synthetic substances and flavors as provided in 21 C.F.R. § 101.22.

103.    The FDA has also repeatedly affirmed its policy regarding the use of the term "natural" as meaning that nothing artificial or synthetic (including all color additives regardless of source) has been included in, or has been added to, a food that would not normally be expected to be in the food.

104.    For example, 21 C.F.R. § 70.3(f) makes clear that "where a food substance such as beet juice is deliberately used as a color, as in pink lemonade, it is a color additive." Similarly, any coloring or preservative can preclude the use of the term "natural" even if the coloring or preservative is derived from natural sources. Further, the FDA distinguishes between natural and artificial flavors in 21 C.F.R. § 101.22.

105.    Defendants' "all natural" and "natural" labeling practices violate FDA Compliance Guide CPG Sec. 587.100, which states: [t]he use of the words "food color added," "natural color," or similar words containing the term "food" or "natural" may be erroneously interpreted to mean the color is a naturally occurring constituent in the food. Since all added colors result in an artificially colored food, we would object to the declaration of any added color as "food" or "natural."

106.    Likewise, California Health & Safety Code § 110740 prohibits the use of artificial flavoring, artificial coloring and chemical preservatives unless those ingredients are adequately disclosed on the labeling.

107.    The FDA has sent out numerous warning letters concerning this issue. *See e.g.*, Exhibit 5 (August 16, 2001 FDA warning letter to Oak Tree Farm Dairy because there was citric acid in its all natural iced tea); Exhibit 6 (August 29, 2001 FDA warning letter to Hirzel Canning

1   Company because there was citric acid or calcium chloride in its all natural tomato products);

2   Exhibit 7 (August 2, 2001 FDA warning letter to GMP Manufacturing, Inc. stating: "[t]he

3   products, Cytomax Exercise and Recovery Drink (Peachy Keen flavor) and Cytomax Lite

4   (Lemon Iced Tea Flavor) are misbranded because they contain colors but are labeled using the

5   term "no artificial colors."). Defendants are aware of these FDA warning letters.

6       108.    Defendants have unlawfully labeled (i) Lipton Pure Leaf Iced Tea – Sweetened,

7   and (ii) Lipton Brisk Lemon Iced Tea "all natural" or having "natural flavors" when they actually

8   contain artificial ingredients and flavorings, artificial coloring and chemical preservatives.

9       109.    Consumers are thus misled into purchasing such products with synthetic unnatural

10  ingredients that are not "all natural" as falsely represented on their labeling. Defendants'

11  products in this respect are misbranded under federal and California law.

12      110.    For these reasons, Defendants' "all natural" and "natural flavors" claims at issue in

13  this Second Amended Complaint are false and misleading and in violation of identical California

14  and federal law, and the products at issue are misbranded as a matter of law. Therefore, these

15  products are misbranded as a matter of California and federal law and cannot be sold or held and

16  thus are legally worthless.

17      111.    Defendants' claims in this respect are false and misleading and the products are in

18  this respect misbranded under identical California and federal laws, Misbranded products cannot

19  be legally sold and are legally worthless. Plaintiff and members of the Class who purchased these

20  products paid an unwarranted premium for these products.

21  **F.  Failing to Disclose the Presence of Chemical Preservatives, Artificial Colors and Artificial Flavors**

22

23      112.    The following Purchased Products have an unlawful and misleading label that fails

24  to disclose the presence of preservatives, artificial colors and artificial flavors:

25          Lipton Sweet Tea
            Lipton Brisk Lemon Iced Tea
26          Pepsi

27

28

SECOND AMENDED CLASS ACTION COMPLAINT                                                          28
CASE NO. 12-CV-01736 (EJD)

113.   The Defendants violated California and federal law by failing to disclose the presence of such chemical preservatives, artificial colors and artificial flavors as mandated by identical California and federal law.

114.   "Under California law "food is misbranded if it bears or contains any artificial flavoring, artificial coloring, or chemical preservative, unless its labeling states that fact (California Health & Safety Code § 110740). California's law is identical to federal law on this point.

115.   Pursuant to 21 C.F.R. § 101.22 which has been adopted by California, "[a] statement of artificial flavoring, artificial coloring, or chemical preservative shall be placed on the food or on its container or wrapper, or on any two or all three of these, as may be necessary to render such statement likely to be read by the ordinary person under customary conditions of purchase and use of such food." 21 C.F.R. § 101.22 defines a chemical preservative as "any chemical that, when added to food, tends to prevent or retard deterioration thereof, but does not include common salt, sugars, vinegars, spices, or oils extracted from spices, substances added to food by direct exposure thereof to wood smoke, or chemicals applied for their insecticidal or herbicidal properties."

116.   Defendants' Lipton Sweet Tea, Lipton Brisk Lemon Iced Tea and Pepsi are misbranded because they contain artificial flavors, chemical preservatives and added colors but fail to disclose that fact.

117.   A reasonable consumer would also expect that when Defendants lists their products' ingredients that it would make all disclosures required by law such as the disclosure of chemical preservatives and coloring mandated by identical California and federal law.

118.   Plaintiff did not know, and had no reason to know, that the Lipton Sweet Tea, Lipton Brisk Lemon Iced Tea, and Pepsi contained undisclosed chemical preservatives and other artificial ingredients because 1) the Defendants falsely represented on its label that the products were free of artificial ingredients & preservatives and 2) failed to disclose those chemical preservatives and artificial ingredients as required by California and federal law.

119.    Consumers were thus misled into purchasing Defendants' products with false and misleading labeling statements and ingredient descriptions, which did not describe the basic nature of the ingredients, as  required by California Health & Safety Code § 110740 and  21 C.F.R. §§ 101.22 which has been adopted as law by California.

120.    Had Plaintiff been aware that these products contained undisclosed chemical preservatives and artificial ingredients she would not have purchased these products.

121.    Because of their false label representations and omissions about chemical preservatives and artificial ingredients Defendants' Lipton Sweet Tea, Lipton Brisk Lemon Iced Tea and Pepsi are  misbranded under identical federal and California law, including California Health & Safety Code § 110740.  Misbranded products cannot be legally sold and are legally worthless. Plaintiff and members of the Class who purchased these products paid an unwarranted premium for these products.

**G.    Website Health Claims**

122.    The following Purchased Products are misbranded because they have the Lipton website on the label, www.liptontea.com, and therefore, any unlawful health claims made on the website are attributed to the product label.  Unilever's website generically described its products by category:  black tea, green tea, etc.

Lipton Pure Leaf Iced Tea – Sweetened
Lipton Iced Green Tea to Go w/ Mandarin & Mango
Lipton Vanilla Caramel Truffle Black Tea
Lipton Green Tea Decaffeinated
Lipton Decaffeinated Tea
Lipton Sweet Tea
Lipton Brisk Lemon Iced Tea

123.    A health claim is a statement expressly or implicitly linking the consumption of a food substance (*e.g.*, ingredient, nutrient, or complete food) to risk of a disease (*e.g.*, cardiovascular disease) or a health-related condition (*e.g.*, hypertension). *See* 21 C.F.R. §101.14(a)(1), (a)(2), and (a)(5). Only health claims made in accordance with FDCA requirements, or authorized by FDA as qualified health claims, may be included in food labeling. Other express or implied statements that constitute health claims, but that do not meet statutory requirements, are prohibited in labeling foods.

124.     21 C.F.R. § 101.14, which has been expressly adopted by California, provides when and how a manufacturer may make a health claim about its product.  A "Health Claim" means any claim made on the label or in labeling of a food, including a dietary supplement, that expressly or by implication, including "third party" references, written statements (e.g., a brand name including a term such as "heart"), symbols (e.g., a heart symbol), or vignettes, characterizes the relationship of any substance to a disease or health-related condition. Implied health claims include those statements, symbols, vignettes, or other forms of communication that suggest, within the context in which they are presented, that a relationship exists between the presence or level of a substance in the food and a disease or health-related condition (*see* 21 C.F.R. § 101.14(a)(1)).

125.     Further, health claims are limited to claims about disease risk reduction, and cannot be claims about the diagnosis, cure, mitigation, or treatment of disease. An example of an authorized health claim is: "Three grams of soluble fiber from oatmeal daily in a diet low in saturated fat and cholesterol may reduce the risk of heart disease. This cereal has 2 grams per serving."

126.     A claim that a substance may be used in the diagnosis, cure, mitigation, treatment, or prevention of a disease is a drug claim and may not be made for a food. 21 U.S.C. § 321(g)(1)(D).

127.     The use of the term "healthy" is not a health claim but rather an implied nutrient content claim about general nutrition that is defined by FDA regulation. 21 C.F.R. § 101.65, which has been adopted by California, sets certain minimum nutritional requirements for making an implied nutrient content claim that a product is healthy.  For example, for unspecified foods the food must supply at least 10 percent of the RDI of one or more specified nutrients. Defendants have misrepresented the healthiness of their products while failing to meet the regulatory requirements for making such claims. In general, the term may be used in labeling an individual food product that:

Qualifies as both low fat and low saturated fat;

Contains 480 mg or less of sodium per reference amount and per labeled serving,

and per 50 g (as prepared for typically rehydrated foods) if the food has a reference amount of 30 g or 2 tbsps or less;

Does not exceed the disclosure level for cholesterol (*e.g.*, for most individual food products, 60 mg or less per reference amount and per labeled serving size); *and*

Except for raw fruits and vegetables, certain frozen or canned fruits and vegetables, and enriched cereal-grain products that conform to a standard of identity, provides at least 10% of the daily value (DV) of vitamin A, vitamin C, calcium, iron, protein, *or* fiber per reference amount. Where eligibility is based on a nutrient that has been added to the food, such fortification must comply with FDA's fortification policy.

21 C.F.R. § 101.65(d)(2).

128.     The FDA's regulation on the use of the term healthy also encompasses other, derivative uses of the term health (*e.g.*, healthful, healthier) in food labeling. 21 C.F.R. § 101.65(d).

129.     Unilever has violated the provisions of § 21 C.F.R. §101.14, 21 C.F.R. §101.65, 21 U.S.C. § 321(g)(1)(D) and 21 U.S.C. § 352(f)(1) by including certain claims on its website. For example, until recently on the link to its webpage entitled "Tea and Health," subtitled "Heart Health Research" and further subtitled "Cholesterol Research" the following claim is made: "[F]our recent studies in people at risk for coronary disease have shown a significant cholesterol lowering effect from tea or tea flavonoids ... One of these studies, on post-menopausal women, found that total cholesterol was lowered by 8% after drinking 8 cups of green tea daily for 12 weeks ...."

130.     The therapeutic claims on its website establish that the product is a drug because it is intended for use in the cure, mitigation, treatment, or prevention of disease. Lipton's products are not generally recognized as safe and effective for the above referenced uses and, therefore, the products would be "new drug[s]" under section 201(p) of the Act [21 U.S.C. § 321(p)]. New drugs may not be legally marketed in the U.S. without prior approval from the FDA as described in section 505(a) of the Act [21 U.S.C. § 355(a)]. FDA approves a new drug on the basis of scientific data submitted by a drug sponsor to demonstrate that the drug is safe and effective.

131.     As stated, the FDA conducted a review of one of Defendants' products (Lipton Green Tea 100% Natural Naturally Decaffeinated Tea) and concluded that Lipton was "in

violation of the Federal Food, Drug, and Cosmetic Act … and the applicable regulations in Title 21, Code of Federal Regulations, Part 101 (21 CFR 101)." FDA found the product to be misbranded stating:

> Your Lipton Green Tea 100% Natural Naturally Decaffeinated product is offered for conditions that are not amenable to self-diagnosis and treatment by individuals who are not medical practitioners; therefore, adequate directions for use cannot be written so that a layperson can use this drug safely for its intended purposes. Thus, your Lipton Green Tea 100% Natural Naturally Decaffeinated product is misbranded under section 502(f)(1) of the Act in that the labeling for this drug fails to bear adequate directions for use [21 U.S.C. § 352(f)(1)].

*See* Exhibit 1.

132.    In response to the FDA Warning Letter, Lipton modified its web site and its packaging by removing some of the most outlandish claims of health and therapeutic benefits that FDA had found in violation of law. However, a number of unlawful statements on Lipton's web site remain.  For example, on the present day web site the following statements appear:

A large number of studies suggest that tea may help address key health issues.

Tea and Heart Health
A heart healthy diet typically contains flavonoid rich foods.  Studies have also shown that tea can improve endothelial/ blood vessel function.

STAY HEALTHY
The secret is out: tea is good for your body.   Research suggests that tea which contains goodies including flavonoids, may help maintain your health. So tea can truly be part of your healthy lifestyle. Take a closer look at The Power of the Leaf. Just step inside to discover the possibilities.

Natural components of tea may help maintain good oral health.

Tea which is rich in flavonoids, can help improve your vascular function …And Lipton Tea is made from tea leaves naturally rich in flavonoids plus other good stuff your body loves.

Flavonoids are dietary compounds found in tea, wine, cocoa, fruit and vegetables. They contribute significantly to taste and color, and possibly help maintain certain normal, healthy body functions. A diet rich in flavonoids is generally associated with helping maintain normal, healthy heart function." And the package front panel of many Lipton Tea products claims a level of "flavonoids," a substance or nutrient without an established referenced daily intake value (RDI), and contains the following statement, "Regular tea drinking, as part of a healthy diet, may help maintain healthy vascular function.

133.    In addition, the labels of Lipton tea products tell consumers to call or go to the Lipton website to learn more about "tea's role in a healthy lifestyle" or "tea and health."

134. Such health claims are in violation of 21 U.S.C. § 352(f)(1) and therefore the products are misbranded.

135. Not only do Unilever's website health claims regarding the benefits of "tea flavonoids" violate FDA rules and regulations, they directly contradict Unilever's own scientific research, which has concluded: "[T]he evidence today does not support a direct relationship between tea consumption and a physiological AOX [antioxidant] benefit." This conclusion was reported by Dr. Jane Rycroft, Director of Lipton Tea Institute of Tea, in an article published in January, 2011.

136. This is further confirmed by the USDA which recently removed the USDA ORAC Database for Selected Foods from its website "due to mounting evidence that the values indicating antioxidant capacity have no relevance to the effects of specific bioactive compounds, including polyphenols on human health." It was this database that the defendants premised a number of their labeling claims including the graphs of antioxidant and/or flavonoid content they placed on their labels.

137. Nonetheless, Unilever continues to tout the benefits of "tea flavonoids" on its product labels and on its website.

138. Defendants' materials and advertisements not only violate regulations adopted by California such as 21 C.F.R. § 101.14, they also violate California Health & Safety Code § 110403 which prohibits the advertisement of products that are represented to have any effect on enumerated conditions, disorders and diseases.

139. Defendants' health related claims are unlawful and the products are in this respect misbranded under identical California and federal laws. Misbranded products cannot be legally sold and thus are legally worthless.

**THE PURCHASED PRODUCTS ARE MISBRANDED UNDER THE SHERMAN LAW AND ARE MISLEADING AND DECEPTIVE**

140.   There are eight (8) Purchased Products.  Plaintiff purchased all eight (8) in California during the Class Period.

141.   Each Purchased Product has a label that violates the Sherman Law and is therefore misbranded and may not be sold or purchased.

142.   Each Purchased Product has a label that is false, misleading and deceptive.

**a.   <u>Lipton Pure Leaf Iced Tea - Sweetened (6-16 oz bottles)</u>**

143.   Plaintiff purchased Lipton Pure Leaf Iced Tea – Sweetened (6-16 oz bottles) in the Class Period.  The label of the package purchased by Plaintiff is as follows:







144.    The following unlawful and misleading language appears on the label:

**"ALL NATURAL"**

*  *  *

**"Contains Natural Antioxidants" [AOX logo]**

145.    Plaintiff reasonably relied on these label representations in paragraph 144 and based and justified the decision to purchase the product, in substantial part, on these label representations.  Also, Plaintiff reasonably relied and believed that this product was not misbranded under the Sherman Law and was therefore legal to buy and possess and would not have purchased it had she known it was misbranded.

146.    Plaintiff was misled by Defendants' unlawful and misleading label on this product. Plaintiff would not have otherwise purchased this product had she known the truth about this product, *i.e.*, that it was not all natural and that it did not contain an antioxidant nutrient with beneficial qualities.  In addition, Plaintiff paid on unwarranted premium for this product.  Plaintiff had other food alternatives that that satisfied legal standards and Plaintiff also had cheaper alternatives.  Reasonable consumers would be misled by these label representations in the same way(s) as Plaintiff.

147.    This product is unlawful, misbranded and violates the Sherman Law (through California Health & Safety Code § 110660, § 110740, and incorporation of 21 C.F.R. § 101.22)

1   because the label uses the phrase "All Natural" even though this product contains the following

2   artificial ingredients: apple extract (color) and citric acid.  This product is also misleading and

3   deceptive because the label uses the phrase "All Natural" on food that contains artificial

4   ingredients and, therefore, is not truly "all natural."

5        148.   This product is unlawful, misbranded, violates the Sherman Law (through

6   incorporation of 21 C.F.R. § 101.13 and § 101.54(g)), and is misleading and deceptive because in

7   the label uses the phrase "*Contains Natural Antioxidants*" (on the AOX logo) and (1) the

8   antioxidants are not named, (2) because there are no RDIs for the unnamed antioxidants being

9   touted (3) no antioxidants are capable of qualifying for a "good source" claim (which a "contains"

10   claim must do), and (4) Defendants lack adequate scientific evidence that the claimed antioxidant

11   nutrients participate in physiological, biochemical, or cellular processes that inactivate free

12   radicals or prevent free radical-initiated chemical reactions after they are eaten and absorbed from

13   the gastrointestinal tract.

14        149.   The August 2010 FDA warning letter (Exhibit 1) gave Defendant notice of these

15   violations.  Defendant did not change this label despite this warning letter.

16        **b.**   **Lipton Iced Green Tea to Go with Mandarin & Mango (14 sticks)**

17        150.   Plaintiff purchased Lipton Iced Green Tea to Go with Mandarin & Mango (14

18   sticks) in the Class Period.  The label of the package purchased by Plaintiff is as follows:




1    151.    The following unlawful and misleading language appears on the label:

2            **"Contains Tea Flavonoids"**

3    152.    Plaintiff reasonably relied on the label representation in paragraph 151 and based

4    and justified the decision to purchase the product, in substantial part, on this label representation.

5    Also, Plaintiff reasonably relied and believed that this product was not misbranded under the

6    Sherman Law and was therefore legal to buy and possess and would not have purchased it had

7    she known it was misbranded.

8    153.    Plaintiff was misled by Defendants' unlawful and misleading label on this product.

9    Plaintiff would not have otherwise purchased this product had she known the truth about this

10   product, *i.e.,* that it did not meet the minimum nutritional threshold to make such claims. In

11   addition, Plaintiff paid on unwarranted premium for this product.  Plaintiff had other food

12   alternatives that that satisfied legal standards and Plaintiff also had cheaper alternatives.

13   Reasonable consumers would be misled by these label representations in the same way(s) as

14   Plaintiff.

15   154.    This product is unlawful, misbranded, violates the Sherman Law (through

16   incorporation of 21 C.F.R. § 101.13 and § 101.54(g)), and is misleading and deceptive because in

17   the label uses the phrase "*Contains Tea Flavonoids*" (on the AOX logo) and (1) the antioxidants

18   are not named, (2) because there are no RDIs for the unnamed antioxidants being touted (3) no

19   antioxidants are capable of qualifying for a "good source" claim (which a "contains" claim must

20   do), and (4) Defendants lack adequate scientific evidence that the claimed antioxidant nutrients

21   participate in physiological, biochemical, or cellular processes that inactivate free radicals or

22   prevent free radical-initiated chemical reactions after they are eaten and absorbed from the

23   gastrointestinal tract.

24   155.    The August 2010 FDA warning letter (Exhibit 1) gave Defendant notice of these

25   violations.  Defendant did not change this label despite this warning letter.

26

27

28

1

           **c.**     **Lipton Vanilla Caramel Truffle Black Tea (20 bags)**

2

        156.    Plaintiff purchased Lipton Vanilla Caramel Truffle Black Tea (20 bags) in the

3

Class Period.  The label of the package purchased by Plaintiff is as follows:

4

5

6

7

8

9

10

11

12

13

14

15



16

17

18

19

20

21

22



23

24

25

26

27

28

157.    The following unlawful and misleading language appears on the label:

*"contains 90 mg per serving of naturally protective antioxidants..."*

158.    Plaintiff reasonably relied on the label representation in paragraph 157 and based and justified the decision to purchase the product, in substantial part, on this label representation. Also, Plaintiff reasonably relied and believed that this product was not misbranded under the Sherman Law and was therefore legal to buy and possess and would not have purchased it had she known it was misbranded.

159.    Plaintiff was misled by Defendants' unlawful and misleading label on this product. Plaintiff would not have otherwise purchased this product had she known the truth about this product, *i.e.*, that it did not contain an antioxidant nutrient with beneficial qualities.  In addition, Plaintiff paid on unwarranted premium for this product.  Plaintiff had other food alternatives that that satisfied legal standards and Plaintiff also had cheaper alternatives.  Reasonable consumers would be misled by these label representations in the same way(s) as Plaintiff.

160.    This product is unlawful, misbranded, violates the Sherman Law (through incorporation of 21 C.F.R. § 101.13 and § 101.54(g)), and is misleading and deceptive because in the label uses the phrase "*contains...naturally protective antioxidants*" and (1) the antioxidants are not named, (2) because there are no RDIs for the unnamed antioxidants being touted (3) no antioxidants are capable of qualifying for a "good source" claim (which a "contains" claim must do), and (4) Defendants lack adequate scientific evidence that the claimed antioxidant nutrients participate in physiological, biochemical, or cellular processes that inactivate free radicals or prevent free radical-initiated chemical reactions after they are eaten and absorbed from the gastrointestinal tract.

161.    The August 2010 FDA warning letter (Exhibit 1) gave Defendant notice of these violations.  Defendant did not change this label despite this warning letter.

### d.    Lipton Green Tea Decaffeinated (20 bags)

162.    Plaintiff purchased Lipton Green Tea Decaffeinated (20 bags) in the Class Period. The label of the package purchased by Plaintiff is as follows:



163. The following unlawful and misleading language appears on the label:

*"Contains Tea Flavonoids"*

164. Plaintiff reasonably relied on the label representation in paragraph 163 and based and justified the decision to purchase the product, in substantial part, on this label representation. Also, Plaintiff reasonably relied and believed that this product was not misbranded under the Sherman Law and was therefore legal to buy and possess and would not have purchased it had she known it was misbranded.

165. Plaintiff was misled by Defendants' unlawful and misleading label on this product. Plaintiff would not have otherwise purchased this product had she known the truth about this product, *i.e*., that it did not contain an antioxidant nutrient with beneficial qualities. In addition, Plaintiff paid on unwarranted premium for this product. Plaintiff had other food alternatives that that satisfied legal standards and Plaintiff also had cheaper alternatives. Reasonable consumers would be misled by these label representations in the same way(s) as Plaintiff.

166. This product is unlawful, misbranded, violates the Sherman Law (through incorporation of 21 C.F.R. § 101.13 & § 101.54(g)), and is misleading and deceptive because in the label uses the phrase "*Contains Tea Flavonoids*" and (1) the antioxidants are not named, (2)

1   because there are no RDIs for the unnamed antioxidants being touted (3) no antioxidants are

2   capable of qualifying for a "good source" claim (which a "contains" claim must do), and (4)

3   Defendants lack adequate scientific evidence that the claimed antioxidant nutrients participate in

4   physiological, biochemical, or cellular processes that inactivate free radicals or prevent free

5   radical-initiated chemical reactions after they are eaten and absorbed from the gastrointestinal

6   tract.

7        167.    The August 2010 FDA warning letter (Exhibit 1) gave Defendant notice of these

8   violations.  Defendant did not change this label despite this warning letter.

9                **e.        Lipton Decaffeinated Tea (72 bags)**

10       168.    Plaintiff purchased Lipton Decaffeinated Tea (72 bags) in the Class Period.  The

11  label of the package purchased by Plaintiff is as follows:





169.    The following unlawful and misleading language appears on the label:

   *"naturally contain PROTECTIVE ANTIOXIDANTS"*

   \* \* \*

   *"Flavonoid Content" Graph*

170.    Plaintiff reasonably relied on the label representations in paragraph 167 and based and justified the decision to purchase the product, in substantial part, on these label representations.  Also, Plaintiff reasonably relied and believed that this product was not misbranded under the Sherman Law and was therefore legal to buy and possess and would not have purchased it had she known it was misbranded.

171.    Plaintiff was misled by Defendants' unlawful and misleading label on this product. Plaintiff would not have otherwise purchased this product had she known the truth about this product, *i.e.*, that it did not contain an antioxidant nutrient with beneficial qualities.  In addition, Plaintiff paid on unwarranted premium for this product.  Plaintiff had other food alternatives that

1   that satisfied legal standards and Plaintiff also had cheaper alternatives.  Reasonable consumers

2   would be misled by these label representations in the same way(s) as Plaintiff.

3        172.    This product is unlawful, misbranded, violates the Sherman Law (through

4   incorporation of 21 C.F.R. § 101.13 and § 101.54(g)), and is misleading and deceptive because in

5   the label uses the phrase "*naturally contain Protective Antioxidants*" and shows a misleading

6   "Flavonoid Content" graph and (1) the antioxidants are not named, (2) because there are no RDIs

7   for the unnamed antioxidants being touted (3) no antioxidants are capable of qualifying for a

8   "good source" claim (which a "contains" claim must do), (4) Defendants lack adequate scientific

9   evidence that the claimed antioxidant nutrients participate in physiological, biochemical, or

10  cellular processes that inactivate free radicals or prevent free radical-initiated chemical reactions

11  after they are eaten and absorbed from the gastrointestinal tract, (5) the "Flavonoid Content"

12  graph purports to show the total amount of antioxidants in the product as opposed to flavonoids.

13       173.    The August 2010 FDA warning letter (Exhibit 1) gave Defendant notice of these

14  violations.  Defendant did not change this label despite this warning letter.

15            **f.    Lipton Sweet Tea (1 gallon plastic bottle)**

16       174.    Plaintiff purchased Lipton Sweet Tea (1 gallon plastic bottle) in the Class Period.

17  The label of the package purchased by Plaintiff is as follows:

18
19
20
21   
22
23
24
25
26
27
28

175.    The following unlawful and misleading language appears on the label:

*"Contains Tea Flavonoids"*

\* \* \*

*"natural flavor"*

176.    Plaintiff reasonably relied on the label representations in paragraph 173 and based and justified the decision to purchase the product, in substantial part, on these label representations.  Also, Plaintiff reasonably relied and believed that this product was not misbranded under the Sherman Law and was therefore legal to buy and possess and would not have purchased it had she known it was misbranded.

177.    Plaintiff was misled by Defendants' unlawful and misleading label on this product. Plaintiff would not have otherwise purchased this product had she known the truth about this product, *i.e.*, it did not meet the minimal nutritional threshold to make such claims and contains artificial flavors or artificial preservatives. In addition, Plaintiff paid on unwarranted premium for this product.  Plaintiff had other food alternatives that that satisfied legal standards and Plaintiff also had cheaper alternatives.  Reasonable consumers would be misled by these label representations in the same way(s) as Plaintiff.

178.    This product is unlawful, misbranded, violates the Sherman Law (through incorporation of 21 C.F.R. § 101.13 and § 101.54(g)), and is misleading and deceptive because in the label uses the phrases "*Contains Tea Flavonoids*," and (1) the antioxidants are not named, (2) because there are no RDIs for the unnamed antioxidants being touted (3) no antioxidants are capable of qualifying for a "good source" claim (which a "contains" claim must do), and (4) Defendants lack adequate scientific evidence that the claimed antioxidant nutrients participate in physiological, biochemical, or cellular processes that inactivate free radicals or prevent free radical-initiated chemical reactions after they are eaten and absorbed from the gastrointestinal tract.

179.    This product is unlawful, misbranded and violates the Sherman Law (through California Health & Safety Code § 110660, § 110740, and incorporation of 21 C.F.R. § 101.22) because the label fails to disclose that chemical phosphoric acid is used as artificial preservative

1    and/or artificial flavor.  This product is misleading and deceptive because the label suggests that

2    the product is free of such artificial preservatives and/or artificial flavors.

3            **g.      Lipton Brisk Lemon Iced Tea (8 fl oz plastic bottle)**

4            180.    Plaintiff purchased Lipton Brisk Lemon Iced Tea (8 fl oz plastic bottle) in the

5    Class Period.  The label of the package purchased by Plaintiff is as follows:





181.    The following unlawful and misleading language appears on the label:

**"NATURAL FLAVORS"**

182.    Plaintiff reasonably relied on the label representation in paragraph 179 and based and justified the decision to purchase the product, in substantial part, on this label representation. Also, Plaintiff reasonably relied and believed that this product was not misbranded under the Sherman Law and was therefore legal to buy and possess and would not have purchased it had she known it was misbranded.

183.    Plaintiff was misled by Defendants' unlawful and misleading label on this product. Plaintiff would not have otherwise purchased this product had she known the truth about this product, *i.e.,* that it was not all natural and contained artificial ingredients and that it contained artificial preservatives. In addition, Plaintiff paid on unwarranted premium for this product. Plaintiff had other food alternatives that that satisfied legal standards and Plaintiff also had cheaper alternatives.  Reasonable consumers would be misled by these label representations in the same way(s) as Plaintiff.

184.    This product is unlawful, misbranded and violates the Sherman Law (through California Health & Safety Code § 110740 and incorporation of 21 C.F.R. § 101.22) because the label fails to disclose that chemicals phosphoric acid and citric acid are used as artificial preservatives and/or artificial flavors and use of these chemicals precludes the use of the term "natural."  This product is misleading and deceptive because the label suggests that the product is free of such artificial preservatives and/or artificial flavors and has no such chemicals so as to truly be "natural."

### h.    Pepsi

185.    Plaintiff purchased Pepsi cola in the Class Period.

186.    The following unlawful and misleading language appears on the label of Pepsi as an ingredient:

*"phosphoric acid" and "citric acid"*

187.    Plaintiff reasonably relied on the label representations in paragraph 184 and based and justified the decision to purchase the product, in substantial part, on the label representations. Also, Plaintiff reasonably relied and believed that this product was not misbranded under the Sherman Law and was therefore legal to buy and possess and would not have purchased it had she known it was misbranded.

188.    Plaintiff was misled by Defendants' unlawful and misleading label on this product. Plaintiff would not have otherwise purchased this product had she known the truth about this product, i.e., that it contained artificial flavors or artificial preservatives. In addition, Plaintiff paid on unwarranted premium for this product.  Plaintiff had other food alternatives that that satisfied legal standards and Plaintiff also had cheaper alternatives.  Reasonable consumers would be misled by these label representations in the same way(s) as Plaintiff.

189.    This product is unlawful, misbranded and violates the Sherman Law (through California Health & Safety Code § 110740 and incorporation of 21 C.F.R. § 101.22) because the label fails to disclose that chemicals phosphoric acid and citric acid are used as artificial preservatives and/or artificial flavors.  This product is misleading and deceptive because the label suggests that the product is free of such artificial preservatives and/or artificial flavors.

**DEFENDANTS HAVE VIOLATED CALIFORNIA LAW BY MANUFACTURING, ADVERTISING, DISTRIBUTING AND SELLING PURCHASED PRODUCTS**

190.     Defendants have manufactured, advertised, distributed and sold products that are misbranded under California law.  Misbranded products cannot be legally manufactured, advertised, distributed, sold or held and are legally worthless as a matter of law.

191.     Defendants have violated California Health & Safety Code § 110390 which makes it unlawful to disseminate false or misleading food advertisements that include statements on products and product packaging or labeling or any other medium used to directly or indirectly induce the purchase of a food product.

192.     Defendants have violated California Health & Safety Code § 110395 which makes it unlawful to manufacture, sell, deliver, hold or offer to sell any falsely advertised food.

193.     Defendants have violated California Health & Safety Code §§ 110398 and 110400 which make it unlawful to advertise misbranded food or to deliver or proffer for delivery any food that has been falsely advertised.

194.     Defendants have violated California Health & Safety Code § 110403 which prohibits the advertisement of products that are represented to have any effect on enumerated conditions, disorders and diseases.

195.     Defendants have violated California Health & Safety Code § 110660 because their labeling is false and misleading in one or more ways.

196.     Defendants' Purchased Products are misbranded under California Health & Safety Code § 110665 because their labeling fails to conform to the requirements for nutrient labeling set forth in 21 U.S.C. § 343(q) and the regulations adopted thereto.

197.     Defendants' Purchased Products are misbranded under California Health & Safety Code § 110670 because their labeling fails to conform with the requirements for nutrient content and health claims set forth in 21 U.S.C. § 343(r) and the regulations adopted thereto.

198.     Defendants' Purchased Products are misbranded under California Health & Safety Code § 110735 because they purport to be or are represented for special dietary uses, and their labels fail to bear such information concerning their vitamin, mineral, and other dietary properties

1    as the Secretary determines to be, and by regulations prescribes as, necessary in order fully to

2    inform purchasers as to its value for such uses.

3          199.    Defendants' Purchased Products are misbranded under California Health & Safety

4    Code § 110740 because they contain artificial flavoring, artificial coloring and chemical

5    preservatives but fail to adequately disclose that fact on their labeling.

6          200.    Defendants have violated California Health & Safety Code § 110760 which makes

7    it unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food that is

8    misbranded.

9          201.    Defendants have violated California Health & Safety Code § 110765 which makes

10   it unlawful for any person to misbrand any food.

11         202.    Defendants have violated California Health & Safety Code § 110770 which makes

12   it unlawful for any person to receive in commerce any food that is misbranded or to deliver or

13   proffer for delivery any such food.

14         203.    Defendants have violated the standard set by 21 C.F.R. § 101.22, which has been

15   incorporated by reference in the Sherman Law, by failing to include on their product labels the

16   nutritional information required by law.

17         204.    Defendants have violated the standards set by 21 CFR §§ 101.13, 101.14, and

18   101.54 which have been adopted and incorporated by reference in the Sherman Law, by including

19   unauthorized antioxidant and nutrient content claims on their products.

20         205.    Defendants have violated the standards set by 21 CFR §§ 101.14, and 101.65,

21   which have been adopted by reference in the Sherman Law, by including unauthorized health and

22   healthy claims on their products.

### PLAINTIFF AND THE PURCHASED PRODUCTS

24         206.    Plaintiff cares about the nutritional content of food and seeks to maintain a healthy

25   diet.  Plaintiff read and reasonably relied on the labels as described herein when buying the

26   Purchased Products.  Plaintiff relied on Defendants' labeling and based and justified the decision

27   to purchase Defendants' products, in substantial part, on these labels.

28

SECOND AMENDED CLASS ACTION COMPLAINT                                                    50
CASE NO. 12-CV-01736 (EJD)

207.     At point of sale, Plaintiff did not know, and had no reason to know, that the Purchased Products did not contain the beneficial nutrients represented on the labels and in fact were unlawful and misbranded as set forth herein, and would not have bought the products had she known the truth about them, *i.e.*, that the products were illegal to purchase and possess.

208.     After Plaintiff learned that Defendants' Purchased Products were falsely labeled, Plaintiff stopped purchasing them.

209.     As a result of Defendants unlawful misrepresentations, Plaintiff and thousands of others in California and throughout the United States purchased the Purchased Products and the Substantially Similar Products at issue.

210.     Defendants' labeling as alleged herein is false and misleading and was designed to increase sales of the products at issue.  Defendants' misrepresentations are part of its systematic labeling practice and a reasonable person would attach importance to Defendants' misrepresentations in determining whether to purchase the products at issue.

211.     A reasonable person would also attach importance to whether Defendants' products were "misbranded," *i.e.*, legally salable, and capable of legal possession, and to Defendants' representations about these issues in determining whether to purchase the products at issue. Plaintiff would not have purchased Defendants' products had she known they were not capable of being legally sold or held.

212.     Plaintiff's purchase of the Purchased Products damaged Plaintiff because misbranded products cannot be legally sold, possessed, have no economic value, and are legally worthless.  In addition, Plaintiff had cheaper alternatives available and paid an unwarranted premium for the Purchased Products.

## SUBSTANTIALLY SIMILAR PRODUCT CLAIMS

213.     The products listed in paragraph 4 have the same label representations and Sherman Law violations as the Purchased Products as described herein.

*"all natural"*
*"Contains Natural Antioxidants" [AOX logo]*
*"contains flavonoid antioxidants"*

Pure Leaf Unsweetened Iced Tea
Pure Leaf Iced Tea with Lemon
Pure Leaf Green Tea with Honey
Pure Leaf Iced Tea with Peach
Pure Leaf Iced Tea with Raspberry
Pure Leaf Extra Sweet Iced Tea
Pure Leaf Diet Iced Tea with Lemon
Pure Leaf Diet Iced Tea with Peach

*"natural flavors "*

Brisk Tea No-Cal Lemon Iced Tea
Brisk Tea Strawberry Iced Tea
Brisk Tea Peach Iced Tea
Brisk Tea Sweet Tea
Brisk Tea Fruit Punch Iced Tea
Brisk Tea Lemonade Iced Tea
Brisk Tea Sugar Free Lemonade
Brisk Tea Mango Dragon Fruit Iced Tea
Brisk Tea Orangeade Iced Tea
Brisk Tea Sugar Free Orangeade Iced Tea

*"contains tea antioxidants"*
*"contains tea flavonoids"*
*"contains protective antioxidants"*

100% Natural Green Tea
Green Tea with Citrus
Cranberry Pomegranate Green Tea
Orange, Passionfruit & Jasmine Green Tea
Lemon Ginseng Green Tea
Honey Green Tea
Mixed Berry Green Tea
Pyramid Green Tea with Mandarin Orange
Purple Acai and Blueberry Green Tea Superfruit
Red Goji and Raspberry Green Tea Superfruit
Passionfruit and Coconut Green Tea Superfruit
Acai, Dragonfruit and Melon Green Tea Superfruit
Black Currant and Vanilla Superfruit
Decaf Honey Lemon Green Tea
Decaf Blackberry and Pomegranate Green Tea Superfruit

*"contains tea flavonoids"*

Black Currant Raspberry Iced Tea Black Tea To Go Packets
Lemon Iced Black Tea To Go Packets
Mango Pineapple Iced Tea To Go Packets
Blackberry Pomegranate Iced Green Tea To Go Packets

*Failure to disclose artificial flavors and preservatives*

Caffeine Free Pepsi
Pepsi MAX
Pepsi NEXT
Pepsi One
Pepsi Wild Cherry
Diet Pepsi
Caffeine Free Diet Pepsi
Diet Pepsi Lime
Diet Pepsi Vanilla
Diet Pepsi Wild Cherry
Pepsi Made in Mexico
Pepsi Throwback

*"Naturally Protective Antioxidants"*

Black Tea - Bavarian Wild Berry
Black Tea - Black Pearl
Black Tea - Tuscan Lemon

*"All Natural"*
*"Natural"*
*"Natural Flavors"*

100% Natural Green Tea with Citrus
100% Natural Green Tea w/ Passionfruit Mango
100% Natural Iced Tea with Pomegranate Blueberry
Iced Tea Lemonade
Diet Green Tea with Citrus
Diet Green Tea with Watermelon
Diet Iced Tea with Lemon
Diet Sparkling Green Tea with Strawberry Kiwi
Diet Sparkling Green Tea with Mixed Berry
Diet White Tea with Raspberry Flavor

*"contains tea antioxidants"*
*"contains tea flavonoids"*

Iced Black Tea Pitcher Size
Iced Green Tea Blackberry Pomegranate Picher Size
Iced Green Tea Peach Passion Pitcher Size
Decaf Cold Brew Family Size Tea Bags
Green Tea Honey & Lemon Iced Tea Mix
Wild Raspberry White Iced Tea Mix
Decaf Lemon Iced Tea Mix
Diet Lemon Iced Tea Mix
Diet Raspberry Iced Tea Mix
Diet Peach Iced Tea Mix
Diet Decaf Lemon Iced Tea Mix

| | |
|---|---|
| Strawberry Acai Decaf Iced Green Tea To Go Packets<br>Lemon Iced Black Tea Pitcher Packets<br>Peach Apricot Iced Black Tea Pitcher Packets<br>Mango Pineapple Iced Green Tea Pitcher Packets<br>Blackberry Pomegranate Iced Green Tea Pitcher Packets | Unsweetened Decaf Iced Tea Mix<br>Unsweetened Iced Tea Mix<br><br>*"contains tea antioxidants"*<br>*"contains tea flavonoids"*<br>*"contains protective antioxidants"*<br><br>White Tea with Island Mango & Peach<br>White Tea with Blueberry & Pomegranate Flavor<br>Red Tea with Harvest Strawberry and Passionfruit |

## CLASS ACTION ALLEGATIONS

214. Plaintiff brings this action as a class action pursuant to Federal Rule of Procedure 23(b)(2) and 23(b)(3) on behalf of the following class: All persons in the United States, or alternatively California, who since April 6, 2008, purchased one of the following products:

| | |
|---|---|
| Lipton Pure Leaf Iced Tea – Sweetened<br>Lipton Iced Green Tea to Go w/ Mandarin & Mango<br>Lipton Vanilla Caramel Truffle Black Tea<br>Lipton Green Tea Decaffeinated<br>Lipton Decaffeinated Tea<br>Lipton Sweet Tea<br>Lipton Brisk Lemon Iced Tea<br>Pepsi<br>Pure Leaf Unsweetened Iced Tea<br>Pure Leaf Iced Tea with Lemon<br>Pure Leaf Green Tea with Honey<br>Pure Leaf Iced Tea with Peach<br>Pure Leaf Iced Tea with Raspberry<br>Pure Leaf Extra Sweet Iced Tea<br>Pure Leaf Diet Iced Tea with Lemon<br>Pure Leaf Diet Iced Tea with Peach<br>Brisk Tea No-Cal Lemon Iced Tea<br>Brisk Tea Strawberry Iced Tea<br>Brisk Tea Peach Iced Tea<br>Brisk Tea Sweet Tea<br>Brisk Tea Fruit Punch Iced Tea<br>Brisk Tea Lemonade Iced Tea<br>Brisk Tea Sugar Free Lemonade<br>Brisk Tea Mango Dragon Fruit Iced Tea<br>Brisk Tea Orangeade Iced Tea<br>Brisk Tea Sugar Free Orangeade Iced Tea<br>100% Natural Green Tea<br>Green Tea with Citrus<br>Cranberry Pomegranate Green Tea<br>Orange, Passionfruit & Jasmine Green Tea<br>Lemon Ginseng Green Tea<br>Honey Green Tea<br>Mixed Berry Green Tea<br>Pyramid Green Tea with Mandarin Orange | Black Tea - Bavarian Wild Berry<br>Black Tea - Black Pearl<br>Black Tea - Tuscan Lemon<br>100% Natural Green Tea with Citrus<br>100% Natural Green Tea w/ Passionfruit Mango<br>100% Natural Iced Tea with Pomegranate Blueberry<br>Iced Tea Lemonade<br>Diet Green Tea with Citrus<br>Diet Green Tea with Watermelon<br>Diet Iced Tea with Lemon<br>Diet Sparkling Green Tea with Strawberry Kiwi<br>Diet Sparkling Green Tea with Mixed Berry<br>Diet White Tea with Raspberry Flavor<br>Iced Black Tea Pitcher Size<br>Iced Green Tea Blackberry Pomegranate Picher Size<br>Iced Green Tea Peach Passion Pitcher Size<br>Decaf Cold Brew Family Size Tea Bags<br>Green Tea Honey & Lemon Iced Tea Mix<br>Wild Raspberry White Iced Tea Mix<br>Decaf Lemon Iced Tea Mix<br>Diet Lemon Iced Tea Mix<br>Diet Raspberry Iced Tea Mix<br>Diet Peach Iced Tea Mix<br>Diet Decaf Lemon Iced Tea Mix<br>Unsweetened Decaf Iced Tea Mix<br>Unsweetened Iced Tea Mix<br>White Tea with Island Mango & Peach<br>White Tea with Blueberry & Pomegranate Flavor<br>Red Tea with Harvest Strawberry and |

| | |
|---|---|
| Purple Acai and Blueberry Green Tea Superfruit | Passionfruit |
| Red Goji and Raspberry Green Tea Superfruit | Caffeine Free Pepsi |
| Passionfruit and Coconut Green Tea Superfruit | Pepsi MAX |
| Acai, Dragonfruit and Melon Green Tea Superfruit | Pepsi NEXT |
| Black Currant and Vanilla Superfruit | Pepsi One |
| Decaf Honey Lemon Green Tea | Pepsi Wild Cherry |
| Decaf Blackberry and Pomegranate Green Tea Superfruit | Diet Pepsi |
| | Caffeine Free Diet Pepsi |
| Black Currant Raspberry Iced Tea Black Tea To Go Packets | Diet Pepsi Lime |
| | Diet Pepsi Vanilla |
| Lemon Iced Black Tea To Go Packets | Diet Pepsi Wild Cherry |
| Mango Pineapple Iced Tea To Go Packets | Pepsi Made in Mexico |
| Blackberry Pomegranate Iced Green Tea To Go Packets | Pepsi Throwback |
| Strawberry Acai Decaf Iced Green Tea To Go Packets | |
| Lemon Iced Black Tea Pitcher Packets | |
| Peach Apricot Iced Black Tea Pitcher Packets | |
| Mango Pineapple Iced Green Tea Pitcher Packets | |
| Blackberry Pomegranate Iced Green Tea Pitcher Packets | |

215.    The following persons are expressly excluded from the Class:  (1) Defendants and their subsidiaries and affiliates; (2) all persons who make a timely election to be excluded from the proposed Class; (3) governmental entities; and (4) the Court to which this case is assigned and its staff.

216.    This action can be maintained as a class action because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable.

217.    Membership in the Class is so numerous as to make it impractical to bring all Class members before the Court.  The exact number of Class members is unknown, but Plaintiff reasonably estimates and believes that there are thousands of persons in the Class.

218.    There are questions of law and fact common to the Class which predominate over any questions which may affect only individual members of the Class, including but not limited to the following:

(a)    Whether Defendants engaged in unfair or deceptive business practices by failing to properly package and label products sold to consumers;

(b)    Whether the food products at issue were misbranded or unlawfully packaged and labeled under the Sherman Law;

(c)    Whether Defendants made unlawful and misleading "All Natural," preservative, and nutrient content claims with respect to their food products sold to consumers;

(d)     Whether Defendants violated California Bus. & Prof. Code § 17200 *et seq.*, California Bus. & Prof. Code § 17500 *et seq.*, the Consumers Legal Remedies Act, Cal. Civ. Code §1750 *et seq.*, California Civ. Code § 1790 *et seq.*, 15 U.S.C. § 2301 *et seq.*, and the Sherman Law;

(e)     Whether Plaintiff and the Class are entitled to equitable and/or injunctive relief; and

(f)     Whether Defendants' unlawful, unfair and/or deceptive practices harmed Plaintiff and the Class.

219.     Plaintiff is a member of the Class she seeks to represent.  Plaintiff's claims are typical of the Class members' claims.  Plaintiff will fairly and adequately protect the interests of the Class in that Plaintiff's claims are typical and representative of the Class.

220.     There are no unique defenses which may be asserted against Plaintiff individually, as distinguished from the Class.  The claims of Plaintiff are the same as those of the Class.

221.     There exist no conflicts of interest as between Plaintiff and the other Class members.  Plaintiff has retained counsel that is competent and experienced in complex class action litigation. Plaintiff and counsel will fairly and adequately represent and protect the interests of the Class.

222.     Plaintiff and Plaintiff's counsel have the necessary financial resources to adequately and vigorously litigate this class action.  Plaintiff is aware of the fiduciary responsibilities to the Class and agrees to diligently discharge those duties.

223.     The questions of law and/or fact common to the members of the Class predominate over questions that may affect only individual members.  The common nucleus of operative fact herein centers on Defendant's conduct.

224.     This class action is superior to any other method for the fair and efficient adjudication of this dispute.  The damages suffered by many members of the Class are small in relation to the expense and burden of individual litigation and, therefore, it is highly impractical for individual Class members to attempt to vindicate their interests individually.  There will be no extraordinary difficulty in the management of this Class action.

225.     The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) are met as Defendant has acted or refused to act on grounds

generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole.

226.    Plaintiff and Plaintiff's counsel are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Business and Professions Code § 17200** *et seq.*
**<u>Unlawful Business Acts and Practices</u>**

227.    Plaintiff incorporates by reference each allegation set forth above.

228.    Defendants' conduct constitutes unlawful business acts and practices.

229.    Defendants sold the Purchased Products in California and throughout the United States during the Class Period which were misbranded.

230.    Defendants are corporations and, therefore, each is a "person" within the meaning of the Sherman Law.

231.    Defendants' business practices are unlawful under § 17200 *et seq.* by virtue of Defendants' violations of the advertising provisions of Article 3 of the Sherman Law and the misbranded food provisions of Article 6 of the Sherman Law.

232.    Defendants' business practices are unlawful under § 17200 *et seq.* by virtue of Defendants' violations of § 17500 *et seq.*, which forbids untrue and misleading advertising.

233.    Defendants' business practices are unlawful under § 17200 *et seq.* by virtue of Defendants' violations of the Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.*

234.    Defendants sold Plaintiff and the Class products that were not capable of being sold or held legally, and which were legally worthless. Plaintiff and the Class paid a premium price for these products.

235.    As a result of Defendants' illegal business practices, Plaintiff and the Class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future conduct and such other orders and judgments which may be necessary to disgorge Defendants' ill-gotten gains and to restore to any Class Member any money paid.

236. Defendants' unlawful business acts present a threat and reasonable continued likelihood of injury to Plaintiff and the Class.

237. As a result of Defendants' conduct, Plaintiff and the Class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future conduct by Defendants, and such other orders and judgments which may be necessary to disgorge Defendants' ill-gotten gains and restore any money paid by Plaintiff and the Class.

**SECOND CAUSE OF ACTION**
**Business and Professions Code § 17200 *et seq.***
**Unfair Business Acts and Practices**

238. Plaintiff incorporates by reference each allegation set forth above.

239. Defendants' conduct as set forth herein constitutes unfair business acts and practices.

240. Defendants sold the Purchased Products in California and throughout the United States during the Class Period which were misbranded.

241. Plaintiff and members of the Class suffered a substantial injury by virtue of buying Defendants' misbranded products that they would not have purchased absent Defendants' illegal conduct.

242. Defendants' deceptive packaging and labeling of their products as described herein and their sale of unsalable misbranded products that were illegal to possess was of no benefit to consumers, and the harm to consumers and competition is substantial.

243. Defendants sold Plaintiff and the Class products that were not capable of being legally sold or held and that were legally worthless. Plaintiff and the Class paid a premium price for these products.

244. Plaintiff and the Class who purchased Defendants' products had no way of reasonably knowing that the products were misbranded and were not properly marketed, advertised, packaged and labeled, and thus could not have reasonably avoided the injury each of them suffered.

245. The consequences of Defendants' conduct as set forth herein outweigh any justification, motive or reason therefore. Defendants' conduct is and continues to be immoral,

1   unethical, unscrupulous, contrary to public policy, and is substantially injurious to Plaintiff and

2   the Class.

3       246.    As a result of Defendants' conduct, Plaintiff and the Class, pursuant to Business

4   and Professions Code § 17203, are entitled to an order enjoining such future conduct by

5   Defendants, and such other orders and judgments which may be necessary to disgorge

6   Defendants' ill-gotten gains and restore any money paid by Plaintiff and the Class.

7                          **THIRD CAUSE OF ACTION**
                      **Business and Professions Code § 17200 *et seq.***
8                      <u>**Fraudulent Business Acts and Practices**</u>

9       247.    Plaintiff incorporates by reference each allegation set forth above.

10      248.    Defendants' conduct as set forth herein constitutes fraudulent business practices

11  under California Business and Professions Code sections § 17200 *et seq.*

12      249.    Defendants' conduct in mislabeling and misbranding originated from and was

13  approved at Defendants' headquarters in California.

14      250.    Defendants sold Purchased Products in California and throughout the United

15  States during the Class Period which were misbranded.

16      251.    Defendants' misleading packaging and labeling of its products and their

17  misrepresentations that the products were salable, capable of legal possession and not misbranded

18  were likely to deceive reasonable consumers, and in fact, Plaintiff and members of the Class were

19  deceived.  Defendants have engaged in fraudulent business acts and practices.

20      252.    Defendants' fraud and deception caused Plaintiff and the Class to purchase

21  Defendants Purchased Products that they would otherwise not have purchased had they known

22  the true nature of those products.

23      253.    Defendants sold Plaintiff and the Class Purchased Products that were not capable

24  of being sold or held legally and that were legally worthless. In addition, Plaintiff and the Class

25  paid a premium price for the products.

26      254.    As a result of Defendants' conduct as set forth herein, Plaintiff and the Class,

27  pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future

28

1   conduct by Defendants, and such other orders and judgments which may be necessary to disgorge

2   Defendants' ill-gotten gains and restore any money paid by Plaintiff and the Class.

3                              **FOURTH CAUSE OF ACTION**
                           **Business and Professions Code § 17500** *et seq.*
4                            <u>**Misleading and Deceptive Advertising**</u>

5          255.    Plaintiff incorporates by reference each allegation set forth above.

6          256.    Plaintiff asserts this cause of action for violations of California Business and

7   Professions Code § 17500 *et seq.* for misleading and deceptive advertising against Defendants.

8          257.    Defendants' conduct in mislabeling and misbranding its food products originated

9   from and was approved at Defendants' headquarters in California.

10          258.    Defendants sold products in California and throughout the United States during the

11  Class Period which were misbranded.

12          259.    Defendants engaged in a scheme of offering Defendants' products for sale to

13  Plaintiff and members of the Class by way of, *inter alia*, product packaging and labeling.  These

14  materials misrepresented and/or omitted the true contents and nature of Defendants' products.

15  Defendants' advertisements and inducements were made within California and throughout the

16  United States and come within the definition of advertising as contained in Business and

17  Professions Code § 17500 *et seq.* in that such product packaging and labeling were intended as

18  inducements to purchase Defendants' products and are statements disseminated by Defendants to

19  Plaintiff and the Class that were intended to reach members of the Class.  Defendants knew, or in

20  the exercise of reasonable care should have known, that these statements were misleading and

21  deceptive as set forth herein.

22          260.    In furtherance of their plan and scheme, Defendants prepared and distributed

23  within California and nationwide via product packaging and labeling, the statements misleading

24  and deceptive representations as described herein.  Plaintiff and the Class necessarily relied on

25  reasonably relied on Defendants' materials, and were the intended targets of such representations.

26          261.    Defendants' conduct in disseminating misleading and deceptive statements in

27  California and nationwide to Plaintiff and the Class was and is likely to deceive reasonable

28

1 consumers by obfuscating the true composition and nature of Defendants' products in violation of

2 the "misleading prong" of California Business and Professions Code § 17500 *et seq.*

3       262.    As a result of Defendants' violations of the "misleading prong" of California

4 Business and Professions Code § 17500 *et seq.*, Defendants have been unjustly enriched at the

5 expense of Plaintiff and the Class. Misbranded products cannot be legally sold or held and are

6 legally worthless and Plaintiff and the Class paid a premium price for these products.

7       263.    Plaintiff and the Class, pursuant to Business and Professions Code § 17535, are

8 entitled to an order enjoining such future conduct by Defendants, and such other orders and

9 judgments which may be necessary to disgorge Defendants' ill-gotten gains and restore any

10 money paid by Plaintiff and the Class.

11

**FIFTH CAUSE OF ACTION**
**Business and Professions Code § 17500 *et seq.***
<u>**Untrue Advertising**</u>

12

13       264.    Plaintiff incorporates by reference each allegation set forth above.

14       265.    Plaintiff asserts this cause of action against Defendants for violations of California

15 Business and Professions Code § 17500 *et seq.*, regarding untrue advertising.

16       266.    Defendants' conduct in mislabeling and misbranding its food products originated

17 from and was approved at Defendants' headquarters in California.

18       267.    Defendants sold products in California and throughout the United States during the

19 Class Period.

20       268.    Defendants engaged in a scheme of offering Defendants' products for sale to

21 Plaintiff and the Class by way of product packaging and labeling, and other promotional

22 materials. These materials misrepresented and/or omitted the true contents and nature of

23 Defendants' products. Defendants' advertisements and inducements were made in California and

24 throughout the United States and come within the definition of advertising as contained in

25 Business and Professions Code §17500 *et seq.* in that the product packaging and labeling, and

26 promotional materials were intended as inducements to purchase Defendants' products, and are

27 statements disseminated by Defendants to Plaintiff and the Class. Defendants knew, or in the

28 exercise of reasonable care should have known, that these statements were untrue.

269.     In furtherance of their plan and scheme, Defendants prepared and distributed in California and nationwide via product packaging and labeling, and other promotional materials, statements that falsely advertise the composition of Defendants' products, and falsely misrepresented the nature of those products.  Plaintiff and the Class were the intended targets of such representations and would reasonably be deceived by Defendants' materials.

270.     Defendants' conduct in disseminating untrue advertising throughout California deceived Plaintiff and members of the Class by obfuscating the contents, nature and quality of Defendants' products in violation of the "untrue prong" of California Business and Professions Code § 17500.

271.     As a result of Defendants' violations of the "untrue prong" of California Business and Professions Code § 17500 *et seq.*, Defendants have been unjustly enriched at the expense of Plaintiff and the Class.  Misbranded products cannot be legally sold or held and are legally worthless and Plaintiff and the Class paid a premium price for these products.

272.     Plaintiff and the Class, pursuant to Business and Professions Code § 17535, are entitled to an order enjoining such future conduct by Defendants, and such other orders and judgments which may be necessary to disgorge Defendants' ill-gotten gains and restore any money paid by Plaintiff and the Class.

**SIXTH CAUSE OF ACTION**
**Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq*.**

273.     Plaintiff incorporates by reference each allegation set forth above.

274.     This cause of action is brought pursuant to the CLRA.  Defendants' violations of the CLRA were and are willful, oppressive and fraudulent, thus supporting an award of punitive damages.

275.     Plaintiff and the Class are entitled to actual and punitive damages against Defendants for its violations of the CLRA.  In addition, pursuant to Cal. Civ. Code § 1782(a)(2), Plaintiff and the Class are entitled to an order enjoining the above-described acts and practices, providing restitution to Plaintiff and the Class, ordering payment of costs and attorneys' fees, and any other relief deemed appropriate and proper by the Court pursuant to Cal. Civ. Code § 1780.

276.    Defendants' actions, representations and conduct have violated, and continue to violate the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the sale of goods or services to consumers.

277.    Defendants sold products in California during the Class Period.

278.    Plaintiff and members of the Class are "consumers" as that term is defined by the CLRA in Cal. Civ. Code §1761(d).

279.    Defendants' products were and are "goods" within the meaning of Cal. Civ. Code §1761(a).

280.    By engaging in the conduct set forth herein, Defendants violated and continue to violate Section 1770(a)(5), of the CLRA, because Defendants' conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices, in that it misrepresents the particular ingredients, characteristics, uses, benefits and quantities of the goods.

281.    By engaging in the conduct set forth herein, Defendants violated and continue to violate Section 1770(a)(7) of the CLRA, because Defendants' conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices, in that it misrepresents the particular standard, quality or grade of the goods.

282.    By engaging in the conduct set forth herein, Defendants violated and continue to violate Section 1770(a)(9) of the CLRA, because Defendants' conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices, in that it advertises goods with the intent not to sell the goods as advertised.

283.    By engaging in the conduct set forth herein, Defendants have violated and continue to violate Section 1770(a)(16) of the CLRA, because Defendants' conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices, in that it represents that a subject of a transaction has been supplied in accordance with a previous representation when they have not.

284.    Plaintiff requests that the Court enjoin Defendants from continuing to employ the unlawful methods, acts and practices alleged herein pursuant to Cal. Civ. Code § 1780(a)(2).  If

1   Defendants are not restrained from engaging in these practices in the future, Plaintiff and the

2   Class will continue to suffer harm.

3          285.    Pursuant to Section 1782(a) of the CLRA, on May 8, 2012, Plaintiff's counsel

4   served Defendants with notice of Defendants' violations of the CLRA.  As authorized by

5   Defendants' counsel, Plaintiff's counsel served Defendants by certified mail, return receipt

6   requested.   Defendants, through its counsel, acknowledged receipt of Plaintiff's CLRA demand

7   notice, by responding with a letter dated June 7, 2012.

8          286.    Defendants have failed to provide appropriate relief for its violations of the CLRA

9   within 30 days of its receipt of the CLRA demand notice.  Accordingly, pursuant to Sections

10  1780 and 1782(b) of the CLRA, Plaintiff is entitled to recover actual damages, punitive damages,

11  attorneys' fees and costs, and any other relief the Court deems proper.

12         287.    Plaintiff makes certain claims in this Second Amended Complaint that were not

13  included in the original Complaint filed on April 11, 2012, and were not included in Plaintiff's

14  CLRA demand notice.

15         288.    At the time of any amendment seeking damages under the CLRA, Plaintiff will

16  demonstrate that the violations of the CLRA by Defendants were willful, oppressive and

17  fraudulent, thus supporting an award of punitive damages.

18         289.    Consequently, Plaintiff and the Class will be entitled to actual and punitive

19  damages against Defendants for its violations of the CLRA.  In addition, pursuant to Cal. Civ.

20  Code § 1782(a)(2), Plaintiff and the Class will be entitled to an order enjoining the above-

21  described acts and practices, providing restitution to Plaintiff and the Class, ordering payment of

22  costs and attorneys' fees, and any other relief deemed appropriate and proper by the Court

23  pursuant to Cal. Civ. Code § 1780.

## JURY DEMAND

25         Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

27         WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, and on

28  behalf of the general public, prays for judgment against Defendants as follows:

SECOND AMENDED CLASS ACTION COMPLAINT                                                    63
CASE NO. 12-CV-01736 (EJD)

1        A.      For an order certifying this case as a class action and appointing Plaintiff

2   and her counsel to represent the Class;

3        B.      For an order awarding, as appropriate, damages in excess of five million

4   dollars ($5,000,000), restitution or disgorgement to Plaintiff and the Class for all causes of action;

5        C.      For an order requiring Defendants to immediately cease and desist from

6   selling their products in the class definition above in violation of law; enjoining Defendants from

7   continuing to market, advertise, distribute, and sell these products in the unlawful manner

8   described herein; and ordering Defendants to engage in corrective action;

9        D.      For all remedies available pursuant to Cal. Civ. Code § 1780;

10        E.      For an order awarding attorneys' fees and costs;

11        F.      For an order awarding punitive damages;

12        G.      For an order awarding pre-and post-judgment interest; and

13        H.      For an order providing such further relief as this Court deems proper.

14   Dated:  April 24, 2013        Respectfully submitted,

16          /s/  *Pierce Gore*

17   Ben F. Pierce Gore (SBN 128515)
       PRATT & ASSOCIATES

18   1871 The Alameda, Suite 425
       San Jose, CA 95126

19   Telephone:  (408) 429-6506
       Fax:  (408) 369-0752

20   pgore@prattattorneys.com

21   *Attorneys for Plaintiff*